# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VERONICA DORATO, as Personal
Representative of the Wrongful Death Claim of
Daniel Tillison, deceased estate of Daniel
Tillison; BRUCE THOMPSON, as guardian
ad litem for D.T. and J.T., minor children;
MARIA TOUCHET, as guardian ad litem for I.M.,
a minor child; and MARY JOBE,

       Plaintiffs,

vs.                                                                          No. CIV 14-0365 JB/GBW

OFFICER MARTIN SMITH, in his official
and individual capacities; JOHN/JANE DOE
SUPERVISOR, in his/her official and individual
capacities; ALBUQUERQUE POLICE DEPARTMENT;
and CITY OF ALBUQUERQUE,

       Defendants.

### <u>MEMORANDUM OPINION AND AMENDED ORDER</u>[1]

**THIS MATTER** comes before the Court on Defendant Martin Smith's Motion for

Summary Judgment Requesting Dismissal of Plaintiffs' Complaint on Qualified Immunity and

---

[1] On March 31, 2015, the Court issued an Order, filed March 31, 2015 (Doc. 72)("Order")
in which it granted in part and denied in part Defendant Martin Smith's Motion for Summary
Judgment Requesting Dismissal of Plaintiffs' Complaint on Qualified Immunity and Other
Grounds, and Memorandum in Support, filed May 12, 2014 (Doc. 11), stating: "The Court will,
however, at a later date issue a memorandum opinion more fully detailing its rationale for this
decision." Order at 1 n.1. This Memorandum Opinion and Amended Order is the promised
opinion.

     In the Order, the Court dismissed Count I of the Complaint for Civil Rights Violations,
filed in state court on March 14, 2014, filed in federal court on April 18, 2014 (Doc. 1-1)
("Complaint"), but declined to dismiss any other count, including Count II, which concerns
excessive force, and Count III, which concerns state law claims for assault, battery, false arrest,
and false imprisonment. See Order at 1-2. In this Memorandum Opinion and Amended Order,
the Court amends the Order only so far as it concerns Count III, the state law claims. The Court
concludes that Defendant Martin Smith had probable cause to arrest Daniel Tillison. Because
false arrest and false imprisonment claims require a lack of probable cause, the Court will
dismiss those claims. The Court will not, however, dismiss the Plaintiffs' assault and battery
claims.

Other Grounds, and Memorandum in Support, filed May 12, 2014 (Doc. 11)("Motion").  The Court held a hearing on November 24, 2014.  The primary issues are: (i) whether the Court should deny the Motion or permit the Plaintiffs to conduct additional discovery pursuant to rule 56(d) of the Federal Rules of Civil Procedure; (ii) whether Plaintiffs Mary Jobe, D.T., J.T., and I.M. have standing to assert their loss of consortium claims; (iii) whether the Plaintiffs have standing to assert a seizure claim over the black Sports Utility Vehicle ("SUV") that Daniel Tillison was driving when Defendant Martin Smith shot him; (iv) whether Smith seized Tillison before shooting him; (v) whether Smith had probable cause to arrest Tillison; (vi) whether Smith violated Tillison's rights under the Fourth Amendment to the Constitution of the United States of America by using excessive force; (vii) whether Tillison's rights were clearly established at the time; and (viii) whether the New Mexico Legislature waived Smith's immunity under the New Mexico Tort Claims Act, N.M. Stat. Ann. § 41-4-1 ("NMTCA").

Because additional discovery is not necessary for the Court to decide the Motion, the Court will deny the Plaintiffs' rule 56(d) request.  Jobe, D.T., J.T., and I.M. allege only state law claims, and, as such, they have standing.  Because it is reasonable to infer that Tillison had a possessory interest in the SUV, the Plaintiffs have standing to argue that Smith seized the SUV. Smith did not, however, seize Tillison or the SUV before shooting Tillison, because Tillison never submitted to Smith's authority.  Additionally, Smith had probable cause to arrest Tillison. Smith used excessive force in shooting Tillison, because it is disputed whether he could have believed that Tillison posed a threat of serious bodily harm to himself or to others.  At the time of the shooting, it was clearly established that Smith could not use deadly force without a reasonable belief that Tillison posed a threat of serious bodily injury to himself or to others. Finally, because Smith had probable cause to arrest Tillison, the New Mexico Legislature has not waived his immunity under the NMTCA as far as it concerns the Plaintiffs' false arrest and false

imprisonment claims, but the Legislature has waived his immunity as it relates to the Plaintiffs' assault and battery claims.  Accordingly, the Court will grant the Motion in part and deny it in part.  The Court will grant the Motion and dismiss Count I of the Complaint for Civil Rights Violations, filed in state court on March 14, 2014, filed in federal court on April 18, 2014 (Doc. 1-1)("Complaint"), which concerns unlawful seizure.  The Court will also dismiss the Plaintiffs' false arrest and false imprisonment claims in Count III of the Complaint.  The Court will deny Smith's remaining requests in the Motion, including Smith's request for the Court to dismiss Count II -- which concerns excessive force -- and to dismiss the Plaintiffs' assault and battery claims in Count III.

## FACTUAL BACKGROUND

"On or about March 19, 2012, Officer Martin Smith was wearing his uniform[ and his] badge of office, and [he was] patrolling within his marked police vehicle during a day shift in the southeast area command of Albuquerque, NM."  Motion ¶ 1, at 1-2 (setting forth this fact).  See Affidavit of Martin Smith ¶ 2, at 1, filed May 12, 2014 (Doc. 11-1)("Smith Aff.").[2]

---

[2]The Plaintiffs attempt to dispute this fact by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Plaintiffs' Opposed Amended Response to Defendants' Motion for Summary Judgment [Doc. 11] at 4, filed July 9, 2014 (Doc. 31)("Response").  The local rules state:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because the Plaintiffs do not refer to a portion of the record to dispute Smith's asserted fact, the Court deems the fact undisputed.  Moreover, asserting that a fact is not material does not dispute it.  "Arguments and concerns about the materiality and relevance of a fact do not dispute [it]."  Walton v. N.M. State Land Office, 49 F. Supp. 3d 920, n.2 (D.N.M 2014)(Browning, J.)(citing O'Brien v. Mitchell, 883 F. Supp. 2d 1055, 1058 n. 1 (D.N.M.

At approximately 1:08 p.m., Officer Smith was dispatched to a call which had been holding.  The dispatch entry from the call stated as follows:

> 31 [SUSPICIOUS] MALE PARKED IN FRT [FRONT] NEAR COMM [COMMUNITY] MAILBOXES -- SUBJ [SUBJECT] IN A BLK [BLACK] MITS [MITSUBISHI] MONTERO 568PTX [LICENSE PLATE #] WAS TRYING TO SELL SOUND SYSTEM -- POSS [POSSIBLY] 27-6 [STOLEN] ITEMS -- REQ'ING [REQUESTING] 34'S [OFFICERS] CHECK ON SUBJ [SUBJECT]

Motion ¶ 2, at 2 (setting forth this fact)(quoting Computer Aided Dispatch Detailed History of Police Call #P120790534 as of 4/9/2012 10:03:06 at 1, filed May 12, 2014 (Doc. 11-2)("March 19, 2012, CAD"))(alterations in Motion but not in source).  See Smith Aff. ¶ 3, at 1; March 19, 2012, CAD at 1.[3]  "According to the Computer Aided Dispatch ('CAD'), Officer Smith was the only officer initially dispatched by the dispatcher to respond to this call."  Motion ¶ 3, at 2 (setting forth this fact).  See Smith Aff. ¶ 4, at 1; March 19, 2012, CAD at 1.[4]

---

2012)(Browning, J.)("[Defendant's] argument that the facts underlying the state criminal case are immaterial does not specifically controvert those facts, and the Court will therefore deem those facts admitted.")).  The Court will address materiality, if necessary, in its Analysis.

[3]The Plaintiffs attempt to dispute this fact by stating: "Plaintiffs do not dispute that Smith was dispatched to the referenced call but Plaintiffs do dispute that this dispatch entry is correct as it contradicts what was actually told to dispatch by the 911 caller as the 911 caller never indicates that he believes the items are stolen."  Response at 4.  The Plaintiffs cite to a 911 call, in which the caller tells the dispatcher that a suspicious person -- likely Daniel Tillison -- tried to sell him a car system.  See 911 Call at 0:05-0:24, hand delivered to the Court on July 7, 2014, filed July 9, 2014 (Doc. 31-1)("911 Call").  The Plaintiffs are correct that the 911 caller did not say that the sound system was stolen.  See 911 Call at 0:01-0:51.  Smith's asserted fact, however, is that the 911 dispatcher dispatched him to investigate a possibly stolen sound system.  See Motion ¶ 2, at 2.  The Plaintiffs' evidence does not dispute this asserted fact, and the Court, thus, concludes that it is undisputed.

[4]The Plaintiffs address this fact by stating: "Plaintiffs admit that according to the CAD Officer Smith was dispatched to this call.  However, Plaintiffs dispute Defendants' characterization that any other officers were dispatched in reference to the original call.  Further this statement contradicts Smith's statement as found in his affidavit."  Response at 4.  The Plaintiffs cite to the Smith Aff., where he states that he "presumed that there would be other officers nearby . . . to assist since the dispatcher had relayed to other officers that the suspected stolen vehicle was in the area."  Smith Aff. ¶ 15, at 3.  The Smith Aff. does not dispute Smith's

"After Officer Smith acknowledged that he was going to take the call, the dispatcher relayed to Officer Smith that there was some history with the suspect vehicle and she indicated that she would send information to him."  Motion ¶ 4, at 2 (setting forth this fact).  See Smith Aff. ¶ 5, at 2; Real Time Recording of Dispatch Call at 2:54-3:15, hand delivered to the Court on May 13, 2014, filed May 12, 2014 (Doc. 12)("Real Time Recording"); Dispatch Recording Transcript at 2:16-20 (transcribed Apr. 21, 2014), filed May 12, 2014 (Doc. 11-3)("Dispatch Tr."); Response at 4 (not disputing this fact).  "Officer Smith was then sent a CAD for call # P120730078 which was a BOLO (Be on the Lookout) for a black 2005 Mitsubishi Montero Sport with a New Mexico license plate of 568PTX which was reported stolen."  Motion ¶ 5, at 2 (setting forth this fact).  See Smith Aff. ¶ 6, at 2; Computer Aided Dispatch Detailed History of Police Call #P120730078 as of 4/9/2012 10:05:23 at 1, filed May 12, 2014 (Doc. 11-4)("March 13, 2012, CAD").[5]

---

asserted fact.  In the Smith Aff., Smith states that he assumed other officers would be in the area.  See Smith Aff. ¶ 15, at 3.  He does not state that other officers were dispatched to respond to the call or that he assumed other officers were dispatched to respond to the call.  Instead, he merely assumed that other officers would be nearby.  The evidence to which the Plaintiffs cite does not dispute Smith's asserted fact, and the Court concludes that it is undisputed.

[5]The Plaintiffs attempt to dispute this fact by stating:

Plaintiffs dispute the fact that Smith was sent Defendants' Exhibit E[, the March 13, 2012, CAD].  As reflected, Smith was dispatched to the call according to Defendants UDMF # 2 on March 13, 2012 at 1:08pm [sic].  However, Defendants' Exhibit E indicates that this CAD was created at 1:57:13 on March 13, 2012, which is almost one hour after Tillison was shot and killed by Smith.  As such, there is no way that Smith could have been given this CAD prior to making contact with Smith.  Further, Defendants Exhibit B[, the March 19, 2012, CAD,] indicates that at 13:08:43 Smith was told by dispatch that the vehicle was not coming back as stolen at this time and that possibly it had been recovered.

Response at 4-5.  Smith replies by arguing that the Plaintiffs incorrectly represent that the March 19, 2012, CAD was created on March 13, 2012.  See Defendant Martin Smith's Reply to Plaintiff's Amended Response to His Motion for Summary Judgment at 3, filed August 20, 2014

The registered owner of the 2005 Mitsubishi Montero reported it stolen on March 13,

2015.  See Motion ¶ 6, at 2 (setting forth unmodified fact); March 13, 2012, CAD at 1.[6]

_____

(Doc. 54)("Reply").  He further argues that the Plaintiffs' argument contradicts their allegation in the Complaint that Smith killed Tillison on March 19, 2012.  See Reply at 4-5.
The Court agrees with Smith.  The vehicle was reported stolen on March 13, 2012, at 1:57:13.  See March 13, 2012, CAD at 1.  Smith was sent a call to be on the lookout for the vehicle on March 19, 2012, at 13:08:53.  See March 19, 2012, CAD at 1.  Contrary to the Plaintiffs' assertion, the vehicle was not reported stolen after Smith killed Tillison.  Accordingly, the Court concludes that Smith's asserted fact is undisputed.

[6]Smith's asserted fact states: "The registered owner of the 2005 Mitsubishi Montero which was reported stolen on March 13, 2012 is Kerry Vanamburg, not decedent Daniel Tillison."  Motion ¶ 6, at 2.  To support this fact, Smith cites to a police report which states that the Mitsubishi Montero is registered to Kerry Vanamburg.  See State of New Mexico Incident Report, Albuquerque Police Department at 1 (March 13, 2012), filed May 12, 2014 (Doc. 11-5) ("Police Report").  The Plaintiffs dispute this fact by stating:

> Plaintiff disputes that Defendants' Fact Nos. 6 is an "undisputed material facts" as it contains hearsay and unsworn statements in the form of a police report which are not sufficient evidence of a fact under Fed. R. Civ. Pro. 56.  See Sandoval v. Board of Regents, 75 N.M. 261, 263, 403 P.2d 699, 700-01 (1965)(court eliminated hearsay statements from the affidavit).  See also Rivera v. Trujillo, 128 N.M. 106, 109 (N.M. Ct. App. 1999)("The district court refused to admit the police accident report for summary judgment purposes because it was not an affidavit and was not presented with other sworn testimony based on personal knowledge.")  "It is well settled in this circuit that we can consider only admissible evidence in reviewing an order for summary judgment."  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995).

Response at 5.  Smith replies by arguing that the March 13, 2012, CAD shows that the vehicle was reported stolen.  See Reply at 4.  He also states that he "has requested a certified copy of a title history of this vehicle and will supplement the record once it is received."  Reply at 4.  Smith has yet to supplement the record.
The Court agrees with the Plaintiffs that the Police Report is hearsay.  "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  The United States Court of Appeals for the Tenth Circuit has stated that courts cannot consider hearsay in deciding a motion for summary judgment.  See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.  Hearsay testimony cannot be considered because [a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." (internal quotations and citations omitted)).  "Police reports are generally excludable as hearsay."  United States v. Jimenez, 275 F. App'x 433, 438 (5th Cir. 2008).  In a civil case, police reports may be admissible as public

> The vehicle was not listed in [the National Crime Information Center, ("NCIC"),] as being stolen; however, there was no information that the vehicle had been recovered which led Officer Smith to believe that it still had not been located and returned to its owner so Officer Smith advised the dispatcher to alert other officers about this vehicle so that they could search for it as well.

Motion ¶ 7, at 3 (setting forth this fact). <u>See</u> Smith Aff. ¶ 7, at 2; Real Time Recording at 5:02-5:19; Dispatch Tr. at 3:11-17.[7]  "The dispatcher then broadcast over the air that the vehicle was last seen in the area of 8201 Marquette northeast; she gave a description of the vehicle and advised that it was reported stolen but was not in the system and it was unknown if it was

---

records under rule 803(8)(A)(ii) of the Federal Rules of Evidence.  <u>See</u>, <u>e.g.</u>, <u>Dortch v. Fowler</u>, 588 F.3d 396, 402 (6th Cir. 2009); <u>Foster v. Gen. Motors Corp.</u>, 20 F.3d 838, 839 (8th Cir. 1994).  This exception, however, covers only information that the officer observed and recorded in the police report, and not information that the officer received from third parties.  "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not."  <u>Walker v. City of Okla. City</u>, 203 F.3d 837, at *8 (10th Cir. Feb. 7, 2000)(unpublished)(table opinion)(quoting <u>United States v. Pazsint</u>, 703 F.2d 420, 424 (9th Cir. 1983)).  "[T]he proponent of hearsay evidence bears the burden of establishing the applicability of a hearsay exception."  <u>United States v. Irvin</u>, 682 F.3d 1254, 1262 (10th Cir. 2012)(citing <u>United States v. Ary</u>, 518 F.3d 775, 786 (10th Cir. 2008)).

To support his asserted fact, Smith cites to the Police Report, which states that Kerry Vanamburg is the registered owner of the Mitsubishi Montero.  <u>See</u> Police Report at 1.  It is not clear, however, from where the officer who prepared the report received this information.  It is unlikely that the officer observed, first hand, that the vehicle is registered to Kerry Vanamburg.  Instead, a third party -- likely Vanamburg -- told the officer to whom the vehicle is registered.  Smith has the burden of showing that an applicable hearsay exception applies to the Police Report, and, in the Reply, instead of attempting to show that the Police Report is not hearsay, Smith argues that other evidence -- the March 13, 2012, CAD -- supports his asserted fact.  Because Smith has not shown that this information in the Police Report is based on information which the officer observed, and not on a third party's out-of-court statement, it is inadmissible hearsay, and the Court cannot consider it in ruling on the Motion.

In the Reply, Smith cites to the March 13, 2012, CAD to support his asserted fact.  <u>See</u> Reply at 4.  While the March 13, 2012, CAD states that the vehicle was reported stolen, it does not state that Kerry Vanamburg is the owner or that he was the one who reported it stolen.  <u>See</u> March 13, 2012, CAD at 1.  Smith's asserted fact is, thus, lacks support in the record.  The Court has, accordingly, modified the asserted fact to more accurately reflect the record.

[7]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Response at 5.  For the reasons stated in note 2, the Court concludes that the fact is undisputed.  <u>See</u> <u>supra</u> note 2.

recovered." Motion ¶ 8, at 3 (setting forth this fact). See Smith Aff. ¶ 8, at 2; Real Time

Recording at 5:21-6:01; Dispatch Tr. at 3:18-4:5.[8]

     "As Officer Smith approached the vicinity of Texas and Marquette, he began looking for

a vehicle matching the description of the call since the dispatcher relayed that the vehicle was in

the area of 8201 Marquette northeast near some community mailboxes." Motion ¶ 9, at 3

(setting forth this fact). See Smith Aff. ¶ 9, at 2.[9] "As Officer Smith drove westbound on

Marquette and approached Texas, he looked around this intersection for the vehicle and did not

see it by any community mailboxes so he continued onto westbound Marquette." Motion ¶ 10,

at 3 (setting forth this fact). See Smith Aff. ¶ 10, at 2.[10]

> As Officer Smith continued driving westbound on Marquette, just west of Texas,
> he drove next to a small parking lot where he saw some community mailboxes,
> and as he was driving he just happened to see a vehicle which matched the
> description of the suspected stolen vehicle. He also observed the driver moving
> around inside of the vehicle.

Motion ¶ 11, at 3 (setting forth this fact). See Smith Aff. ¶¶ 10-12, at 2-3; Diagram of Parking

Lot, filed May 12, 2014 (Doc. 11-1)(Exhibit A1 to the Smith Aff.)[11]

---

    [8]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment." Response at 5. For the reasons stated in note 2, the Court concludes that the fact is undisputed. See supra note 2.

    [9]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment." Response at 5. For the reasons stated in note 2, the Court concludes that the fact is undisputed. See supra note 2.

    [10]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment." Response at 5. For the reasons stated in note 2, the Court concludes that the fact is undisputed. See supra note 2.

    [11]The Plaintiffs respond to this fact by stating:

Because Officer Smith had already partially driven by the parking lot as he was heading westbound on Marquette, the driver of the Mitsubishi was in a position where he could have visibly seen Officer Smith drive by.  Consequently, Officer Smith made the decision to turn into the parking lot and parked to the rear of the vehicle at a semi angle so as to block the vehicle to attempt to prevent the driver from fleeing the area.

Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment.  Further, this statement contains speculation as to what the deceased Mr. Tillison could have seen or heard, which is not admissible in support of summary judgment motions under Fed. R. Civ. Pro 56.  Further, and as will be elaborated on within this brief, this statement was never told by Mr. Smith in his statement to [Internal Affairs], which were given right after the event.

Response at 5 (citation omitted).  To dispute this fact, the Plaintiffs cite to Smith's interview with the Albuquerque Police Department's Internal Affairs.  See Interview of Mark Smith at 7:10-25, Albuquerque Police Department, Case # 12-0025037 (taken March 20, 2012)(Smith), filed July 9, 2014 (Doc. 31-2)("March 20, 2012, Interview").  During his interview, Smith said:

MARTIN SMITH: As I start pulling up, all of a sudden, I seen the -- the black SUV parked in the parking lot of the Pine something apartments.  A vehicle was pulling out at the same time as I got -- as I hit that point, so I let them pull out and then I called out over APD radio that -- that the vehicle is 56 and that it looked like it was occupied.  APD radio, I believe, 10-3'd the air and had other units start responding to the area.

I turned into the parking lot, going north into the parking lot, but the parking lot is kind of small and it's just like right off the road and then you pull into parking spots.  As I turned around the corner there, I -- I pulled up behind the vehicle in a semi angle and seen the guy moving about inside the vehicle.

March 20, 2012, Interview at 7:10-25 (Smith).

Smith replies by arguing that his previous statement does not contradict the Smith Aff.  See Reply at 4.  He argues that, in the Smith Aff. , he states that he observed Tillison moving around inside the vehicle at different times.  See Reply at 4 (citing Smith Aff. ¶ 11, at 2-3; id. ¶ 22, at 4-5; id. ¶ 24, at 5).  Smith also argues that the "Plaintiffs' purported dispute is immaterial."  Reply at 4.

The Court agrees with Smith that the Plaintiffs have failed to dispute this fact.  In the March 20, 2012, Interview, Smith did not state that he did not observe Tillison moving around in the vehicle until he parked behind the vehicle.  That Smith said he saw Tillison moving around when he parked behind him does not contradict Smith's asserted fact that he saw Tillison moving around as he drove by the parking lot.  Rather, that Smith observed Tillison moving around is an additional fact.  Accordingly, the Court concludes that the Plaintiffs have failed to dispute this asserted fact.

Motion ¶ 12, at 3-4 (setting forth this fact).  See Smith Aff. ¶ 13, at 3; Diagram of Parking Lot,

filed May 12, 2014 (Doc. 11-1)(Exhibit A2 to Smith Aff.)("Smith's Diagram of the Parking

Lot").[12]

       Officer Smith had presumed that there would be other officers nearby in
the area to assist since the dispatcher had relayed to other officers that the
suspected stolen vehicle was in the area of 8201 Marquette so he informed
dispatch that he would be out with the vehicle and that it was occupied.

---

[12]The Plaintiffs respond by stating:

> Plaintiffs do not have information at this time to either admit or deny however,
> Plaintiffs dispute that these facts are material to Defendant Smith's decision to use
> lethal force in violation of the 4th Amendment.  Further, this statement contains
> speculation as to what the deceased Mr. Tillison could have seen or heard, which
> is not admissible in support of summary judgment motions under Fed. R. Civ. Pro
> 56.  Further, and as will be elaborated on within this brief, this statement was
> never told by Mr. Smith in his statement to IA, which were given right after the
> event.

Response at 5 (citation omitted).  Smith replies by stating:

> In responding to Fact No. 12, Plaintiffs do not dispute the averments contained in
> this factual recitation as they claim.  Officer Smith did not represent that
> Mr. Tillison saw or heard him as he was driving by the parking lot.  Instead,
> Officer Smith stated in the affidavit that the driver of the Mitsubishi was in a
> position where he could have visibly seen Officer Smith drive by.  Also, the fact
> that Officer Smith did not specifically mention what he averred in paragraph 13 of
> the affidavit in his initial statement to homicide detectives is of no consequence
> because there is no evidence that he was asked a specific question during this
> interview as to whether he believed that his presence was compromised.

Reply at 4-5 (citation omitted).
The Court agrees with Smith.  Smith does not assert that Tillison saw him, but only that
Tillison was in a position that he could have seen Smith drive by him.  Additionally, that Smith
did not tell the interviewers during the March 20, 2012, Interview that Tillison could have seen
him drive by him does not dispute Smith's asserted fact.  There is nothing in the March 20, 2012,
Interview to dispute Smith's asserted fact.  Instead, Smith provided additional detail in the Smith
Aff. than he did at the interview.  Finally, for the reasons set forth in note 2, the Plaintiffs'
materiality argument does not dispute Smith's asserted fact.  See supra note 2.  The Court, thus,
concludes that this fact is undisputed.

Motion ¶ 13, at 4 (setting forth this fact).  See Smith Aff. ¶ 15, at 3; Real Time Recording at 9:44-9:48; Dispatch Tr. at 5:17-18.[13]  "According to the CAD and the radio transmissions, the dispatcher did not actually dispatch another officer [A-325] to this location until after Officer Smith had already called out that he was with the vehicle and reported that it was occupied."  Motion ¶ 14, at 4 (setting forth this fact).  See March 19, 2012, CAD at 1; Real Time Recording at 9:53-9:58; Dispatch Tr. at 5:20-22.[14]  "After Officer Smith relayed to the dispatcher that he was with the suspect vehicle, he exited his marked police vehicle and approached the" driver's

---

[13]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny however, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Response at 5-6.  For the reasons stated in note 2, the Court concludes that this fact is undisputed.  See supra note 2.

[14]The Plaintiffs respond by stating:

Plaintiffs do not have information at this time to either admit or deny.  However, the record reflects that there was nothing preventing Smith from knowing whether backup was called, if units were on their way, and if he did not hear that backup was on the way he should have requested the same before making the initial approach and contact with Daniel Tillison as ultimately it is the officer's responsibility to request backup if he/she feels it is warranted.  Further, assuming the facts as set forth by Smith are true and found to be material they only weigh against him in that it shows that because he failed to wait for backup or call for backup that his own reckless conduct was what contributed to the need to use lethal force.  See Zia Trust v. Montoya, 597 F.3d 1150, 1154-1155 (10th Cir. 2010).

Response ¶ 14, at 6.  This assertion does not dispute Smith's asserted fact.  First, the local rules state that the non-movant -- the Plaintiffs in this case -- "must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).  The Plaintiffs do not, however, cite to any evidence disputing Smith's asserted fact.  Second, the Plaintiffs' argument that the Smith should have requested backup before approaching Tillison and that Smith's reckless conduct attributed to the need for lethal force are legal arguments, and not factual ones.  Accordingly, the Court concludes that this fact is undisputed and will address the Plaintiffs' legal arguments in the Analysis.

side of the SUV.  Motion ¶ 15, at 4 (setting forth unmodified fact).  See Smith Aff. ¶ 17, at 4;

Smith's Diagram of the Parking Lot at 1.[15]

When Officer Smith approached the car, he had his firearm drawn in the
low ready position since he was investigating a felony crime given that the

_____

[15]Smith's asserted fact states: "After Officer Smith relayed to the dispatcher that he was
with the suspect vehicle, he exited his marked police vehicle and approached the rear quarter
panel of the SUV on the driver's side."  Motion ¶ 15, at 4.  The Plaintiffs dispute this fact by
stating:

> Plaintiffs do not have information at this time to either admit or deny.  Further,
> assuming the facts as set forth by Smith are true and found to be material they
> only weigh against him in that it shows that because he failed to wait for backup
> or call for backup that his own reckless conduct was what contributed to the need
> to use lethal force.  See Zia Trust v. Montoya, 597 F.3d 1150, 1154-1155 (10th
> Cir. 2010).  Further, Smith's statement contradicts his own given to IA on March
> 20, 2012 wherein he states that he got out of his vehicle and approached the
> window while issuing commands.

Response at 15 (citation omitted).  The Plaintiffs cite to Smith's March 20, 2012, Interview,
where he stated that he "got out of [his] vehicle, started approaching the window and issuing
commands to put his hand outside the window."  March 20, 2012, Interview at 7:25-8:2 (Smith).
Smith replies by stating:

> Plaintiffs' cited evidence does not dispute this fact as they represent.  Although
> Officer Smith said in the affidavit that he approached the rear quarter panel of the
> SUV on the driver's side, this rear quarter panel is also near the window that he
> mentioned in the statement referenced by Plaintiffs.  Also, Exhibit A2[,Smith's
> Diagram of the Parking Lot,] depicts that Officer Smith was at a window as he
> described in the statement referenced by Plaintiffs.  Notwithstanding, Plaintiffs;
> [sic] purported dispute is immaterial.

Reply at 5 (citations omitted).
The Court concludes that the Plaintiffs have disputed this fact.  Smith's asserted fact
states that he approached the SUV's rear quarter panel while he stated in the March 20, 2012,
Interview that he approached the window.  Compare Motion ¶ 15, at 4, with March 20, 2012,
Interview at 7:25-8:2 (Smith).  Smith tries to reconcile these two statements by stating that there
is a window by the rear quarter panel.  See Reply at 5.  In the March 20, 2012, Interview,
however, Smith stated that he approached the window and commanded Tillison to put his hands
outside the window.  See March 20, 2012, Interview at 7:25-8:2 (Smith).  The window that
Smith approached was the same one through which he commanded Tillison to put his hands.
Because Tillison was sitting in the driver's seat, the window to which Smith was referring was
the front driver's side window.  The Court, thus, finds it disputed toward what window Smith
walked.  The Court has, accordingly, modified Smith's asserted fact.

> vehicle in question had been reported as stolen.  The vehicle was also located in a high crime area.  The initial call also reported that there was a male who was trying to sell a sound system which was possibly stolen.  It also concerned Officer Smith that the driver was moving around inside of the vehicle.

Motion ¶ 16, at 4-5 (setting forth this fact).  See Smith Aff. ¶ 19, at 4; March 19, 2012, CAD at 1; Real Time Recording at 5:31-6:01; Dispatch Tr. at 3:22-5:5.[16]  "Officer Smith identified himself as a police officer by announcing 'Albuquerque Police' and he then said: Let me see your hands; put your hands out the window."  Motion ¶ 17, at 5 (setting forth this fact).  See Smith Aff. ¶ 20, at 4; Response at 6 (not disputing this fact).[17]  The driver said something to

---

[16]The Plaintiffs respond by stating:

> Plaintiffs do not have information at this time to either admit or deny.  Plaintiffs dispute that the male who called ever stated that the equipment was possibly stolen.  Further, assuming the facts as set forth by Smith are true and found to be material they only weigh against him in that it shows that because he failed to wait for backup or call for backup that his own reckless conduct was what contributed to the need to use lethal force.  See Zia Trust v. Montoya, 597 F.3d 1150, 1154-1155 (10th Cir. 2010).

Response at 6 (citation omitted).  To dispute this fact, the Plaintiffs cite to the 911 Call.  There, the caller reports that a suspicious person in a Mitsubishi Montero tried to sell the caller a sound system, but the caller does not state that he thought the sound system was stolen.  See 911 Call at 0:01-0:51.

    While the Plaintiffs are correct in stating that the sound system was not reported stolen in the original 911 Call, the dispatcher reported to Smith that the sound system was possibly stolen.  See March 19, 2012, CAD at 1; Smith Aff. ¶ 3, at 1.  The Plaintiffs have not presented evidence showing that Smith was aware that the 911 caller did not state that the sound system was possibly stolen, and they do not dispute that the 911 dispatcher reported to Smith that the sound system was possibly stolen.  Furthermore, the caller made the 911 Call, because a "suspicious person" attempted to sell him a sound system.  911 Call at 0:05-0:24.  It is reasonable for the dispatcher to assume that the sound system was possibly stolen.  In any case, because Smith did not know that the original caller did not say that the sound system was possibly stolen, and because the dispatcher reported to Smith that it was possibly stolen, the Court concludes that the Plaintiffs have not disputed this fact.

[17]The Plaintiffs respond by stating: "Plaintiffs admit.  However, it should be noted that Smith states that the driver did say something to him in response but he does not recall what the driver said."  Response ¶ 17, at 6 (citing Smith Aff. ¶ 20, at 4).  Because the Plaintiffs do not dispute this fact, but assert an additional fact, the Court finds Smith's asserted fact undisputed and will include the Plaintiffs' additional fact.

Smith, but Smith does not recall what he said.  <u>See</u> Response at 6 (setting forth this fact); Smith Aff. ¶ 20, at 4.[18]

"Officer Smith told the driver to put his hands out of the window so that he could see both hands in order to ensure that he was not holding a weapon."  Motion ¶ 18, at 5 (setting forth unmodified fact).  <u>See</u> Smith Aff. ¶ 21, at 4.[19]

_____

[18]The Plaintiffs did not file this fact as a separately numbered fact, as the local rules require.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.").  There is, however, support in the record for this fact -- from Smith's own affidavit -- <u>see</u> Smith Aff. ¶ 20, at 4, and Smith does not dispute this fact in the Reply, <u>see</u> Reply at 1-17.  The Court will, accordingly, include this fact.

[19]Smith's asserted fact states: "The driver's side window was down so Officer Smith told the driver to put his hands out of the window so that he could see both hands in order to ensure that he was not holding a weapon."  Motion ¶ 18, at 5.  The Plaintiffs dispute this fact by stating:

> Plaintiffs do not have information at this time to either admit or deny.  However, Smith's statement "that the driver's side window was open" contradicts the statement he gave to IA on March 20, 2012 (one day after the incident), wherein he states that the window was closed when he made his first approach, "at one point he reaches with his left hand and starts opening up the window."  Also, Smith's statement that he wanted to see Tillison's hands to make sure he did not have a weapon contradicts Smith's statements that he could see Tillison's hands.

Response at 6 (citations omitted).  The Plaintiffs cite Smith's March 20, 2012, Interview, where he stated that Tillison attempted to open the vehicle's window.  <u>See</u> March 20, 2012, Interview at 8:14-16 (Smith)("He's -- at one point he reaches with his left hand and starts opening up the window, but I can't see his right hand at all.").  They also cite a portion of the March 20, 2012, Interview in which Smith states that he could see Tillison reaching around in the vehicle.  <u>See</u> March 20, 2012, Interview at 8:5-23 (Smith).  Finally, the Plaintiffs cite to the Smith Aff., where he states that Tillison was moving around inside the vehicle and reaching into the back of the vehicle.  <u>See</u> Smith Aff. ¶ 22, at 4-5.

Smith replies by stating:

> Although the record cited by Plaintiffs shows that Officer Smith said in his initial interview that he saw the driver start opening up the window, Officer Smith likely misspoke and meant to say that the driver was starting to open up the door because the very next sentence he mentions that he pushed the door frame closed.

> Instead of obeying Officer Smith's commands, the driver of the vehicle continued moving around inside of the SUV and at one point looked back at Officer Smith and then reached down and then reached into the back of the vehicle. The driver's actions in disobeying Officer Smith's commands and in moving around the vehicle in this manner caused Officer Smith to have extreme concern that he was reaching for a weapon.

Motion ¶ 19, at 5 (setting forth this fact).  See Smith Aff. ¶ 22, at 4-5.[20]  "Based upon what

Officer Smith had observed, he yelled at the driver: 'Let me see your hands, let me see your

---

> In fact, he describes later on in this same statement that it was the door that Mr. Tillison was attempting to open, not the window.  Also, Plaintiffs' representation that Officer Smith contradicted himself with respect to whether he could see Mr. Tillison's hands is false as the record cited by Plaintiffs does not show any such contradiction because Officer Smith did not mention in his affidavit in Paragraph 22 or in statements to investigators that he saw Mr. Tillison's hands at this point during the encounter.

Reply at 5-6 (citations omitted).

    Even if Smith misspoke during the March 20, 2012, Interview, as Smith asserts, this mistake makes his fact disputed.  It seems odd that Smith would order Tillison to put his hands out the window when the window was closed.  Also, after stating that Tillison started to open the window, Smith stated that he pushed the door frame closed, supporting Smith's assertion that he just misspoke.  In any case, because the Plaintiffs have presented evidence that specifically controverts Smith's asserted fact, the Court concludes that it is disputed and will modify it accordingly.

    [20]The Plaintiffs respond by stating:

> Plaintiffs do not have information at this time to either admit or deny.  Smith's statement that he wanted to see Tillison's hands to make sure he did not have a weapon contradicts Smith's statements that he could see Tillison's hands.  Moreover, the materiality of this dispute is questionable under Graham, which counsels focus on the objective factors facing the police, not their subjective speculations.  If we allow law enforcement to deploy force merely because they predict someone may become aggressive the Fourth Amendment guarantee will have no meaning.  Graham v. Connor, 490 U.S. 386 (1989).

Response at 6 (citations omitted).  The Plaintiffs cite to the Smith Aff. and to the March 20, 2012, Interview.  In both, Smith states that he saw the vehicle's driver moving around in the vehicle and reaching behind him.  See Smith Aff. ¶ 22, at 4-5; March 20, 2012, Interview at 8:5-23 (Smith).  That Smith could see the driver moving around and reaching behind himself does not mean that Smith could see the driver's hands.  To the contrary, in the March 20, 2012, Interview, to which the Plaintiffs cite, Smith stated that he could not see the driver's right hand.  See March 20, 2012, Interview at 8:15-16 (Smith).  The Plaintiffs, thus, fail to present evidence

hands.  Put them out the window now.'  The driver did not comply with these directives."

Motion ¶ 20, at 5 (setting forth this fact).  See Smith Aff. ¶ 23, at 5.[21]

> At one point as the driver was moving around, the driver reached with his left hand and started opening the door so Officer Smith immediately pushed the door frame closed because he was concerned that the driver was going to come out of the vehicle with a weapon since the driver was moving and reaching around inside the vehicle and disobeying Officer Smith's commands to show his hands.

Motion ¶ 21, at 5 (setting forth this fact).  See Smith Aff. ¶ 24, at 5.[22]

---

that specifically controverts this fact.  Additionally, arguing that a fact is immaterial does not dispute it.  The Court, accordingly, concludes that the fact is undisputed.

[21]The Plaintiffs respond by stating: "Plaintiffs do not have information at this time to either admit or deny whether Tillison complied with these commands as we know he did say something to Smith in response to being issued these commands.  Plaintiffs do not dispute that Smith issued commands to Tillison to show Smith his hands."  Response at 20.  Because the Plaintiffs do not dispute this fact and do not present evidence to controvert it, the Court concludes that the fact is undisputed.

[22]The Plaintiffs respond by stating:

> Plaintiffs do not have information at this time to either admit or deny.  However, this statement contradicts Smith's statements that he was unaware if Tillison had any weapons because he states that he saw him open the window with his left hand, open the door with his left hand, and then put the car into gear which would have been done with his right hand, and that Tillison is reaching with his right hand behind the seat.  Moreover, the materiality of this dispute is questionable under Graham, which counsels focus on the objective factors facing the police, not their subjective speculations.  If we allow law enforcement to deploy force merely because they predict someone may become aggressive the Fourth Amendment guarantee will have no meaning.  Graham v. Connor, 490 U.S. 386 (1989).

Response at 7 (citations omitted).  The Plaintiffs cite to the Smith Aff. and to his March 20, 2012, Interview.  In the Smith Aff., Smith states that he saw the driver moving around inside the vehicle, and reaching down and reaching into the back of the vehicle.  See Smith Aff. ¶ 22, at 4-5.  In the March 20, 2012, Interview, Smith stated that the driver moved around inside the vehicle, reached into the back of the vehicle, attempted the open the window, possibly attempted to open the door (Smith stated that the driver attempted to open the window, but then states that he pushed the door frame shut), and put the vehicle into reverse.  See March 20, 2012, Interview at 8:5-23 (Smith).  This evidence does not contradict Smith's asserted fact.  First, Smith did not state, in the Smith Aff. or at the March 20, 2012, Interview, that he could see the driver's hands.  Second, Smith did not say that the driver attempted to open the window, open the door, and shift

"After Officer Smith pushed the door closed, the driver . . . put the vehicle into reverse so Officer Smith moved out of the way to avoid getting hit since he was standing just a few feet away from the driver's side of the SUV."  Motion ¶ 22. At 6 (setting forth unmodified fact).  See Smith Aff. ¶ 26, at 5.[23]  "As the driver reversed the vehicle, the driver . . . slammed the SUV into

_____

the gears at the same time.  The evidence suggests that he saw the driver do these things one after another.  Smith did not know where the driver's hands were at all times.  Instead, it appears that, throughout the encounter, Smith, at most, knew -- or should have known -- where one of Smith's hands was.  Accordingly, the Plaintiffs fail to specifically controvert this fact.  Moreover, asserting that a fact is immaterial does not dispute it.  The Court, thus, concludes that the fact is undisputed.

[23]Smith's fact states: "After Officer Smith pushed the door closed, the driver drove forward and then put the vehicle into reverse so Officer Smith moved out of the way to avoid getting hit since he was standing just a few feet away from the driver's side of the SUV."  Motion ¶ 22, at 6.  The Plaintiffs respond to this fact by stating:

> Plaintiffs dispute this fact as it contradicts Smith's statement given on March 20, 2012 that Tillison put the car in reverse he did not drive forward first then put the car into reverse.  Also this contradicts all of the evidence that was submitted by Defense counsel then submitted to Plaintiffs' expert who also opines that based on this evidence Tillison placed the vehicle in reverse and drove back first not forward.  Further, Smith omits the fact that according to his March 20, 2012 IA statement it is at this point that Smith "discharged his firearm into Tillison's rear tire, trying to disable the vehicle."

Response at 7 (alterations omitted)(citations omitted).  The Plaintiffs cite to the March 20, 2012, Interview, to their expert's report, and to a video recreation.  In the March 20, 2012, Interview, Smith stated that, while he was issuing orders to the driver, the driver "reaches over, throws the vehicle into reverse and slams . . . into [Smith's] patrol vehicle and the truck that's parked right next to him."  March 20, 2012, Interview at 8:22-25 (Smith).  The Plaintiffs' expert, Christopher Stewart, opines: "While Officer Smith was issuing verbal commands to Mr. Tillison the Mitsubishi was driven in reverse."  Engineering Report, Prepared by Christopher M. Stewart, P.E. at 5 (June 3, 2014), filed July 9, 2014 (Doc. 31-3)("Stewart Report")(citation omitted).  In the video recreation, the Mitsubishi Montero is seen backing up into Smith's patrol car before trying to drive forward.  Video Recreation Facing Tillison at 0:01-0:03, hand delivered to the Court on July 7, 2014, filed July 7, 2014 (Doc. 30)("Video Recreation").

Smith replies by stating that "it is immaterial as to whether Plaintiffs dispute whether the vehicle went forward before it went into reverse as it is undisputed by Plaintiffs' own expert that the vehicle did go into reverse."  Reply at 6.  He states that the Plaintiffs do not dispute that Smith moved out of the way to avoid the SUV hitting him, because he was a few feet away from the SUV.  See Reply at 6-7.  Smith also states that he did not omit the fact that he fired at the SUV's rear tire, because he asserts that fact later in the Motion.  See Motion at 7.  Finally, Smith

Officer Smith's marked patrol car . . . .  His actions in driving in this manner led Officer Smith to

believe that he was attempting to flee the area."  Motion ¶ 23, at 6 (setting forth unmodified

fact).  See Smith Aff. ¶ 26, at 5; Diagram of Parking Lot During the Incident, filed May 12, 2014

(Doc. 11-1)(Exhibit A4 to Smith Aff.)("Smith's Diagram of the Parking Lot During the

Incident").[24]  "When Officer Smith was attempting to move out of the way of the vehicle's path,

---

states that, "[i]n the event that this Court finds that whether the vehicle went into reverse first
. . . , then for purposes of this motion only, the defense will stipulate to th[is] fact[]."  Reply at 6
n.3.
    The Plaintiffs have disputed Smith's asserted fact.  In the March 20, 2012, Interview,
Smith stated that the driver first placed the vehicle into reverse and backed up, which directly
controverts Smith's asserted fact.  The Plaintiffs do not dispute the rest of the fact.  The Court
has thus modified the fact.

    [24]Smith's asserted fact states:

    As the driver reversed the vehicle, the driver did not go straight back but instead
    drove backwards into a southeasterly direction from the parking space during
    which time he slammed the SUV into Officer Smith's marked patrol car and into
    a truck which was parked in the adjacent parking space which was directly east of
    the SUV.  His actions in driving in this manner led Officer Smith to believe that
    he was attempting to flee the area.

Motion ¶ 24, at 6.  The Plaintiffs dispute this fact by stating:

    Plaintiffs dispute this fact as it contradicts all of the evidence that was submitted
    by Defense counsel then submitted to Plaintiffs' expert who also opines that based
    on this evidence Tillison placed the vehicle in reverse and drove back first not
    forward.  It was at this time that Tillison hit Smith's police car and only his police
    car not the truck parked next to Tillison's car as stated by Smith.  Further, Smith
    omits the fact that according to his March 20, 2012 IA statement it is at this point
    that Smith "discharged his firearm into Tillison's rear tire, trying to disable the
    vehicle."  Moreover, the materiality of this dispute is questionable under Graham,
    which counsels focus on the objective factors facing the police, not their
    subjective speculations.  If we allow law enforcement to deploy force merely
    because they predict someone may become aggressive the Fourth Amendment
    guarantee will have no meaning.  Graham v. Connor, 490 U.S. 386 (1989).

Response at 7 (alterations omitted)(citations omitted).  The Plaintiffs cite to Stewart's report and
to a video recreation of the incident.  In his report, Stewart opines that:

he started heading towards his vehicle . . . ."   Motion ¶ 24, at 6 (setting forth unmodified fact).

See Smith Aff. ¶ 28, at 6; Smith's Diagram of the Parking Lot During the Incident at 1.[25]

---

> While Officer Smith was issuing verbal commands to Mr. Tillison the Mitsubishi
> was driven in reverse.  The left rear of the Mitsubishi contacted the left front push
> bar.  The Mitsubishi pushed the Ford rearward approximately 4.0 feet.  The left
> front tire of the Ford scuffed the pavement as it was being pushed.  The tires of
> the Mitsubishi left scuff marks on the pavement.

Stewart Report at 5.  In the video recreation, when Tillison reverses the vehicle for the first time,
he hits only Smith's patrol car, and not the truck in the adjacent parking spot.  See Video
Recreation at 0:01-0:05.

Smith responds by arguing that "[i]t is . . . immaterial as to whether Mr. Tillison collided
with both the truck and Officer Smith's police car when it first went into reverse because it is
when the vehicle was in reverse when it was a threat to Officer Smith."  Reply at 6.  He states
that, "[i]n the event that this Court finds that whether the vehicle . . . only collided into the police
vehicle when it did so, then for purposes of this motion only, the defense will stipulate to th[is]
fact[]."  Reply at 6 n.3.

The Court concludes that the Plaintiffs have specifically controverted this fact.  Their
expert's opinion and video recreation directly controverts Smith's assertions that Tillison turned
his vehicle as he reversed and that he hit the truck in the next parking spot.  Smith has not
challenged the validity of Stewart's qualifications or of his opinion.  The Court thus finds it
disputed whether Tillison turned as he reversed and whether he hit the truck.  The Court will,
consequently, modify Smith's asserted fact.

[25]Smith's asserted fact states:

> When Officer Smith was attempting to move out of the way of the vehicle's path,
> he started heading towards his vehicle until he realized that he was compromising
> his safety by turning his back towards the driver so he moved further west and to
> the north of the adjacent parking space of where the SUV had been parked so that
> he could avoid getting hit.

Motion ¶ 24, at 6.  The Plaintiffs dispute this fact by stating: "Plaintiffs dispute Smith's version
of the events as it contradicts his March 20, 2012 statement in which he states he moved back
towards his car and then shot the rear tire of Tillison's car."  Response at 7.  The Plaintiffs cite to
Smith's March 20, 2012, Interview where he stated that he could not remember whether he
moved back toward his patrol car or whether he moved toward the front of Tillison's vehicle.
See March 20, 2012, Interview at 26:5-21 (Smith, Morant).  Smith eventually decided, however,
that he thinks he moved back towards his patrol car.  See March 20, 2012, Interview at
26:22-27:2 (Smith, Morant).  He stated that he began moving towards his patrol car and then he
fired a bullet at the SUV's rear wheel.  See March 20, 2012, Interview at 26:22-27:10 (Smith,
Morant).

Smith replies by stating that the "Plaintiffs' cited evidence does not dispute this fact as
they represent."  Reply at 7.  The Court disagrees with Smith.  Smith asserts that he moved

"Officer Smith fired a shot into the left rear tire of the Mitsubishi in an attempt to disable

the vehicle . . . ."  Motion ¶ 25, at 6 (setting forth unmodified fact).  See Smith Aff. ¶ 29, at 6;

Diagram of Parking Lot After the Incident, filed May 12, 2014 (Doc. 11-1)(Exhibit A5 to Smith

Aff.)("Smith's Diagram of the Parking Lot After the Incident").[26]  "The shot to the tire did not

_____

towards his car and then moved toward the adjacent parking spot before shooting the SUV's rear
tire.  See Motion ¶ 24, at 6.  In the March 20, 2012, Interview, however, he stated that he moved
back toward his patrol car and then shot the rear tire.  See March 20, 2012, Interview at
26:22-27:10 (Smith, Morant).  It is thus disputed whether Smith moved toward the adjacent
parking spot before shooting the SUV's rear tire.  The Court has, accordingly, modified Smith's
asserted fact.

[26]Smith's asserted fact states:

> Officer Smith fired a shot into the left rear tire of the Mitsubishi in an attempt to
> disable the vehicle because he was in a position of its direct path and he feared
> that the driver was going to run into him since the driver almost ran over him
> when he first put the vehicle into reverse.

Motion ¶ 25, at 6.  The Plaintiffs dispute this fact by stating:

> Plaintiffs dispute Smith's version of the events as it contradicts his own UDMF
> number 22 wherein he says he moved out of the way before the shot the rear tire
> and it also contradicts the evidence submitted by Smith's own counsel.  See
> Exhibit C[, Stewart Report,] page 5, ¶ 3-4 and DVD recreation showing that
> Smith was never in the direct path of Tillison's car.  Further, this statement
> contradicts Defendants' UDMF number 24 which clearly states that he moved out
> of the way so he could avoid getting hit.  Now he states that he shot the tire of the
> car because he was in a position of its direct path.

Response at 7 (citation omitted)(emphasis in original).  The Plaintiffs cite to Stewart's report,
where he opines that, after Tillison backed the SUV into Smith's patrol car, Smith "moved to the
northwest quadrant of the second parking space from the west," "[p]ositioned near the front of
the parked Taurus," and "fired a round at the left rear tire of the Mitsubishi."  Stewart Report
at 5.  They also cite to the video recreation, which shows that Smith is never in the direct path of
Tillison's vehicle.  See Video Recreation at 0:01-0:10.
    Smith replies by stating: "Officer Smith attempted to move out of the way to avoid
getting hit as the vehicle was reversing and then after it reversed, it was turned at an angle
resulting it being in the direct path of Officer Smith.  Also, Plaintiffs' expert conclusions do not
contradict Fact No. 25."  Reply at 7.
    The Court concludes that the Plaintiffs have disputed Smith's asserted fact.  First, Smith
asserts that he was in the direct path of the car.  See Motion ¶ 25, at 6.  The Video Recreation,
however, shows that SUV did not face Smith until after Smith shot Tillison and the SUV came to

rest.  See Video Recreation at 0:01-0:10.  The Video Recreation shows that the SUV went backwards in a relatively straight line, hitting Smith's patrol vehicle.  See Video Recreation at 0:01-0:02.  It then shows that the SUV went forward in a relatively straight line, hitting the wall.  See Video Recreation at 0:02-0:05.  It finally shows that the SUV began backing up in a relatively straight line, until Smith shot Tillison, at which point the SUV turned to the right, hitting the truck.  See Video Recreation at 0:05-0:10.  Because Smith was to the side of the SUV, he was never in its direct path until after he shot Tillison.  Smith has not objected to the Video Recreation, and it specifically controverts Smith's asserted fact.  Second, Smith asserts that Tillison nearly ran him over when Tillison first reversed the SUV.  See Motion ¶ 25, at 6.  Smith was, however, beside the vehicle when Tillison drove in reverse, not in front or behind.  Tillison may have almost hit him with the front of the car if he turned it as he reversed, but he would not have run over Smith, because Smith was not behind the car.  The Court thus concludes that Smith's asserted fact is disputed and will modify it accordingly.

> Smith asserts the following fact:
>
> Officer Smith is not sure if he fired the shot into the tire when the vehicle was reversing in a southeasterly direction or when it was moving forward or when the vehicle was at a very brief rest after the driver deliberately hit his marked police vehicle because the shot was fired within a split second of the vehicle changing direction.

Motion ¶ 26, at 6-7
>       The Plaintiffs dispute this fact by stating: "Plaintiffs dispute Smith's version of the events as it contradicts his March 26, 2012 statement to IA wherein he states the vehicle was not moving when he shot the tire."  Response at 7.  The Plaintiffs cite to an Albuquerque Police Department interview with Smith.  See Albuquerque Police Department, Case # 12-0025037, Interview of Officer Mark Smith (March 26, 2012), filed July 7, 2014 (Doc. 31-4)("March 26, 2012, Interview").  There, Smith said that he thinks the vehicle was stopped when he shot the rear tire.  See March 26, 2012, Interview at 13:6-22 (Smith, Morant).

Smith replies by stating:

> This fact states that Officer Smith is unsure if the vehicle was in motion or was at a brief rest when the tire was shot.  Officer Smith's statement cited by Plaintiffs also illustrates Officer Smith's uncertainty in this regard as he told the homicide detective that he *thinks* the vehicle *might* have been at a brief rest at his vehicle when the tire was shot.  Nevertheless, in the event this Court finds this is a material issue, for purposes of this motion only, the defense will accept Plaintiffs' allegation in response to Fact No. 26 as true

Reply at 7 (emphasis in original).
>       The Court concludes that the fact is disputed.  Smith asserts that he does not know which direction the SUV was traveling or if it was not moving at all.  See Motion ¶ 26, at 6-7.  In the March 26, 2012, Interview, however, Smith said that he thought the vehicle was stopped.  See March 26, 2012, Interview at 13:6-22 (Smith, Morant).  Smith's statement specifically controverts his asserted fact.  The Court, thus, concludes that it is disputed.

disable the vehicle . . . .   [Smith] then observed the driver move the vehicle forward . . . ."
Motion ¶ 27, at 7 (setting forth unmodified fact).  See Smith Aff. ¶ 30, at 6.[27]  "After the vehicle
had moved forward, Officer Smith saw the vehicle reversing . . . so he moved further west and to
the north to back away from the vehicle . . . ."  Motion ¶ 28, at 7 (setting forth unmodified fact).
See Smith Aff. ¶ 32, at 6-7; Smith's Diagram of the Parking Lot After the Incident at 1.[28]  While

---

[27]Smith's asserted fact states:

> The shot to the tire did not disable the vehicle because after Officer Smith shot the
> tire, he observed the vehicle lunge forward and then go back into reverse pushing
> the truck that had been parked in the adjacent lane to the east of the SUV even
> further over.  He then observed the driver move the vehicle forward again.

Motion ¶ 27, at 7.
     The Plaintiffs dispute this fact by stating: "Plaintiffs disputes [sic] as it contradicts the
evidence submitted by Smith's own counsel."  Response at 7.  The Plaintiffs cite to Stewart's
report and the Video Recreation to dispute this fact.  In his report, Stewart opines that, before
Smith shot Tillison, the SUV did not hit the truck.  See Stewart Report at 5.  He also opines that,
after Smith shot the rear tire, the SUV drove forward until it hit the wall and then drove
backwards, at which point Smith shot Tillison.  See Stewart Report at 5-6.  The Video
Recreation shows the same thing -- that the SUV did not hit the truck until after Smith shot
Tillison.  See Video Recreation at 0:01-0:10.
     Smith replies by stating: "Plaintiffs' own expert's conclusions are that the vehicle went
forward after the rear tire was shot and then went backwards."  Reply at 8.  The Court disagrees
with Smith.  Stewart opines that, after Smith shot the rear tire, the SUV went forward, until it hit
the wall, and then backwards, at which point Smith shot Tillison.  See Stewart Report at 5-6.
Smith's asserted fact, however, is that, after Smith shot the rear tire, the SUV lurched forward,
went backwards, and then again went forward.  See Motion ¶ 27, at 7.  Stewart's report
specifically controverts this fact.  Additionally, Smith asserts that the SUV hit the truck before he
shot Tillison.  See Motion ¶ 27, at 7.  This assertion is contrary to Stewart's report and to the
Video Recreation, which both show that the SUV did not hit the truck until after Smith shot
Tillison.  Accordingly, the Court concludes that the fact is disputed and will modify it
accordingly.

[28]Smith's asserted fact states: "After the vehicle had moved forward, Officer Smith saw
the vehicle reversing and he believed it to be coming towards his direction so he moved further
west and to the north to back away from the vehicle in case the driver attempted to come at him
with the vehicle again."  Motion ¶ 28, at 7.
     The Plaintiffs dispute this fact by stating: "Plaintiffs disputes [sic] as it contradicts the
evidence submitted by Smith's own counsel.  Further this statement contradicts Smith's own
UDMF number 22 wherein he states at this point he had already moved out of the way."
Response at 8.  The Plaintiffs cite to Stewart's report and to the Video Recreation to dispute this

the SUV was in motion, "Officer Smith saw that the driver had his left arm extended holding onto the steering wheel while he moved his right hand over his left arm."  Motion ¶ 29, at 7.  See Smith Aff. ¶ 33, at 7.[29]  "The driver had a black object in his right hand which he pointed at

---

fact.  Stewart opines that SUV hit the wall and then reversed with the front wheels turned to the right.  See Stewart Report at 5.  The Video Recreation shows that the SUV moved forward and backwards in a relatively straight line, and did not begin to turn until Smith shot Tillison.  See Video Recreation at 0:01-0:10.
       Smith replies by stating:

> Officer Smith attempted to move out of the way to avoid getting hit as the vehicle was first reversing.  Plaintiffs' expert conclusions do not contradict Fact No. 28.  In fact, the expert's diagrams illustrate that Officer Smith was in the northwest portion of the adjacent parking space as described in Fact No. 28.

Reply at 8 (citations omitted).
       The Court concludes that the Plaintiffs have disputed Smith's asserted fact.  First, Smith asserts that the SUV appeared to be reversing in his direction.  See Motion ¶ 28, at 7.  According to Stewart's report and the Video Recreation, the SUV was never reversing toward Smith, especially considering Smith was to the side of the SUV.  Second, Smith asserts that he moved in case Tillison "attempted to come at him with the vehicle again."  Motion ¶ 28, at 7.  It is disputed whether Tillison ever attempted to come at Smith with the SUV.  If Smith was standing to the side of the SUV, as all parties agree, and the SUV kept a relatively straight line until Smith shot Tillison, then the SUV was never driving in Smith's direction.  Those two portions of Smith's asserted fact are thus disputed.  The Court concludes that the remaining fact is undisputed.  Smith asserts that he moved northwest and away from the vehicle.  See Motion ¶ 28, at 7.  The Plaintiffs attempt to dispute this portion of Smith's fact by stating that Smith already asserted that he moved away from the SUV.  See Response at 8.  The Court disagrees with the Plaintiffs.  That Smith moved away from the SUV does not mean that he could not have later moved further away.  The Court thus concludes that this portion of Smith's asserted fact is undisputed.  Because the Plaintiffs have disputed portions of Smith's asserted fact, the Court has modified it.

     [29]Smith's asserted fact states: "As the vehicle was reversing, Officer Smith saw that the driver had his left arm extended holding onto the steering wheel while he moved his right hand over his left arm."  Motion ¶ 29, at 7.
       The Plaintiffs dispute this fact by stating: "Plaintiffs dispute Smith's version of the events as it contradicts Smith's March 20, 2012 and March 26, 2012 statement wherein he states Tillison was coming forward when he saw what he alleges in his UDMF number 29."  Response at 8.  The Plaintiffs cite to the March 20, 2012, Interview and to the March 26, 2012, Interview.  In both interviews, Smith stated that he saw something in Tillison's hand while Tillison was driving forward.  See March 20, 2012, Interview at 28:3-29:6 (Smith, Morant, Mowrer); March 26, 2012, Interview at 5:20-6:6 (Smith).
       Smith replies by stating:

Officer Smith through the open window."  Motion ¶ 30, at 7 (setting forth this fact).  See Smith

Aff. ¶ 34, at 7.[30]  "According to Officer Smith, the driver pointed this object in a 'gangster style'

manner of aiming a gun."  Motion ¶ 31, at 7 (setting forth this fact).  See Smith Aff. ¶ 34, at 7.[31]

> Given the following: (1) Officer Smith was dispatched to investigate a felony crime; (2) Officer Smith observed the driver moving around in the vehicle reaching down and into the back of the vehicle; (3) the driver disobeyed Officer Smith's commands to show his hands; . . . (5) the driver deliberately struck Officer Smith's police vehicle . . . in an effort to flee; (6) the driver continued to

---

> Officer Smith conceded in his affidavit that he was not exactly sure how the Mitsubishi was positioned when he shot at Mr. Tillison because the vehicle was in motion.  Plaintiffs' expert opines that the vehicle was in reverse when Mr. Tillison was shot and therefore this fact is not in dispute as Plaintiffs allege.  Plaintiffs have not introduced any evidence to dispute that Mr. Tillison had his left arm extended holding onto the steering wheel while he moved his right hand over his left arm.

Reply at 8 (citations omitted).

The Court concludes that the Plaintiffs have disputed Smith's asserted fact.  He asserts that he noticed the position of Tillison's hands while Tillison was reversing.  See Motion ¶ 29, at 7.  In his previous interview, however, he stated that he noticed Tillison's hands -- specifically that Tillison had a black object in one hand -- while Tillison was driving forward.  See March 20, 2012, Interview at 28:3-29:6 (Smith, Morant, Mowrer); March 26, 2012, Interview at 5:20-6:6 (Smith).  It is thus disputed whether Tillison was driving forwards or backwards when Smith noticed his hands.  Consequently, the Court has modified Smith's asserted fact.

[30]The Plaintiffs respond by stating:

> Plaintiffs do not have enough information at this time to admit or deny.  However, given the expert report and DVD of the expert's recreation of events attached hereto as Exhibit C[, Stewart Report,] it is very unlikely that, given Smith was less than 5-10 feet away, he could not tell that the telephone in Tillison's hand was indeed a telephone and not a gun.

Response at 8.  Because the Plaintiffs do not dispute this fact, and because Smith does not assert that he was too far away to see what Tillison was holding in his hand, the Court concludes that the fact is undisputed.

[31]The Plaintiffs respond by stating: "Plaintiffs do not have enough information at this time to admit or deny.  However, whether Tillison was holding his cell phone in a gangster style way is not material to whether lethal force in violation of the 4th Amendment should have been used."  Response at 8.  For the reasons stated in note 2, the Court concludes that this fact is undisputed.  See supra note 2.

move the vehicle forward and back even after Officer Smith shot the rear tire; (7) the manner in which driver held the black object in his right hand and pointed it at Officer Smith through the open window, Officer Smith believed this black object was a gun so he fired a round at him.

Response at 7-8 (setting forth unmodified fact).  See Smith Aff. ¶ 35, at 7.[32]  Later investigation revealed that the object was a cellular telephone.  See March 26, 2012, Interview at 6:2-5 (Smith).

"After firing the round, Officer Smith observed the driver fall back into his seat as the SUV continued reversing and pushing the truck over until it was hung up on the bumper and then came to a final rest."  Motion ¶ 33, at 8 (setting forth this fact).  See Smith Aff. ¶ 38, at 8; Response at 8 (not disputing this fact).  "Detective Michael Kleinfeld was dispatched as the lead criminalistics detective to process and document the scene of the shooting."  Motion ¶ 34, at 8 (setting forth this fact).  See Affidavit of Michael Kleinfeld ¶ 3, at 1, filed May 12, 2014 (Doc. 11-6)("Kleinfeld Aff.").[33]  "As part of his investigation, Detective Kleinfeld prepared

---

[32]The Plaintiffs respond by stating:

Plaintiffs dispute Defendants versions as (1) Smith was dispatched to investigate a suspicious person where there was no report that anything was stolen and given the NCIC report came back showing that the car was not stolen when he arrived he had no probable cause to believe Mr. Tillison had committed any crime. Regarding Defendants points 2-7, Plaintiffs disputes and rather than repeat what has already stated herein Plaintiffs refer the court to Plaintiffs' response to Defendants UDMF numbers 18-31.

Response at 8.  The Court has already concluded that it is undisputed that Smith was dispatched to investigate a suspicious person who was selling a sound system that was possibly stolen.  See supra note 3.  The Court has concluded, however, that it is disputed whether Tillison nearly hit Smith with the SUV, see supra note 28, and whether Tillison struck the truck with the SUV before being shot, see supra note 24.  The Plaintiffs have not disputed Smith's remaining reasons.  The Court has, accordingly, modified Smith's asserted fact to more accurately reflect the evidence.

[33]The Plaintiffs respond by stating:

diagrams labeled A1, A2, and A3 to Detective Kleinfeld's affidavit."  Motion ¶ 35, at 8 (setting

forth this fact).  See Kleinfeld Aff. ¶¶ 5, 6, & 8, at 2; Overhead Diagram of Apartments and

Parking Lot, filed May 12, 2014 (Doc. 11-6)(Exhibit A1 to Kleinfeld Aff.)("Kleinfeld's

Overhead Diagram of Apartments and Parking Lot"); Diagram of Parking Lot During at

Beginning of the Encounter, filed May 12, 2014 (Doc. 11-6)(Exhibit A2 to Kleinfeld

Aff.)("Kleinfeld's Diagram of Parking Lot During Initial Encounter"); Diagram of Parking Lot,

filed May 12, 2014 (Doc. 11-6)(Exhibit A3 to Kleinfeld Aff.)("Kleinfeld's Diagram of Parking

Lot After the Incident").[34]  "The diagram marked as Exhibit A1 is a depiction of the overall

overhead area of Pine Park Apartments in relation to where these apartments are situated on

Marquette in between Texas and Tennessee streets.  This diagram is not to scale."  Motion ¶ 36,

at 8 (setting forth this fact).  See Kleinfeld Aff. ¶ 5, at 2; Kleinfeld's Overhead Diagram of

Apartments and Parking Lot at 1.[35]

---

Admit.  Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment.  Further, Kleinfeld's opinions are not proper evidence to support a motion for summary judgment under Fed. Rule Civ. Pro. 56 as they are hearsay and not based on personal knowledge.

Response at 8.  Because the Plaintiffs admit this fact, because asserting that a fact is immaterial does not dispute it, and because Smith does not rely on any of Kleinfeld's opinion in this fact, the Court concludes that the fact is undisputed.

[34]The Plaintiffs respond by stating: "Admit.  Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Response at 8.  For the reasons stated in note 2, the Court concludes that this fact is undisputed.  See supra note 2.

[35]The Plaintiffs respond by stating:

Plaintiff disputes that Smith's car was at the location as stated in Defendants Exhibit A2,[ Kleinfeld's Diagram of Parking Lot During Initial Encounter,] as the evidence shows that his car was much closer.  See Exhibit C[, Stewart Report,] Appendix A Figure 2 which is to scale and based on evidence submitted by

> The diagram marked Exhibit A2[, Kleinfeld's Diagram of Parking Lot During Initial Encounter,] is a depiction of the overhead view of the parking lot area located on the south side of the apartment building.  The vehicles depicted in the parking lot are general representations of where vehicles were parked in parking spaces at the time Officer Smith first arrived on scene.  This diagram is not to scale.

Motion ¶ 37, at 8-9 (setting forth this fact).  See Kleinfeld Aff. ¶ 6, at 2; Kleinfeld's Diagram of

Parking Lot During Initial Encounter at 1.[36]

> The diagram marked Exhibit A3[, Kleinfeld's Diagram of Parking Lot After the Incident,] is a depiction of the overhead view of the parking lot area located on the south side of the apartment building which documents the final resting place of the black Mitsubishi SUV, Officer Smith's vehicle (N11), a 2008 Dodge pickup truck which was parked just east of the black Mitsubishi, the position of Daniel Tillison's body after he was removed from the Mitsubishi SUV and attended to by rescue personnel, the position of Officer George Trujillo's police vehicle when he first pulled up on scene after the shooting, physical evidence

---

> Defendants.   Further, Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment.

Response at 8.  Smith replies by stating:

> Plaintiffs are incorrect in their attempt to dispute Fact No. 36 as Fact No. 36 does not reference Exhibit A2[, Kleinfeld's Diagram of Parking Lot During Initial Encounter,] but rather only refers to Exhibit A1[, Kleinfeld's Overhead Diagram of Apartments and Parking Lot,] which is a depiction of the overall area of Pine Park Apartments in relation to where these apartments are situated on Marquette in between Texas and Tennessee streets.

Reply at 9.

The Court agrees with Smith.  His asserted fact references only Exhibit A1, which is the Kleinfeld's Overhead Diagram of Apartments and Parking Lot, and not A2, which is the Kleinfeld's Diagram of Parking Lot During Initial Encounter.   See Motion ¶ 36, at 8. Additionally, Kleinfeld's Overhead Diagram of Apartments and Parking Lot does not show Smith's patrol vehicle.  See Kleinfeld's Overhead Diagram of Apartments and Parking Lot at 1. Finally, asserting that a fact is immaterial does not dispute it.  Accordingly, the Court concludes that the fact is undisputed.

[36]The Plaintiffs respond by stating: "Admit.  Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Response at 8.  For the reasons stated in note 2, the Court concludes that this fact is undisputed.  See supra note 2.

located on scene, and a depiction of an estimation of where Officer Smith was positioned when he fired shots.  This diagram is not to scale.

Motion ¶ 38, at 9 (setting forth this fact).  See Kleinfeld Aff. ¶ 8, at 2; Kleinfeld's Diagram of Parking Lot After the Incident at 1.[37]

"Officer Smith has indicated on Exhibits A5, A6, and A7 to his affidavit of where he believes his approximate position was when he fired the shot a decedent Daniel Tillison." Motion ¶ 39, at 9 (setting forth this fact).  See Smith Aff. ¶¶ 36-37, at 7-8; Smith's Diagram of the Parking Lot After the Incident at 1; Picture of Parking Lot from Smith's Shooting Position Facing the SUV, filed May 12, 2014 (Doc. 11-1)(Exhibit A6 to Smith Aff.)("Smith's Picture From His Shooting Position"); Picture of Parking Lot from behind the SUV's Open Door, filed May 12, 2014 (Doc. 11-1)(Exhibit A7 to Smith Aff.); Response at 8 (not disputing this fact). "The photographs labeled as Exhibit A8, Exhibit A9, Exhibit A10, Exhibit A11, and Exhibit A12 [to Smith's affidavit] depict damage to the Mitsubishi SUV, Officer Smith's vehicle and to the silver 2008 Dodge pickup truck which was caused by the driver of the Mitsubishi SUV." Motion ¶ 40, at 9 (setting forth this fact).  See Kleinfeld Aff. ¶¶ 5, 6, & 8, at 2; Picture of Rear Right Tire of Vehicle, filed May 12, 2014 (Doc. 11-6)(Exhibit A8 to Kleinfeld Aff.); Picture of Patrol Car's Front and SUV's Back, filed May 12, 2014 (Doc. 11-6)(Exhibit A9 to Kleinfeld Aff.); Pictures of Front Left Side of the SUV, filed May 12, 2014 (Doc. 11-6)(Exhibit A10 to Kleinfeld Aff.)("Kleinfeld's Pictures of the Front Left Side of the SUV"); Pictures of the Trucks Rear Left Side, filed May 12, 2014 (Doc. 11-6)(Exhibit A11 to Kleinfeld Aff.); Pictures of the Truck's Back, filed May 12, 2014 (Doc. 11-6)(Exhibit A12 to Kleinfeld Aff.); Response at 8 (not

---

[37]The Plaintiffs respond by stating: "Admit.  Plaintiffs dispute that these facts are material to Defendant Smith's decision to use lethal force in violation of the 4th Amendment."  Response at 8.  For the reasons stated in note 2, the Court concludes that this fact is undisputed.  See supra note 2.

disputing this fact).[38]   "From Detective Kleinfeld's review of the autopsy report based upon his

training and experience as a crime scene investigator, Mr. Tillison's left arm was up and

---

[38]The Defendants assert the following fact: "Accident Reconstructionist Officer David Weidner was also dispatched to the scene of the shooting and he determined that from the physical evidence that the Mitsubishi had moved forwards and backwards more than once in the parking space while the front tires were turned to the right."  Motion ¶ 41, at 9-10.  The Plaintiffs dispute this fact by stating:

> Plaintiffs dispute Weidner's statement that the car Tillison was driving moved forward more than once.  Furthermore, Weidner's opinions are not proper evidence to support a motion for summary judgment under Fed. Rule Civ. Pro. 56 as they are hearsay and not based on personal knowledge.  Weidner has not been disclosed as an expert by Defendants and they have submitted no evidence that his testimony would survive any Daubert Motion/challenge or be otherwise admissible at trial.  At summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form.  See Hardy v. S.F. Phosphates Ltd. Co.,185 F.3d 1076, 1082 n. 5 (10th Cir. 1999).  The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in the court's role at the summary judgment stage.  To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence").  See also Sandoval v. Board of Regents, 75 N.M. 261, 263, 403 P.2d 699, 700-01 (1965)(court eliminated hearsay statements from the affidavit).

Response at 41 (emphasis in original).
        Smith replies by stating:

> Plaintiffs supposedly dispute Fact No. 41 based upon their expert report even though the expert does not opine how many times the vehicle moved backwards and forwards and there is also no indication that this expert went to the scene as Accident Reconstructionist Officer David Weidner has.   Nevertheless, the difference of opinion, if any, as to how often the vehicle moved forwards and backwards is immaterial as the times it did move forward and back, the record establishes that Mr. Tillison was a threat to Officer Smith.

Reply at 9.  The Court concludes that the Plaintiffs have disputed this fact.  In his report, Stewart breaks down the incident and describes each of the SUV's movements.  See Stewart Report at 5-6.  Stewart opines that the SUV reversed, drove forward, and then reversed again as Smith

extended forward as though he was holding onto the steering wheel when he was shot."  Motion ¶ 42, at 10 (setting forth this fact).  See Kleinfeld Aff. ¶ 20, at 4; Portion of Daniel Tillison's Autopsy Report, filed May 12, 2014 (Doc. 11-6).[39]

## PROCEDURAL BACKGROUND

The Plaintiffs filed suit in state Court on March 14, 2014, see Complaint at 1, and the Defendants removed the case to federal court on April 18, 2014, see Notice of Removal, filed April 18, 2014 (Doc. 1).  The Plaintiffs allege nine counts.  Count I alleges that Smith violated Tillison's Fourth Amendment right to be free from unreasonable seizure of himself and his black SUV.  See Complaint ¶¶ 105-114, at 14-15.  Count II alleges that Smith used excessive force in shooting Tillison.  See Complaint ¶¶ 115-119, at 15-16.  Count III alleges state-law tort claims against Smith, including assault, battery, false arrest, and false imprisonment.  See Complaint ¶¶ 120-128, at 16.  Count IV alleges that Defendant City of Albuquerque was negligent in hiring, training, supervising, and retaining Smith.  See Complaint ¶¶ 129-132, at 17-18.  Count V alleges a negligent assault and battery claim against the City of Albuquerque under a respondeat superior theory.  See Complaint ¶¶ 133-137, at 18.  Count VI alleges loss of consortium for I.M., the child of Plaintiff Mary Jobe, Tillison's girlfriend/fiancé at the time of his death.  See Complaint ¶ 5, at 2; id. ¶¶ 138-143, at 18-19.  Counts VII and VIII allege loss of consortium for

---

shot Tillison.  See Stewart Report at 5-6.  Thus, according to Stewart, the SUV drove forward only once.  Similarly, the Video Recreation shows the SUV driving forward only once.  See Video Recreation at 0:01-0:10.  This evidence directly contradicts Smith's asserted fact that the SUV drove forwards and backwards more than once.  Accordingly, the Court concludes that the fact is disputed.

[39]The Plaintiffs respond by stating: "Admit.  However, Weidner's opinions are not proper evidence to support a motion for summary judgment under rule 56."  Response at 9 (citation omitted).  Because the Plaintiffs do not dispute Smith's asserted fact, the Court concludes that it is undisputed.

D.T. and J.T., Jobe and Tillison's children.  See Complaint ¶¶ 4-5, at 2; id. ¶¶ 144-155, at 19-20.

Count IX alleges loss of consortium for Jobe.  See Complaint ¶¶ 156-161, at 20-21.

### 1.    **The Motion.**

Smith filed the Motion on May 12, 2014.  See Motion at 1.  Smith argues that Jobe, D.T.,

J.T., and I.M. lack standing to bring federal claims on their own behalf and that, if they are

bringing federal claims, the Court should dismiss them.  See Motion at 10.  He also argues that

Tillison's estate lacks standing to assert an unlawful seizure claim for the SUV, because Tillison

had no possessory interest in it.  See Motion at 10.  Smith maintains that a plaintiff must assert

his or her own legal rights and cannot rely on third parties' rights.  See Motion at 11 (citing

Warth v. Seldin, 422 U.S. 490, 499 (1975)).  He contends that, to have standing in a 42 U.S.C.

§ 1983 action, a plaintiff must assert that he or she suffered a constitutional violation, and not

that someone else suffered the wrong.  See Motion at 11 (citing Archuleta v. McShan, 897 F.2d

495, 497 (10th Cir. 1990); Dohaish v. Tooley, 670 F.2d 934, 936 (10th Cir. 1982)).  Smith

argues that the Plaintiffs must show that he deprived their constitutional rights and not third

parties' rights.  See Motion at 11 (citing Trujillo v. Board of Cnty. Comm'rs, 768 F.2d 1186,

1190 (10th Cir. 1985)).

Smith maintains that the Complaint does not contain any allegations showing that Jobe,

D.T., J.T., or I.M. can assert a cause of action on their own behalf.  See Motion at 12.  He argues

that Tillison was the only person involved in the incident.  See Motion at 12.  Smith also argues

that Tillison was not the registered owner of the Mitsubishi Montero that was reported stolen six

days before the shooting.  See Motion at 12.  Smith contends that, because Tillison did not

lawfully possess the SUV, he lacked a privacy interest in it and, therefore, has no standing to

assert his seizure claim.  See Motion at 12 (citing United States v. Worthon, 520 F.3d 1173, 1183

(10th Cir. 2008)).

Smith contends that he is entitled to qualified immunity on Counts I and II.  See Motion at 12.  He asserts that, because he raised the issue of qualified immunity, the record must contain sufficient facts to rebut the presumption that he is entitled to immunity.  See Motion at 12-13 (citing Medina v. Cram, 252 F.3d 1124, 1130 (10th Cir. 2001)).  Smith maintains that he did not seize Tillison until he shot him.  See Motion at 14.  Smith contends that, "'[u]nless an officer's show of authority succeeds in restraining the person, the person has not been seized within the meaning of the Fourth Amendment.'"  Motion at 14 (quoting Latta v. Keryte, 118 F.3d 693, 698 (10th Cir. 1997)).  Smith asserts that, when he ordered Tillison to show his hands and put them out the window, Tillison refused to comply with his instructions and attempted to flee.  See Motion at 14-15.  Smith contends that, even when he shot the SUV's rear tire, he did not seize Tillison, because the shot did not cause Tillison to stop.  See Motion at 15 (citing Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994)).

Smith argues that, even if he seized Tillison, he had reasonable suspicion and probable cause to do so.  See Motion at 15.  He contends that he received information through the CAD that a male in a black Mitsubishi Montero was possibly attempting to sell a stolen sound system.  See Motion at 17.  Smith also contends that he had information that the vehicle had been reported stolen and that it was in a high crime area.  See Motion at 17 (citing Gallegos v. City of Colorado Springs, 114 F.3d 1024 (10th Cir. 1997)).  He maintains that, based on the totality of the circumstances, he had reasonable suspicion to stop and detain the SUV's driver.  See Motion at 17.

Smith contends that he acted reasonable in approaching the SUV with his firearm drawn and in the low-ready position as he made contact with the driver.  See Motion at 17.  He asserts that, because police officers are not required to take unnecessary risks in performing their duties, they may take reasonably necessary steps to protect their personal safety and to maintain the

status quo during the course of an investigatory stop.  See Motion at 17 (citing United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)).  Smith states that the use of firearms, handcuffs, and other forceful techniques during an investigatory stop does not transform the stop into a custodial arrest, if the circumstances reasonably warrant such measures.  See Motion at 17 (citing United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994)).  He contends that, because he was investigating a felony crime in a high crime area, and because he observed Tillison moving around inside the SUV, Tillison posed an immediate threat that warranted Smith partially blocking the SUV with his patrol vehicle and drawing his firearm.  See Motion at 18. Smith asserts that, in Henry v. Storey, 658 F.3d 1235, 1239 (10th Cir. 2011), the United States Court of Appeals for the Tenth Circuit held that an officer did not use excessive force by pointing his weapon at a person whom the officer had probable cause to believe stole a vehicle. See Motion at 18.  Smith also asserts that, in Thomas v. Durastanti, 607 F.3d 655, 668 (10th Cir. 2008), the Tenth Circuit held that a reasonable officer could believe that it was necessary to display weapons when an undercover agent observed the occupants of a vehicle drive away from a high crime area, in a stolen vehicle, and in a reckless manner.  See Motion at 18-19.

Smith argues that he had an objectively reasonable basis to seize and arrest Tillison.  See Motion at 19.  Smith contends that the dispatcher told him that the vehicle was stolen and that there was no information that it had been recovered.  See Motion at 19.  He also contends that he observed an occupant inside the vehicle.  See Motion at 19.  Smith maintains that he had probable cause to believe that the vehicle was stolen.  See Motion at 19.  He argues that, when Tillison backed up the vehicle and nearly hit him with it, and when Tillison crashed the vehicle into Smith's patrol vehicle and into the truck, there was probable cause to arrest Tillison for a number of crimes, including Aggravated Assault against a Police Officer, Assault against a Police Officer, Attempted Aggravated Assault against a Police Officer, Aggravated Assault,

Attempted Aggravated Assault, Assault, Criminal Damage to Property, Resisting and Evading Arrest, and Refusing to Obey.  See Motion at 19-20.

Concerning the Plaintiffs' excessive force claim, Smith asserts that excessive force is judged from the perspective of a reasonable officer and that the Court should consider a number of factors, including (i) the severity of the crime; (ii) whether the suspect posed an immediate threat to the safety of the officer or others; and (iii) whether the suspect was actively resisting arrest or attempting to evade arrest.  See Motion at 20 (citing Graham v. Connor, 490 U.S. 386, 396-97 (1989)).  He asserts that deadly force is justified if a reasonable officer in his position would have probable cause to believe that there was a threat of serious physical harm to himself or to others.  See Motion at 20 (citing Sevier v. City of Lawrence, 60 F.3d 695, 699 (10th Cir. 1995)).  Smith contends that his assessment of danger did not have to be correct, but only reasonable.  See Motion at 20-21.  He states that an officer's conduct preceding the use of force is relevant, because an officer's own recklessness or deliberate conduct may create the need for the force.  See Motion at 21-22.  Smith contends that the Tenth Circuit uses a non-exclusive list of factors to assess the threat facing an officer: (i) whether the officer ordered the suspect to drop a weapon and whether the suspect complied; (ii) whether the suspect made any hostile motions with a weapon towards the officer; (iii) the distance separating the officer and the suspect; and (iv) the suspect's intentions.  See Motion at 22 (citing Estate of Larsen ex rel Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)).

Smith argues that, based on the totality of the circumstances -- which include Tillison moving around in the vehicle, nearly hitting Smith with the vehicle, moving the vehicle back and forward, and pointing a black object at Smith -- his actions in shooting Tillison were objectively reasonable.  See Motion at 22-23.  Smith contends that a reasonable officer in his position would have had probable cause to believe that Tillison posed a serious threat of physical harm.  See

Motion at 23.  Smith asserts that, even though the vehicle was found to be in reverse after the shooting, the vehicle's threat was still present, because Tillison could have easily put the vehicle in drive and drove it into Smith within a split second.  See Motion at 23 (citing Thomas v. Durastanti, 607 F.3d at 665; Waterman v. Batton, 393 F.3d 471, 479 (4th Cir. 2005)).

Smith asserts that his conduct immediately preceding the shooting did not rise to the level of recklessness.  See Motion at 24.  He contends that he parked his patrol vehicle in a manner that partially blocked the SUV, because he was looking for a stolen vehicle that he saw in the parking lot, and because he could not conceal his presence in the area.  See Motion at 24.  Smith maintains that he informed the dispatcher where the vehicle had last been seen, even though the dispatcher did not send another officer to assist him until after he parked behind the Mitsubishi. See Motion at 24.  Smith states that, as he approached the vehicle, he stayed to its side and that he "did not jump out in front of the car."  Motion at 24.  He asserts that he moved into the adjacent parking space as Tillison reversed the SUV and almost hit him.  See Motion at 24. Smith argues that Tillison's deliberate and reckless conduct created the danger.  See Motion at 24.

Smith contends that the clearly established law on March 19, 2012, would not have put him on notice that his conduct amounted to a constitutional violation.  See Motion at 25.  He argues that Thomas v. Durastanti demonstrates that his behavior was reasonable under the totality of the circumstances.  See Motion at 25 (citing Thomas v. Durastanti, 607 F.3d at 655). Smith maintains that there was no clearly established law that would have put him on notice that Tillison was seized when he did not submit to Smith's authority.  See Motion at 26 (citing California v. Hodari D., 499 U.S. 621, 625-26 (1991)).  He also maintains that there was no clearly established law that would have put him on notice that approaching a stolen vehicle, with

his weapon drawn in low-ready position, and shooting the vehicle's tire was unreasonable.  See Motion at 26 (citing Henry v. Storey, 658 F.3d at 1239; Bella v. Chamberlain, 24 F.3d at 1256).

Smith argues that the New Mexico Legislature has not waived his immunity under the NMTCA.  See Motion at 26.  He asserts that § 41-4-12 sets forth specific torts for which law enforcement officers' immunity is waived.  See Motion at 26 (citing N.M. Stat. Ann. § 41-4-12). Smith argues that his immunity has not been waived, because his actions were lawful, and because he had reasonable suspicion and probable cause to detain and arrest Tillison.  See Motion at 26-27 (citing Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, ¶¶ 12-14, 173 P.3d 6; Romero v. Sanchez, 1995-NMSC-028, 895 P.2d 212; Mead v. O'Connor, 1959-NMSC-077, ¶ 4, 344 P.2d 478).

## 2. The Response.

The Plaintiffs responded to the Motion on July 9, 2014.  See Motion at 1.  The Plaintiffs argue that the Smith Aff. contradicts many statements he made in the March 20, 2012, Interview, and in the March 26, 2012, Interview.  See Response at 1-2.  They contend that Smith had a better recollection of the shooting the day afterwards than two years later.  See Response at 2. The Plaintiffs state that Smith drafted the Smith Aff. with counsel's help and after conferring with other officers to "elaborately compose a story which would benefit them in the litigation of this matter."  Response at 2.  The Plaintiffs assert that Smith's contradictions matter, because they give the Court the ability to sanction Smith for providing false statements, and because they show that the Court should allow the Plaintiffs to conduct discovery.  See Response at 2 (citing Chavez v. City of Albuquerque, 402 F.3d 1039 (10th Cir. 2005); Condor v. A.L. Williams & Assocs., 739 P.2d 634, 641 n.1 (Utah Ct. App. 1987)).  The Plaintiffs argue that Smith's contradictory statements create credibility issues that a jury, and not a judge, should resolve.  See Response at 3 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  They contend

that the Supreme Court of the United States of America and the Tenth Circuit have reversed a district court's granting of summary judgment when the district court relied on affidavits from witnesses whom the nonmovant did not have an opportunity to cross examine.  See Response at 3-4 (citing Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 491 (1962); Adams v. Campbell Cnty. Sch. Dist., 483 F.2d 1351, 1353 (10th Cir. 1973)).

The Plaintiffs argue that summary judgment is inappropriate if more discovery is needed. See Response at 9.  They contend that they should have the opportunity to cross examine Smith and to obtain mental-health evaluations about Smith's disability rating from the Veteran's Administration ("VA"), because of his post-traumatic stress disorder ("PTSD").  Response at 9. The Plaintiffs assert that, under rule 56(d) of the Federal Rules of Civil Procedure, they should be permitted to conduct discovery.  See Response at 10.  They contend that, pursuant to rule 56(d), the Court should deny the Motion, defer ruling on it, allow time for discovery, or grant other appropriate relief.  See Response at 10.

The Plaintiffs maintain that Jobe, D.T., J.T., and I.M. have standing, because they have brought loss of consortium claims.  See Response at 11.  They contend that, because D.T. and J.T. are Tillison's biological children, they are Tillison's only statutory beneficiaries, and, thus, they have standing to bring claims on behalf of Tillison's estate.  See Response at 11.  The Plaintiffs maintain that a person's estate has standing to bring a § 1983 claim on his or her behalf.  See Response at 11-12 (citing Berry v. City of Muskogee, 900 F.2d 1489, 1506-07 (10th Cir. 1990)).  The Plaintiffs also assert that it is disputed whether Tillison was driving a stolen vehicle or whether he had permission to drive the vehicle.  See Response at 12.

The Plaintiffs argue that the Supreme Court, the Tenth Circuit, and New Mexico law make clear that a reasonable officer would have known that it was unconstitutional for Smith to shoot Tillison when he posed no threat to Smith or to the public.  See Response at 13.  They first

- 37 -

argue that Smith seized Tillison.   <u>See</u> Response at 13.   They contend that Smith lacked reasonable suspicion or probable cause to seize Tillison.   <u>See</u> Response at 13.   The Plaintiffs assert that Smith was dispatched to investigate a suspicious person and that there was no report that anything was stolen, including the vehicle, because the NCIC showed that it was not stolen. <u>See</u> Response at 13.   They contend that Smith had no probable cause that Tillison committed a crime, and that Tillison was merely sitting in his car in a parking lot and talking on the telephone, when Smith approached with his gun drawn and began yelling commands at Tillison.   <u>See</u> Response at 13.   The Plaintiffs assert that Smith's stop was a felony stop, which is more serious than an investigatory stop, because it involves aggressively extracting a vehicle's occupant at gunpoint, and handcuffing him or her on the ground.   <u>See</u> Response at 13 (citing Albuquerque Police Department Procedural Orders at 2 (dated Nov. 4, 2011), filed July 9, 2014 (Doc. 31-5)("APD Motor Vehicle SOP")).

The Plaintiffs argue that, by pulling his patrol car against Tillison's bumper, Smith's conduct was excessive in light of what Smith knew at the time of the stop and that Smith escalated the situation before making contact with Tillison.   <u>See</u> Response at 14.   The Plaintiffs state that, if Smith was so afraid that he needed to conduct a felony stop by blocking Tillison's vehicle and approach with his gun drawn, he should have called for backup rather than escalating the situation.   <u>See</u> Response at 14 (citing <u>Sevier v. City of Lawrence</u>, 60 F.3d at 699-701).   They contend that, in <u>Zia Trust Co. ex rel. Causey v. Montoya</u>, the defendant-officer rushed up to a van with his gun drawn and without backup, because the defendant-officer believed that a domestic violence suspect was driving the van.   <u>See</u> Response at 14.   The Plaintiffs assert that, there, the Tenth Circuit held that the defendant-officer's use of deadly force was unreasonable when he shot the van's driver as the driver tried to drive the van at the officer, but it was stuck on a pile of rocks and could only move about one foot.   <u>See</u> Response at 14.

The Plaintiffs maintain that Smith seized Tillison when he blocked his vehicle and approached the vehicle with his weapon drawn.  See Response at 14-15.  They contend that, if a police-citizen encounter exceeds the limits of an investigatory detention, the encounter becomes an arrest for which the officer needs probable cause.  See Response at 15 (citing United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008)).  The Plaintiffs maintain that, when Smith approached Tillison, he posed no threat to Smith and did not attempt to communicate with Smith.  See Response at 15.  They contend that the test for determining whether a person is seized is whether, considering all the circumstances, the police's conduct would have communicated to a reasonable person that he or she was not free to decline the officer's requests to terminate the encounter.  See Response at 16 (citing Lundstrom v. Romero, 616 F.3d 1108, 1119 (10th Cir. 2010)).  The Plaintiffs contend that, because Tillison did not pose a threat, and because Smith escalated the situation, Smith's actions were not reasonable to justify Tillison's seizure, and that Smith's de facto arrest of Tillison violated his Fourth Amendment rights.  See Response at 16.

The Plaintiffs argue that Smith's reliance on United States v. Albert and United States v. Holt is misplaced, because both cases involve traffic stops, which did not occur here.  See Response at 16.  They contend that a traffic stop presumably involves a subject first committing a traffic violation, which satisfies the probable cause standard; here, however, Tillison was merely sitting in a parked car and had allegedly offered to sell stereo equipment, which was later determined to not be stolen.  See Response at 16.  The Plaintiffs argue that, at most, Smith should have done an investigatory detention, which he did not do.  See Response at 16.  They contend that Smith's subjective belief whether there was probable cause is irrelevant, because the test is an objective one.  See Response at 17 & n.2.  They also contend that it is irrelevant

- 39 -

whether Tillison would have been charged with a crime, because the analysis focuses on what Smith knew at the time of the initial seizure.  <u>See</u> Response at 17.

The Plaintiffs argue that Smith's failure to warn Tillison that he intended to use deadly force was presumptively unreasonable.  <u>See</u> Response at 17.  They assert that the man who was talking with Tillison on the telephone heard Smith yell "show me your hands," and heard Tillison reply, "why?  I didn't do nothing wrong."  Response at 17 n.3 (alterations omitted).  The Plaintiffs contend that they should be able to cross examine Smith about this statement.  <u>See</u> Response at 17.  They state that Smith did not give Tillison any reason why he blocked his car, why he pointed a gun at him, or why he ordered him to put his hands up.  <u>See</u> Response at 17-18.  The Plaintiffs argue that Smith could see Tillison's hands during various times of the encounter, and that Smith was between five and ten feet away from Tillison when he shot him.  <u>See</u> Response at 18.  They state that Smith did not know what was in Tillison's right hand and argue that, "[i]f we allow officers to believe that they are justified in shooting someone without any basis that the person is actually armed we are living in a country that no longer acknowledges the foundations upon which the Fourth Amendment was founded."  Response at 18.  The Plaintiffs maintain that, when Smith shot Tillison, he was not an immediate threat to Smith or to the public.  <u>See</u> Response at 18.

The Plaintiffs contend that, in <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985), the Supreme Court held that, if a fleeing suspect does not pose an immediate threat to the officer or to others, the harm of failing to apprehend the suspect does not justify the use of deadly force.  <u>See</u> Response at 18.  They argue that deadly force is not justified unless, where feasible, a warning is given.  <u>See</u> Response at 18 (citing <u>Harris v. Roderick</u>, 126 F.3d 1189, 1201 (9th Cir. 1997)).  The Plaintiffs argue that, before shooting Tillison, Smith did not warn Tillison that he would use deadly force, even though it was feasible for him to give a warning.  <u>See</u> Response at 18.  They

contend that, while Tillison may have been trying to flee, Stewart's report shows that Tillison's vehicle never made any attempt to drive toward Smith.  See Response at 18.

The Plaintiffs maintain that Smith's shooting of Tillison was objectively unreasonable. See Response at 19 (citing Graham v. Connor, 490 U.S. at 397).  They assert that Smith's subjective and speculative fear about what might occur cannot justify his use of deadly force. See Response at 19 (citing Curley v. Klem, 298 F.3d 271, 280 (3d Cir. 2002)).  The Plaintiffs contend that Smith killed Tillison either out of an anticipated or accidental response to a PTSD flashback.  See Response at 19.  They argue that it was unreasonable for Smith to so quickly use deadly force before backup had an opportunity to arrive.  See Response at 19.  The Plaintiffs contend that Smith was not in immediate danger of being hit and that he did not know what Tillison had in his hand.  See Response at 19.  They assert that Smith's only remaining justification for shooting Tillison was that Tillison was trying to leave the parking lot.  See Response at 19-20.

The Plaintiffs argue that, in Cordova v. Aragon, 569 F.3d 1183 (10th Cir. 2009), the Tenth Circuit held that a motorist's fleeing from police, without more, is insufficient to justify the use of deadly force.  See Response at 20.  They argue that, there, the suspect was driving in the wrong direction on a highway and struck various objects before a police officer got in front of the suspect and shot him as he passed.  See Response at 20.  The Plaintiffs assert that the Tenth Circuit held that the officer was not justified in shooting the driver merely because there was a remote and speculative possibility that the driver may put someone else in danger.  See Response at 20.

The Plaintiffs argue that a state court found that a different Albuquerque Police Department ("APD") officer used unreasonable force in shooting a fleeing suspect and found that APD's deadly force training is not reasonably designed.  See Response at 21 (citing Higgins

v. City of Albuquerque, No. CIV 2009-0915 (N.M. 2d Jud. Dist.)).  They attempt to distinguish

Estate of Larsen ex rel Sturdivan v. Murr by arguing that Tillison was not armed, that the SUV

rolled backwards after Smith shot Tillison, that Tillison's cellular telephone is less than five

inches long, and that Smith was never in Tillison's path.  See Response at 21.  The Plaintiffs

argue that, immediately after Smith shot Tillison, he called dispatch and told them that he shot

Tillison because Tillison tried to run over him.  See Response at 21.  They state that Smith did

not mention that he believed that Tillison had a gun until the March 20, 2012, interview.  See

Response at 21.

The Plaintiffs argue that Smith violated APD's standard operating procedures ("SOPs").

See Response at 22 (citing Albuquerque Police Department Procedural Orders, Use of Force

(dated Apr. 20, 2009), filed April 18, 2014 (Doc. 1-2)("APD Use of Force SOP")).  They

contend that APD's SOPs require officers, where feasible, to give a warning before using deadly

force and state that, if a motor vehicle is bearing down on an officer, the officer should not fire at

the vehicle, but should attempt to move out of its path.  See Response at 22.  The Plaintiffs quote

the conclusions of their police procedures expert, Melvin Tucker, where he opines that Smith's

use of force was unreasonable.  See Response at 22-23 (citing Expert Report of Melvin L.

Tucker at 4-7, filed July 9, 2014 (Doc. 31-6)("Tucker Report")).  The Plaintiffs argue that

Smith's reckless conduct caused Tillison's death and the need to use deadly force.  Response

at 23.  The Plaintiffs also assert that the Department of Justice found that Smith was not justified

in shooting Tillison.  See Response at 23 (citing Letter to Mayor Richard J. Berry from Jocelyn

Samuels, Acting Assistant Attorney General, DOJ Civil Rights Division, and Damon P.

Martinez, Acting United States Attorney, District of New Mexico (dated April 10, 2014)("DOJ

Letter")).[40]

---

[40]Concerning this shooting the DOJ stated as follows:

In evaluating the totality of the circumstances surrounding an officer's use of deadly force, courts have considered "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001)(citations and internal quotation marks omitted). We reviewed several incidents that provide reasonable cause to believe that the officers were reckless and that their recklessness contributed significantly to their decision to use deadly force.

For example, in March 2012, an officer shot Daniel Tillison after approaching him without waiting for backup. The officer was responding to an anonymous call about an individual selling stereo equipment in a parking lot. When the officer arrived, Tillison was sitting in his car, which the officer believed might be stolen (he had received conflicting information prior to making contact with Tillison). The officer approached the driver's side of the car with his gun drawn. This is an important fact. If the officer believed Tillison posed such a threat to the officer or public safety that it was necessary to draw his weapon, it is not at all clear why the officer did not take cover and wait for other officers to assist him. There was no exigency that required the officer to act immediately; it was the officer who decided when to approach Tillison. The officer spoke to Tillison, recounting that Tillison was evasive and appeared to be reaching for something in the car. Tillison tried to get out of the car, but the officer pushed the door closed. Tillison then backed into the officer's vehicle and an adjacent truck. The officer shot at one of the vehicle's tires. As Tillison attempted to drive forward, the officer stated that he saw something that resembled a gun in Tillison's hand and that Tillison gave him a "warrior stare." The officer then shot directly at Tillison, killing him. The item in Tillison's hand was a cell phone; police found no guns in the car. Based on our review of the facts, Tillison did not pose an immediate threat of death or serious bodily harm and the shooting could have been avoided if the officer had waited for other officers to assist him. The officer was not in control of the situation because he approached Tillison alone and resorted to deadly force.

This incident bears striking similarities to the situation encountered by police in Zia Trust v. Montoya, 597 F.3d 1150, 1153 (10th Cir. 2010). In Zia Trust, an officer rushed up to a van that he believed was being driven by a domestic violence suspect. The officer had drawn his weapon and approached the van alone. Id. The suspect tried to drive his van at the officer, but it was stuck on a pile of rocks and could only move about a foot. Id. The officer shot the driver of the van, and he later died. Id. The Tenth Circuit found that the officer's

The Plaintiffs argue that, even if the Court dismisses their federal claims, the New Mexico Legislature has waived Smith's NMTCA immunity.[41]  They assert that New Mexico courts can interpret the New Mexico Constitution more broadly than the Constitution of the United States, but that New Mexico courts do not analyze a case under state constitutional law if the federal Constitution provides full protection.  See Response at 24 (citing State v. Wagoner, 2001-NMCA-014, 24 P.3d 274).  The Plaintiffs maintain that Smith's conduct violated both the New Mexico and United States constitutions.  See Response at 24.  They contend that the New

─────────────────────

> recklessness in how he approached the driver could support a finding that the officer's use of deadly force was unreasonable.  Id. at 1154-55.
>
> . . . .
>
> We identified other policy violations that went uninvestigated and uncorrected.  For instance, the policy allowing officers to use deadly force to disable a vehicle's tires was violated when officers shot directly at, and killed, Daniel Tillison and Mickey Owings. . . .
>
> . . . .
>
> We also observed deficiencies in how detectives approached shooting incidents that were questionable, i.e., not clearly justified.  Based on our review, detectives approached these incidents with less scrutiny than required, such as by failing to canvass for witnesses, to test the officer's account, and to address contradictions. . . .  In the shooting review of Daniel Tillison, detectives failed to canvass the area for witnesses even though the shooting occurred in a parking lot within sight of a number of residences.  In addition, in some reviews, the shooting officer's interview was attended by other officers who were involved in the incident.  This practice encourages collusion and discourages candor.  Finally, the reviews seemed biased in favor of clearing the officer as opposed to gaining a full understanding of the incident.  These deficiencies contribute to the pattern or practice of unnecessary uses of deadly force.

DOJ Report at 13-14, 25, & 28.  While the Court acknowledges the DOJ Report's existence, it has not in any way relied on it in this Memorandum Opinion and Amended Order.

[41]The Plaintiffs' Response states that "Officer Smith['s] immunity has not been waived under New Mexico's Tort Claims Act," but they go on to argue that Smith does not have immunity.  Response at 23-24.  The Plaintiffs likely meant to say that Smith's immunity has been waived.

Mexico Constitution provides greater protection than the United States Constitution.   See Response at 24 (citing State v. Gomez, 1997-NMSC-006, 932 P.2d 1).   The Plaintiffs argue that, because Smith's seizure of Tillison was illegal, he does not have immunity under the NMTCA. See Response at 24 (citing N.M. Stat. Ann. § 41-4-12).

### 3.    **The Reply**.

Smith replied to the Response on August 20, 2014.   See Reply at 1.   Smith argues that his March 20, 2012, and March 26, 2012, interviews do not contradict the Smith Aff.   See Reply at 1.   Smith asserts that homicide detectives, and not Internal Affairs officers, conducted the interviews and that his statements during the interviews were not sworn.   See Reply at 1 n.1.   He contends that the Plaintiffs are not entitled to cross examine affiants and that the Supreme Court regularly permits summary judgment based on affidavits when qualified immunity is raised.   See Reply at 1-2 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Siegert v. Gilley, 500 U.S. 226, 231 (1991)).

Smith argues that his mental health is not at issue in the case, because he is not relying on a physical, mental, or emotional condition as a defense.   See Reply at 10.   He argues that, in Estate of Turnbow v. Ogden City, 254 F.R.D. 434 (D. Utah 2008)(Warner, M.J.), the Honorable Paul M. Warner, United States Magistrate Judge for the District of Utah, reiterated that the Supreme Court has recognized a psychotherapist-patient privilege and that mental health records are normally protected from discovery.   See Reply at 10.   Smith contends that the Plaintiffs have not shown how his mental health records are relevant or essential to responding to the Motion. See Reply at 10-11.   He maintains that, when a defendant raises qualified immunity, the Court should stay discovery until it resolves the qualified-immunity issue and that the Court should narrowly tailor any discovery it allows.   See Reply at 10-11.

Smith argues that Jobe's, D.T.'s, J.T.'s, and I.M.'s loss of consortium claims are individual claims, and not claims that Tillison's estate is bringing on its behalf.  See Reply at 11. He argues that, while Jobe, D.T., J.T., and I.M. may be beneficiaries of Tillison's estate, they cannot assert claims on their own behalf by asserting that the claims are brought on the estate's behalf.  See Reply at 11 (citing Warth v. Seldin, 422 U.S. at 499; Dohaish v. Tooley, 670 F.2d at 936).  Concerning the SUV, Smith argues that the Plaintiffs have not submitted any evidence showing that Tillison owns the SUV or that he had permission to drive it.  See Reply at 11. Smith maintains that Tillison lacks standing to assert a constitutional violation with respect to the SUV.  See Reply at 11 (citing United States v. Worthon, 520 F.3d 1173, 1183 (10th Cir. 2008)).

Smith maintains that the Plaintiffs fail to present any facts showing that Tillison submitted to his authority before being shot, which would establish that Smith seized Tillison. See Reply at 12.  Smith contends that the Plaintiffs must show that he actually restrained Tillison.  See Reply at 12.  Smith states that the Plaintiffs' own expert, Stewart, opines that the vehicle did not come to a stop until after Smith shot Tillison.  See Reply at 12.  Smith argues that, without a showing that Tillison submitted to authority, there was no seizure.  See Reply at 12.

Smith argues that the Plaintiffs ignore the facts which the dispatcher told him, including that the person in a black Mitsubishi Montero was possibly trying to sell stolen goods, that the vehicle had been reported stolen, and that it was not listed as being recovered.  See Reply at 13. He contends that this information gave him reasonable suspicion to investigate further.  See Reply at 13.  Smith argues that the Court cannot rely on the Plaintiffs' argument that he violated an SOP to establish a constitutional violation.  See Reply at 13 (citing Tanberg v. Sholtis, 401 F.3d 1151, 1159 (10th Cir. 2005)).  He contends that the Plaintiffs' statement that he parked his

patrol car against the SUV's bumper lacks support in the record and is contrary to evidence which the Plaintiffs provided.  See Reply at 13.

Smith argues that he did not have to conduct an investigation before approaching the vehicle, because he did not need to take unnecessary risks, and because he faces a real threat each time he approaches an occupied vehicle.  See Reply at 14.  Smith argues that Zia Trust Co. ex rel. Causey v. Montoya is distinguishable, because that incident occurred at night, and because the officer in that case was not investigating a felony.  See Reply at 14.  Smith also argues that the officer in Zia Trust Co. ex rel. Causey v. Montoya did not announce that he was a police officer, the officer walked directly in front of the van with his gun drawn as he first approached the vehicle, and the van moved forward less than one foot.  See Reply at 14-15. Smith contends that, here, he was investigating a felony, he announced that he was a police officer, and Tillison's vehicle continuously moved.  See Reply at 14-15.  Smith asserts that he had probable cause, because Tillison disobeyed his orders, because Tillison tried to hit him with the SUV, and because Tillison rammed other vehicles with the SUV.  See Reply at 15.

In addressing the Plaintiffs' reference to the DOJ Letter, Smith argues that the letter does not have preclusive effect.  See Reply at 15 n.4 (citing Shaffer v. R.J. Reynolds Tobacco Co., 860 F. Supp. 2d 991, 999 (D. Ariz. 2012)(Zapata, J.); Pooshs v. Philip Morris USA, Inc., 904 F. Supp. 2d 1009, 1034 (N.D. Cal. 2012)(Hamilton, J.); In re Light Cigarettes Mktg. Sales Practices Litig., 691 F. Supp. 2d 239 (D. Me. 2010)(Woodcock, Jr., C.J.)).  Smith argues that he had no duty to warn Tillison before using deadly force.  See Reply at 15 (citing Thomson v. Salt Lake Cnty., 584 F.3d 1304, 1321 (10th Cir. 2009)).  He contends that the amount of force he used was not excessive, even though he learned afterwards that Tillison was not armed.  See Reply at 15-16 (citing Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005)).

Smith asserts that Tucker's report contains material omissions and improper conclusions. See Reply at 16.  He contends that Tucker fails to mention that Tillison was moving around inside the vehicle, reaching into the back of the vehicle, disobeying multiple commands to put his hands out the window, and attempting to flee by colliding with Smith's patrol car and the truck.  See Reply at 16-17.  Smith argues that Tucker fails to state that the reason Smith shot the vehicle's tire was because Tillison almost ran over Smith with the vehicle, and because Smith was directly in the vehicle's path.  See Reply at 17.  Smith contends that Tucker makes conclusory statements and inferences that are irrelevant, and the requisite legal standards do not support them.  See Reply at 17.  For those reasons, Smith maintains that the Court should disregard Tucker's report.  See Reply at 17 (citing Medina v. Cram, 252 F.3d at 1133).

### 4.    The November 24, 2014, Hearing.

The Court held a hearing on November 24, 2014.  See Transcript of Hearing (taken Nov. 24, 2014)("Tr.").[42]  Smith largely repeated his arguments from the briefing in regards to the standing and seizure issues.  See Tr. at 4:2-5:24 (Griffin).  Smith asserted that it is undisputed that Tillison drove the SUV backwards and forwards.  See Tr. at 5:25-6:17 (Griffin).  He stated that "the only time that [he is] contending that the vehicle itself was the deadly threat to officer Smith was when [Tillison] backed it up the first time and collided into officer Smith's police vehicle, and almost hit officer Smith."  Tr. at 6:17-22 (Griffin).  Smith stated that, when he "did end up using deadly force at Mr. Till[ison], it was the black object in which Mr. Till[ison] held out in . . . a gangster style type manner of holding a firearm, that caused him to . . . reasonably believe that it was a firearm and that he was about to get shot."  Tr. at 7:1-7 (Griffin).  Smith contended that the vehicle was still a component of the deadly threat, because he had to make a

---

[42]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

split-second decision.  See Tr. at 7:10-17 (Griffin).  Smith repeated his arguments from the briefing concerning whether he had probable cause or reasonable suspicion.  See Tr. at 7:17-8:20 (Griffin).  He asserted that this case is more similar to Thomas v. Durastanti than Zia Trust Co. ex rel. Causey v. Montoya, because he identified himself as an officer, he did not jump in front of the SUV, the SUV was not disabled, the situation was rapidly evolving, and he perceived a threat that he thought was a firearm.  See Tr. at 8:21-9:9 (Griffin).

The Court said that, when Smith called into dispatch and reported that there were shots fired, he stated that Tillison had attempted to run him over, suggesting that threat was the reason Smith shot Tillison.  See Tr. at 9:19-24 (Court).  The Court asked Smith if he was still asserting that he shot Tillison because Tillison tried to run over him.  See Tr. at 9:23-24 (Court).  Smith responded by stating that, during the dispatch call, he was trying to give a description of what happened, which included Tillison nearly running him over, but that the reason he used deadly force was because Tillison was holding a black object that could have reasonably been perceived to be a firearm.  See Tr. at 9:25-10:9 (Griffin).  Smith argued that the vehicle presented a secondary threat and that, while the vehicle was going in reverse when he shot Tillison, had Smith not shot Tillison, there is nothing that would have prevented Tillison from quickly changing direction.  See Tr. at 10:10-19 (Griffin).  Smith maintained, however, that "the actual deadly threat was the black object at the moment that the deadly force was" used.  Tr. at 10:19-21 (Griffin).

The Court asked Smith if there is a factual dispute why he shot Tillison, because he told the dispatcher that Tillison nearly ran him over, but now he is arguing that it was because of the cellular telephone.  See Tr. at 11:2-9 (Court).  Smith maintained that the dispatch call was merely a description of what happened, and not the reason for why he fired his gun, and that the reason he shot Tillison was because Tillison had a black object in his hand.  See Tr. at 11:10-21

(Griffin).  Smith stated that, at the time, he did not know which direction the vehicle was traveling, but that, for the Motion, the Court can assume that it was traveling in reverse.  See Tr. at 11:21-12:6 (Griffin).  Smith contended that he mentioned the black object during his interview with the homicide detectives, but that he is not sure if he mentioned it during his interview with internal affairs, because his counsel had not reviewed the transcript of the internal affairs interview.  See Tr. at 12:22-13:11 (Griffin).  Smith clarified that, when he stated that Tillison held the black object "gangster style," he means that, if the object were a gun, Tillison would have been holding in a manner so that it was turned sideways.  Tr. at 14:12-15:12 (Carpenter, Griffin, Court).

The Plaintiffs responded by stating that Jobe, D.T., J.T., and I.M. have brought loss-of-consortium claims, which they have standing to bring.  See Tr. at 16:14-25 (Carpenter).  The Plaintiffs clarified that Jobe's, D.T.'s, J.T.'s, and I.M.'s claims are all state law claims, and not federal ones.  See Tr. at 17:4-19 (Carpenter, Court).  The Plaintiffs argued that Smith has made a number of contradictory statements, including that he initially told the dispatcher that he shot Tillison because Tillison almost ran him over, but now he is arguing that he shot him because of the black object.  See Tr. at 18:14-19:20 (Carpenter).  The Plaintiffs maintained that this contradiction creates a genuine issue of material fact.  See Tr. at 20:13-21:1 (Carpenter, Court).  The Court asked the Plaintiffs whether both statements could be true -- that Smith shot Tillison because Tillison tried to run him over and because Tillison had a black object in his hand.  See Tr. at 21:3-18 (Court).  The Plaintiffs responded by stating that, when there are contradicting statements or credibility issues, the Court should let a jury decide the issues and not a judge.  See Tr. at 21:19-23:2 (Carpenter).  When the Court said that, because both statements can be true without having to make a credibility determination, the Plaintiffs argued that the two statements still create a factual issue that precludes summary judgment and that they should have the

opportunity to cross examine Smith about them.  See Tr. at 23:2-24:3 (Carpenter, Court).  The Plaintiffs argued that, even though Smith told the homicide detectives about the black object the day after the shooting, he said that he did not know what was in Tillison's hand.  See Tr. at 24:25-25:22 (Carpenter, Court).

They contended that a police officer cannot use deadly force, based on an object in someone's hand, before definitively determining what is in the person's hand.  See Tr. at 25:23-26:4 (Carpenter, Court).  The Court said that it agrees that a police officer is not justified in using deadly force just because a person has a cellular telephone in his or her hand, but that the context may matter, which was that Tillison was violently hitting two other vehicles.  See Tr. at 28:3-29:2 (Court).  The Plaintiffs responded by arguing that the stereo equipment and SUV were not stolen, which means that Smith lacked any justification to conducting a felony stop. See Tr. at 29:11-30:9 (Carpenter, Court).  The Plaintiffs asserted that their expert's conclusions show that Tillison did not almost run over Smith.  See Tr. at 26:5-20 (Carpenter).  They argued that, because Smith asserted that the vehicle almost ran over him, there is a genuine dispute whether the vehicle almost hit him, and what his justifications in shooting the tire and Tillison were and are.  See Tr. at 26:20-28:1 (Carpenter).

The Court asked the Plaintiffs how Tillison was seized if he never surrendered.  See Tr. at 30:9-31:3 (Carpenter, Court).  The Plaintiffs responded by arguing that Tillison was seized the moment Smith stopped him.  See Tr. at 32:13-19 (Carpenter).  They contended that, in United States v. Maez, 872 F.2d 1444, 1450-51 (10th Cir. 1989), the Tenth Circuit held that a person can be seized while he is inside his own house and disobeying officers' orders to exit.  See Tr. at 32:19-33:2 (Carpenter).  The Court said that case is different, because the defendant eventually complied by coming outside, whereas here, Tillison continued to try to escape.  See Tr. at 33:16-24 (Court).  The Plaintiffs responded by stating that the SUV's movements are disputed.

See Tr. at 33:25-34:4 (Carpenter).  They also argued that Smith relies on cases concerning traffic

stops and that this case does not involve a traffic stop.  See Tr. at 34:11-24 (Carpenter).

The Plaintiffs conceded that Smith had reasonable suspicion to conduct an investigatory

stop, but argued that Smith conducted a felony stop, which amounted to an arrest.  See Tr. at

34:25-35:17 (Carpenter, Court).  They contended that Smith's actions in blocking Tillison's

vehicle and approaching with his gun drawn constituted an arrest, and that Smith lacked probable

cause.  See Tr. at 35:15-37:9 (Carpenter, Court).  The Plaintiffs argued that the bullet's trajectory

indicates that Tillison's left hand was holding the SUV's steering wheel and that, because

Tillison was putting the car into reverse, his right hand was probably holding onto the gear panel.

See Tr. at 39:6-16 (Carpenter).  They asserted that Smith shot Tillison because he was fleeing,

which is unlawful.  See Tr. at 40:1-41:24 (Carpenter, Court).

Smith stated that, because Jobe, D.T., J.T., and I.M. are not bringing federal claims, there

is no standing issue for the Court to resolve concerning their claims.  See Tr. at 17:19-18:11

(Griffin, Court).  Smith asserted that there were no witnesses who observed the incident from

beginning to end.  See Tr. at 19:22-20:12 (Griffin, Court).  He contended that, during his

interview with the homicide detectives, he told them that he could not tell what Tillison was

holding in his right hand, but that it looked like a weapon.  See Tr. at 42:17-43:11 (Griffin).

Smith clarified that Tillison tried to run over him when he was standing next to the vehicle, at

which point Tillison put the vehicle into reverse and ran it into the patrol car.  See Tr. at 44:1-5

(Griffin).  Smith stated that Tillison turned the vehicle toward the patrol car in a maneuver that

Smith described as "a button hook."  Tr. at 44:5-6 (Griffin).  Smith argued that it was at this

point that Tillison came at him with the SUV.  See Tr. at 44:7-15 (Griffin).

The Court asked Smith what occurred when he first arrived at the scene, and he said that

he could not see Tillison's hands, that Tillison was reaching around inside the vehicle, and that

he was afraid that Tillison would exit the vehicle with a weapon drawn or to attack him.  See Tr.

at 44:18-45:6 (Griffin, Court).  The Plaintiffs responded by saying that, from Smith's statements,

they were confused what happened when Smith first approached the vehicle, because Smith said

at one point that the window was open and at another that it was down, and because Smith said

he closed the door, but it is not clear whether Tillison tried to open the door or whether Smith

did.  See Tr. at 45:9-46:1 (Carpenter).  The Court said it was concerned about granting summary

judgment when there was no statement by Smith that he was apprehensive or fearful of the black

object, and Smith responded by stating that in the Smith Aff. he said that he thought the black

object was a gun.  See Tr. at 46:6-47:9 (Griffin, Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)

(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will

bear the burden of persuasion at trial, that party must support its motion with credible evidence --

using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if

not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)

(emphasis in original).[43]  Once the movant meets this burden, rule 56 requires the nonmoving

---

[43]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely
understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R.
Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued

party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation omitted)(internal quotation marks omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

─────────────────

a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have

believed him.  The Court of Appeals should not have relied on such visible
fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the
> litigation, a plaintiff's version of the facts must find support in the record: more
> specifically, "[a]s with any motion for summary judgment, when opposing parties
> tell two different stories, one of which is blatantly contradicted by the record, so
> that no reasonable jury could believe it, a court should not adopt that version of
> the facts."  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)
> (quoting Scott [v. Harris], 550 U.S. at 380); see also Estate of Larsen ex rel.
> Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[44]] explained that the

---

[44]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller; Tadlock v. Lahood, 550 F. App'x 541 (10th Cir. 2013)
(unpublished); United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished);
Lobozzo v. Colo. Department of Corrections, 429 F. App'x 707 (10th Cir. 2011)(unpublished);
Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 361 F. App'x 924 (10th Cir. 2010)
(unpublished); United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished); Silvan
W. v. Briggs, 309 F. App'x 216 (10th Cir. 2009); Douglass v. United Auto Workers Local Union
31, 188 F. App'x 656 (10th Cir. 2006)(unpublished); Saville v. Int'l Bus. Machines Corp., 188
F. App'x 667 (10th Cir. 2006)(unpublished); Chavez v. Perry, 142 F. App'x 325 (10th
Cir. 2005)(unpublished); Miller v. City of Nichols Hills Police Department, 42 F. App'x 212
(10th Cir. 2002)(unpublished); Walker v. City of Oklahoma City, 203 F.3d 83 (10th Cir. Feb. 7,
2000)(unpublished)(table opinion); and Klick v. Hercules, Inc., 5 F.3d 546 (10th Cir. Aug.

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"    Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380. In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events. 550 U.S. at 379. Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony. There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury. And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation. If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.

584 F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th

Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes

---

19, 1993)(table opinion)(unpublished), have persuasive value with respect to material issues and will assist the Court in its preparation of this Memorandum Opinion and Amended Order.

are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING RULE 56(d)

Rule 56(d) of the Federal Rules of Civil Procedure provides:

**(d)     When Facts Are Unavailable to the Nonmovant.**

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

**(1)**     defer considering the motion or deny it;

**(2)**     allow time to obtain affidavits or declarations or to take discovery; or

**(3)**     issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee's notes to the 2010 amendments.   "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion."  Fed. R. Civ. P. 56(d) advisory committee's notes to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  See Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee's notes to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "'Unless dilatory or lacking in merit,'" a party's 56[(d)] application "'should be liberally treated.'"  Jensen v. Redevelopment Agency of

Sandy City, 998 F.2d at 1554 (quoting Comm. for 1st Amend. v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992)).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Rule 56(d) may not be invoked based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary-judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting that the movant has the evidence is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (denying a 56(d) request stating "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit").  See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004) (Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion), aff'd, 455

F.3d 1133 (10th Cir. 2006).  The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant.  Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented.  This includes identifying the probable facts not available and what steps have been taken to obtain these facts.  In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (quoting Comm. for 1st Amend. v. Campbell, 962 F.2d at 1522).  See Tadlock v. Lahood, 550 F. App'x 541, 547 (10th Cir. 2013)(citing Price ex rel. Price v. W. Res., Inc. for the requirements of rule 56(d) after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006) (unpublished)(stating that the affidavit must state "with specificity" how the additional time would enable the party to meet its burden).  A rule 56(d) affidavit or declaration must state, with specificity, what additional discovery is believed necessary.  See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005)(unpublished)("To resist summary judgment on this basis, a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues.").  If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery.  See Tadlock v. Lahood, 550 F. App'x at 547.

In determining whether a party has been dilatory in pursuing discovery, courts should consider: (i) "the length of the pendency of the case prior to the Rule 56[(d)] request"; (ii) "whether and when plaintiff could have anticipated its need for the requested discovery"; (iii) "the previous efforts, if any, made by plaintiff to obtain the needed information either through Rule discovery or otherwise"; (iv) "the degree and nature of discovery already undertaken"; (v) "any limitations placed upon discovery previously by the trial court"; (vi) "any

prior solicitations of or provisions for discovery by the trial court"; (vii) "any warning which plaintiff might have had that, absent a speedier request, discovery might be denied and his claim be dismissed"; and (viii) "whether the requested information was inaccessible to plaintiff, e.g. as when within defendant's exclusive control, or whether alternative, accessible sources existed but were foregone." Paul Kadair, Inc. v. Sony Corp. of Am., 694 F.2d 1017, 1031 (5th Cir. 1983). See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1555 n.7 (noting that the "Fifth Circuit enumerates eight factors to be considered in determining whether a party has been dilatory in seeking discovery" (citing Paul Kadair, Inc. v. Sony Corp. of Am., 694 F.2d at 1031)); Klick v. Hercules, Inc., 5 F.3d 546, at *4 n.3 (10th Cir. Aug. 19, 1993)(table opinion) (unpublished)(stating that Paul Kadair, Inc. v. Sony Corp. of America enumerates "eight factors which should be considered by the court before determining whether a party has been dilatory in conducting discovery"); Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 n.4 (10th Cir. 1984)(stating that the Fifth Circuit, in Paul Kadair, Inc. v. Sony Corp of America, "enumerates eight factors to be considered in determining whether a party has been dilatory in seeking discovery").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[45] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011) (Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[45]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

1.      **Color of State Law**.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The

under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .

furthers the fundamental goals of preserving an area of individual freedom by limiting the reach

of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for

conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th

Cir. 1995).   "The traditional definition of acting under color of state law requires that the

defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made

possible only because the wrongdoer is clothed with the authority of state law.'"   West v. Atkins,

487 U.S. at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).   "The authority with

which the defendant is allegedly 'clothed' may be either actual or apparent."   Jojola v. Chavez,

55 F.3d at 493.   Accordingly, at a base level, to find that an action was taken under color of state

law, the court must find that "'the conduct allegedly causing the deprivation of a federal right'

must be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d

at 1447 (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state

employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time,

it is 'well settled that an otherwise private tort is not committed under color of law simply

because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting

Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).   Thus, "before conduct may be fairly attributed to the state because it

constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's

use or misuse of their authority as a public employee, and the violation allegedly committed by

the defendant." <u>Jojola v. Chavez</u>, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

<u>David v. City & Cnty. of Denver</u>, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting <u>Martinez v. Colon</u>, 54 F.3d 980, 986 (1st Cir. 1995)).

##    2.    **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  <u>Trask v. Franco</u>, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  <u>Martinez v. Carson</u>, 697 F.3d at 1255 (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961), <u>overruled in part by</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  <u>Martinez v. Carson</u>, 697 F.3d at 1255 (citing <u>Trask v. Franco</u>, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be

guided by common-law tort principles -- including principles of causation . . . ."  <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).[46]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  <u>Lippoldt v. Cole</u>, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  <u>Bodine v. Warwick</u>, 72 F.3d 393, 400 (3d Cir. 1995).  "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  <u>Id.</u>  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  <u>See, e.g.</u>, <u>Warner v. Orange Cnty. Dep't of Prob.</u>, 115 F.3d 1068, 1071 (2d Cir. 1997); <u>Springer v. Seaman</u>, 821 F.2d 871, 877 (1st Cir. 1987), <u>abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 . . . (1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  <u>Martinez v. Carson</u>, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him

----

[46]The Court clarified in <u>Herrera v. Santa Fe Public Schools</u> that common-law causation standards do not necessarily apply in the municipal-liability context, and that, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d 1188, 1273 (D.N.M. Aug. 29, 2014)(Browning, J.).

> the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting William Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.   **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, . . . exercise of control or direction, or . . . failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate or conscious choice."  Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal quotation marks omitted).  Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must

also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v. Richardson, 614 F.3d 1185 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.  The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the

complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.  Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right.  In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.  Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.  Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

- 69 -

4.   **Municipal Liability**.

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.  See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).  Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.  See Graves v. Thomas, 450 F.3d at 1218.  When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.  See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and <u>Bivens v. Six Unknown Fed. Narcotics Agents</u>, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

<u>Pearson v. Callahan</u>, 555 U.S. at 232 (quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. <u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  <u>See</u> <u>Riggins v. Goodman</u>, 572 F.3d 1101, 1107 (10th Cir. 2009).

1.      **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the Constitution and then determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).[47]  Regarding the last of these seven

---

[47]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014). This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people. See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law"). But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law). If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read the unwritten signals of its superior courts, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong. For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance." Kerns v. Bader, 663 F.3d at 1180-81. Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.

- 73 -

circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address

the first prong before the second prong in cases involving a recurring fact pattern, where

guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely

only to face challenges in the qualified immunity context.   Camreta v. Greene, 131 S. Ct.

at 2031-32.   See Kerns v. Bader, 663 F.3d at 1181.[48]   "Courts should think carefully before

---

The Court is concerned about this push to not decide constitutional issues, for a number of reasons.  The Court set forth some of these in Kerns v. Board of Education, which the Court quotes in note 48.  See infra note 48.  Additionally, there is a practical problem.  Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated.  If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision.  While appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

[48]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

_____

> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  Wood v. Strickland, 420 U.S. 308, 322 (1975).  In Harlow v. Fitzgerald, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. See 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").[49]  The Tenth Circuit will remand a case to the

---

has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

[49]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

_____

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those

district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

> **2.**      **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to

---

presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

    On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).   A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."   Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"   Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).   "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."   Anderson v. Creighton, 483 U.S. at 639.   "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken

beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

### LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally

may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996). Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing." Oliver v. Woods, 209 F.3d at 1186.

### 1.    Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention. An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)). Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for

making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).   Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.   United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").   A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, which probable cause or consent must support to be valid.   See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.   "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."   Terry v. Ohio, 392 U.S. at 29.   In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.  See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk")

which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).   The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194.   The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.   See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").   While many of the factors that the Tenth Circuit considered would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.   See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.   See 355 F. App'x at 227-28.   A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.   See 355 F. App'x at 228.   Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which

the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed

unconcerned and told him that the man in the truck had asked only if she needed a ride; she had

refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and

admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind

the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer

discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he

had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found

that the facts available to the officer would have led a reasonable officer to conclude that

reasonable suspicion existed and that the officer's "subjective characterization of his actions is

irrelevant."  355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable

Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, wrote and Judges Briscoe

and McWilliams joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian.  Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355 F. App'x at 229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.  See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's:

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417.  At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vazquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.  483 F. App'x at 418 (quoting District Court Opinion at 19).  The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."  483 F. App'x at 418.  The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of

the dwelling."   483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)).   The Tenth

Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her conclusion that the officer

lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could

have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into

the home."  483 F. App'x at 417.

2.      **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may

nevertheless be justified as an arrest.   An arrest is a seizure that is "characterized by highly

intrusive or lengthy search or detention."   Oliver v. Woods, 209 F.3d at 1186 (quoting United

States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).   The general rule is that "the use of

firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person

has been placed under arrest.   United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th

Cir. 1994).   See Florida v. Royer, 460 U.S. 491, 499 (1983).   The use of handcuffs, however,

does not always elevate a detention into an arrest.   See United States v. Albert, 579 F.3d 1188,

1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop.");

United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The

use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake,

No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. Apr. 30, 2014)

(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the

plaintiff, whom he suspected had recently assaulted a person on the side of the road by

threatening him with a gun).   "Inasmuch as an arrest exceeds an investigative stop's limited

scope or duration, it must be supported by probable cause."   United States v. Rodriguez, 836

F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.).   See Wilson v. Jara, 866 F. Supp. 2d 1270,

1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by

highly intrusive or lengthy search or detention.'"  (quoting Oliver v. Woods, 209 F.3d at 1185)),

aff'd, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'"  United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

- 87 -

3.      __When a Detention Becomes an Arrest__.

The Tenth Circuit has held that a police-citizen encounter which goes beyond the limits of an investigative stop is an arrest which probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").  "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances."  United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'"  United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp. 2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's determination in United States v. Perea that the officers had reasonable suspicion to believe that

the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); United States v. Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest. 'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974. See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the

safety of the agents."). <u>United States v. Perea</u> was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous. <u>See</u> 374 F. Supp. 2d at 976. The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat. The measures taken during a <u>Terry</u> stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety. The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous. The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat. The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4.   **Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.**

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." <u>Romero v. Fay</u>, 45 F.3d 1472, 1476-77 (10th Cir. 1995). Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]." <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1259 (10th Cir. 1998). However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect." <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *49 (citing <u>Cortez v. McCauley</u>, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

The Tenth Circuit confronted the issue when an officer must conduct further investigation before arresting an individual in Romero v. Fay.   In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder.  See 45 F.3d at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.  See 45 F.3d at 1474.  The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred.  See 45 F.3d at 1474.  The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.  See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  See 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, authored, and Judges Tacha and McKay joined.  See 45 F.3d at 1476.  The Tenth Circuit stated that the Fourth Amendment requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention."  45 F.3d at 1476-77.  The Tenth Circuit determined that,

[o]nce [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . . Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff]. They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest. Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.   See 478 F.3d at 1113 (internal quotation marks omitted).   Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.   See 478 F.3d at 1113.   The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

> whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].   See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.   Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").   Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted).   The Tenth Circuit further held that

> it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."   Romero, 45 F.3d at 1476-77 (footnote omitted); see also Baptiste v. J.C. Penney, Co., 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").   In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.   Defendants, however, . . . conducted no investigation.   Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

Cortez v. McCauley, 478 F.3d at 1117-18 (footnotes omitted)(citations omitted).   The Tenth Circuit concluded, therefore, that qualified immunity did not apply.   See 478 F.3d at 1118-22.

In Garcia v. Casuas, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.   See 2011 WL

7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights.  See 2011 WL 7444745, at *12.  The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz.  See 2011 WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."  2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights.  See 2011 WL 7444745, at *15.  Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie.  See 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . .  Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . .
>
> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . .  The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:
>
> > Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff,

under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n. 8.

. . . .

These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause.  Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him.  When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . .  Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . .  During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives.  The cases that Garcia cites establish only that the police may not ignore available material witnesses.  Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed.  Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . .  Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination,

because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect.  See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).  The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview.  Casuas was not required to investigate further after that determination.

2011 WL 7444745, at *47-49.

## RELEVANT LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d at 1128.  Accord Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1137-38 (D.N.M. 2011)(Browning, J.).  An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."  Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level

of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.  A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .   That perspective includes an examination of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)(citations omitted)(internal quotation marks omitted).   When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d at 1128.

**1.      Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.

> These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260.  In Weigel v. Broad, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan

v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).    Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. at 396.

### 2.        Least- or Less-forceful Alternatives in Excessive-Force Cases.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor."  James v. Chavez, No. CIV 09-0540, 2011 WL 5822726, at *17 (D.N.M. Nov. 9, 2011)(Browning, J.).    The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.  Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").   "To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so

long as the method chosen is reasonable." Tanner v. San Juan Sheriff's Office, 864 F. Supp. 2d 1090, 1115 (D.N.M. 2012)(Browning, J.).

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop under Terry v. Ohio of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotation marks omitted)(citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards . . . should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th

Cir. 1994). Similarly, "violations of state law and police procedure generally do not give rise to a [42 U.S.C. §] 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force)[, abrogated on other grounds by Saucier v. Katz, 533 U.S. at 205]. Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052.

Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty. Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones." 28 F.3d at 1052 (internal quotation marks omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct

which is objectively 'reasonable' under the Fourth Amendment."); <u>Scott v. Henrich</u>, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); <u>Menuel v. City of Atlanta</u>, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."); <u>Plakas v. Drinski</u>, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under <u>Tennessee v. Garner</u> [471 U.S. 1 (1985)] and <u>Graham v. Connor</u>.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  <u>Jonas v. Bd. of Comm'rs</u>, 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.).  <u>See</u>, <u>e.g.</u>, <u>Blossom v. Yarbrough</u>, 429 F.3d at 968 ("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."  (quoting <u>Medina v. Cram</u>, 252 F.3d at 1133)); <u>Jiron v. City of Lakewood</u>, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  <u>See also</u> <u>Roy v. Inhabitants of the City of Lewiston</u>, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); <u>Diaz v. Salazar</u>, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."

Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983).  The Court has also rejected the consideration of a less intrusive alternative to end a threat.  See Jonas v. Bd. of Comm'rs, 699 F. Supp. 2d at 1293 ("To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least-, or even a less-, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable."); Chamberlin v. City of Albuquerque, No. CIV 02-0603 JB/ACT, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

### 3.    The Actual-Injury Requirement.

As the Court explained in Sisneros v. Fisher, 685 F. Supp. 2d 1188 (D.N.M. 2010)(Browning, J.),

> [t]here might appear to be some tension within the Tenth Circuit case law whether physical injury is an element of an excessive-use-of-force claim.  The Tenth Circuit has stated that there is no physical-injury element, yet, in handcuffing cases, the Tenth Circuit has required something more than redness or soreness to establish the actual-injury element of an excessive-use-of-force claim.  The Court concludes that, in the Tenth Circuit, temporary redness or soreness is, as a matter of law, a de minimis injury for the purpose of an excessive-use-of-force claim.

685 F. Supp. 2d at 1208.

The cases make clear that "actual injury," not "physical injury," is required to sustain a claim of excessive use of force.  E.g., Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)("[T]o recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." (emphasis added)(quoting Cortez v. McCauley, 478 F.3d at 1129 n.25)).  The Tenth Circuit explained in Vondrak v. City of Las Cruces: "We have consistently rejected a bright-line

rule requiring plaintiffs to demonstrate <u>physical</u> injury when bringing excessive force claims. . . . Nevertheless, when an excessive force claim relies upon unduly tight handcuffing, we have held that the plaintiff must show 'some <u>actual</u> injury.'"   535 F.3d at 1208 (citing <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1195 (10th Cir. 2001))(emphasis added)(citations omitted).  In <u>Cortez v. McCauley</u>, the Tenth Circuit explained in more depth:

> In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some <u>actual</u> injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight.  Although Rick Cortez complained to the officer that the handcuffs were too tight, the summary judgment record presents too little evidence of any actual injury.  We believe that a claim of excessive force requires some <u>actual injury that is not de minimis, be it physical or emotional.  The only evidence in the record is his affidavit that the handcuffs left red marks that were visible for days afterward.</u>  This is insufficient, as a matter of law, to support an excessive force claim if the use of handcuffs is otherwise justified.

478 F.3d at 1129 (emphasis added)(citations omitted).  Thus, in <u>Cortez v. McCauley</u>, the Tenth Circuit rejected Cortez' excessive-use-of-force claim, not because he lacked physical injury, but because his injury -- in his case, a physical injury -- was de minimis.  <u>See</u> 478 F.3d at 1129-30. The implication is that, had Cortez alleged some emotional injury, or some additional physical injury such as a dislocated shoulder or sprained wrist, his injuries would have risen to a non-de minimis level, and become the "actual injury" that an excessive-use-of-force claim requires. <u>E.g.</u>, <u>Vondrak v. City of Las Cruces</u>, 535 F.3d at 1209 (finding genuine issue of fact existed whether plaintiff suffered "actual injury" when, in addition to unduly tight handcuffing, plaintiff provided evidence that he might have permanent nerve damage in his wrists).

The quintessential example of this injury requirement is <u>Holland ex rel. Overdorff v. Harrington</u>, in which a Sheriff deployed the SWAT team to execute an arrest warrant at a home in which the officers knew that other persons, including children, would be present.  <u>See Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d at 1192.  The Tenth Circuit had to answer the question

whether the officers' action of detaining the plaintiffs "at gunpoint, initially forcing several of them to lie down on the ground for ten to fifteen minutes, and ultimately gathering all of them in the living room of the residence" was an excessive use of force under the Fourth Amendment. 268 F.3d at 1192.  Ultimately, the Tenth Circuit found that it was an excessive use of force, notwithstanding the lack of any alleged physical injuries:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.  These are the very ingredients relevant to an excessive force inquiry.  Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.  Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances.

268 F.3d at 1192-93 (internal citations and quotation marks omitted).  The Tenth Circuit did not, however, stop there.  In response to an argument that the plaintiff's claim must fail for want of evidence of physical injury, the Tenth Circuit stated:

> Physical injury may be the most obvious injury that flows from the use of excessive force.  Yet the interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property and privacy interests -- a person's "sense of security" and individual dignity.  No physical injury was pleaded in Baker[ v. Monroe Township, 50 F.3d 1186 (3d Cir. 1995)] or McDonald[ v. Haskins, 966 F.2d 292 (7th Cir. 1992)].  Nor was physical injury alleged in Bivens v. Six Unknown Named Agents, 403 U.S. 388 . . . (1971), which held that officers may be held liable in damages for violating persons' Fourth Amendment rights, including the use of unreasonable force.

268 F.3d at 1195.  It thus appears that the Tenth Circuit does not require evidence of physical injury to satisfy the "actual injury" element of an excessive-use-of-force claim.  Neither Vondrak v. City of Las Cruces nor Cortez v. McCauley repudiates that rule.  See Fisher v. City of Las Cruces, 584 F.3d at 897 (stating that Cortez v. McCauley "acknowledged -- and did not

overrule -- our prior conclusion that in excessive force cases 'proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element'").  The holdings in those cases apparently demonstrate only that the Tenth Circuit has decided that the injuries alleged in those cases -- redness and pain that unduly tight handcuffing caused -- are, as a matter of law, de minimis injuries.

In some instances, emotional trauma in addition to the soreness in the plaintiff's wrists is still insufficient.  In one unpublished opinion, the Tenth Circuit held that officers committed no constitutional violation when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction-of-justice statute.  See Silvan W. v. Briggs, 309 F. App'x 216, 224 (10th Cir. 2009)(unpublished).  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See 309 F. App'x at 224.  In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

> While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed.  Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing. . . .  Similarly, there is no evidence that Cory suffered any injury from being denied liquids. . . .  Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity -- even if it may later seem unnecessary in the peace of a judge's chambers -- rises to the level of a constitutional violation.

309 F. App'x at 224-25 (citations omitted)(internal quotation marks omitted).

### 4.    Overlapping Excessive-Force and Unlawful-Arrest Claims.

The Tenth Circuit has also explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising
> from a single encounter, it is necessary to consider both the justification the
> officers had for the arrest and the degree of force they used to effect it.  If the
> plaintiff can prove that the officers lacked probable cause, he is entitled to
> damages for the unlawful arrest, which includes damages resulting from any force
> reasonably employed in effecting the arrest.  If the plaintiff can prove that the
> officers used greater force than would have been reasonably necessary to effect a
> lawful arrest, he is entitled to damages resulting from that excessive force.  These
> two inquiries are separate and independent, though the evidence may overlap.
> The plaintiff might succeed in proving the unlawful arrest claim, the excessive
> force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127.  Moreover,

> in a case where police effect an arrest without probable cause or a detention
> without reasonable suspicion, but use no more force than would have been
> reasonably necessary if the arrest or the detention were warranted, the plaintiff has
> a claim for unlawful arrest or detention but not an additional claim for excessive
> force.

478 F.3d at 1126.  See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M. 2009)

(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate with

the circumstances" depends upon whether the arrest was lawful).  Thus, if it is clear that the

amount of force used would have been reasonable if the detention or arrest had been appropriate,

then the plaintiff can recover damages only for the unlawful arrest -- including any damages that

flow from the officers' use of force during the arrest -- but there will be no separate

excessive-use-of-force claim.  See Cortez v. McCauley, 478 F.3d at 1127 (holding that a plaintiff

must present evidence that the force used was more than that which would be required in

effectuating a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful

arrest and the use of excessive force).

> As the Court has explained:

> Thus, the Court must engage in a two-part inquiry when addressing combined
> excessive-use-of-force and unlawful-arrest claims.  First, was there an unlawful
> arrest?  Second, if there was an unlawful arrest, was the amount of force used
> greater than what would have been necessary to [e]ffect a lawful arrest?  If the
> amount of force used would have been reasonable to [e]ffect an arrest if an arrest

> had been justified, the damages for excessive force are subsumed within the
> damages for unlawful arrest.  It is only when the force was excessive as compared
> to the execution of a lawful arrest that a plaintiff can recover on both claims

Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1211 (D.N.M. 2010)(Browning, J.)(citing Cortez v.

McCauley, 478 F.3d at 1126).

## LAW REGARDING THE NMTCA

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent

unfair and inequitable results which occur in the strict application of the doctrine of sovereign

immunity."  N.M. Stat. Ann. § 41-4-2(A).  The New Mexico Legislature also recognized,

however,

> that while a private party may readily be held liable for his torts within the chosen
> ambit of his activity, the area within which the government has the power to act
> for the public good is almost without limit, and therefore government should not
> have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A).  As a result, it was "declared to be the public policy of New

Mexico that governmental entities and public employees shall only be liable within the

limitations of the Tort Claims Act and in accordance with the principles established in that act."

N.M. Stat. Ann. § 41-4-2(A).  The NMTCA is also "based upon the traditional tort concepts of

duty and the reasonably prudent person's standard of care in the performance of that duty."

N.M. Stat. Ann. § 41-4-2(C).

The NMTCA is the

> exclusive remedy against a governmental entity or public employee for any tort
> for which immunity has been waived under the Tort Claims Act and no other
> claim, civil action or proceeding for damages, by reason of the same occurrence,
> may be brought against a governmental entity or against the public employee or
> his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).  A plaintiff may not sue a New Mexico governmental entity, or its

employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to

immunity that the NMTCA grants.  See Begay v. State, 1985-NMCA-117, 723 P.2d 252, 255 ("Consent to be sued may not be implied, but must come within one of the exceptions to immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay, 1986-NMSC-049, 721 P.2d 1306.  A plaintiff also may not sue a governmental entity or its employees for a damage or damages claim arising out of violations of rights under the New Mexico Constitution unless the NMTCA contains a waiver of immunity.  See Barreras v. N.M. Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation, the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-004, ¶ 8, 952 P.2d 474 (noting that a plaintiff cannot seek damages for violations of rights under the New Mexico Constitution against a city or its employees or agents unless the NMTCA waives immunity); Rubio v. Carlsbad Mun. Sch. Dist., 1987-NMCA-127, ¶ 13, 744 P.2d 919, 922 (holding that no waiver of immunity exists for damages arising out of alleged educational malpractice claim against a school board); Begay v. State, 1985-NMCA-117, ¶ 14 (finding that no waiver exists in NMTCA for suit under Article II, § 11 of the New Mexico Constitution). "Thus, if no specific waiver can be found in the NMTCA, a plaintiff's complaint against the governmental entity or its employees must be dismissed."  Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2013 WL 5554185, at *24 (D.N.M. Aug. 20, 2013)(Browning, J.)(citing Begay v. State, 1985-NMCA-117).

## ANALYSIS

The Court will grant the Motion in part and deny it in part.  The Court will dismiss Count I of the Complaint, because Smith did not seize Tillison, and because Smith had probable cause to arrest Tillison.  Also, because Smith had probable cause, the Court will dismiss the Plaintiffs'

false arrest and false imprisonment claims in Count III.  The Court will deny Smith's remaining requests in the Motion.  Jobe, D.T., J.T., and I.M. have standing, because they allege only state law claims.  Additionally, the Plaintiffs have standing to argue that Smith seized the SUV, because it is reasonable to infer that Tillison had a possessory interest in the SUV.  It is disputed whether a reasonable officer could have believed that Tillison posed a threat of serious bodily harm to himself or others, and the law was clearly established at the time that Smith could not use deadly force when Tillison did not pose such a threat.  Moreover, because it is disputed whether Smith used excessive force, it is also disputed whether he committed assault and battery against Tillison.

## I.   THE PLAINTIFFS DO NOT NEED TO CONDUCT DISCOVERY TO RESPOND TO THE MOTION.

The Plaintiffs do not need to conduct discovery to respond to the Motion.  The Plaintiffs assert that they should be able to conduct discovery of Smith's medical records to discover his mental state when he shot Tillison.  See Response at 9.  The Plaintiffs request that the Court, pursuant to rule 56(d), defer ruling on the Motion, deny the Motion, permit them to conduct discovery, or issue any other appropriate relief.  See Response at 10.  Rule 56(d) requires the nonmovant to file an affidavit or declaration showing why he or she "cannot present facts essential to justify its opposition" to a motion for summary judgment.  Fed. R. Civ. P. 56(d).

The Plaintiffs did not file a rule 56(d) affidavit in connection with the Motion, but they filed one in opposition to the Defendants' Motion, [sic] and Memorandum in Support of Defendants' Motion for Stay of Discovery and Request for Entry of a Protective Order, filed May 29, 2014 (Doc. 16)("Motion to Stay").[50]  See Affidavit of Counsel for Plaintiffs Under FRCP Rule 56(d), filed June 26, 2014 (Doc. 27)("Rule 56(d) Aff.").  In the Rule 56(d) Aff., the

---

[50]On March 17, 2015, the Court granted the Motion to Stay.  See Order, filed March 17, 2015 (Doc. 68).

Plaintiffs' counsel states that discovery is necessary to reconcile conflicting statements that Smith made about the shooting and to determine whether Smith suffers from PTSD.  See Rule 56(d) Aff. ¶¶ 2, 4, at 1-2.

The Court will deny the Plaintiffs request for discovery for three reasons.  First, the additional discovery is unnecessary.  Rule 56(d) states that the Court may defer considering the Motion, deny it, or allow discovery if the nonmovant "cannot present facts essential to justify its opposition" to the Motion.  Fed. R. Civ. P. 56(d).  The additional evidence that the Plaintiffs seek goes only to their excessive force claim and not their seizure claim.   In this Memorandum Opinion and Amended Order, the Court concludes that there is a genuine issue a material fact whether Smith used excessive force in violation of Tillison's constitutional rights.   The additional evidence is, therefore, not essential to the Plaintiffs' opposition to the Motion.  Even without this additional evidence, the Court will deny the Motion, as it concerns the Plaintiffs' excessive force claim.

Second, the Plaintiffs' request for discovery on Smith's PTSD is unnecessary.   In Defendants Martin Smith, the City of Albuquerque, and the City of Albuquerque Police Department's Answer to Plaintiffs' Complaint for Alleged Civil Rights Violations, filed April 25, 2014 (Doc. 10)("Answer"), the Defendants refused to respond to paragraphs 12 and 13 of the Complaint -- which allege that Smith suffers from PTSD and that the VA gave Smith a one hundred percent disability rating, because of his PTSD's severity -- by invoking Smith's physician-patient privilege.  See Answer ¶ 8, at 2.  Smith moved for the Court to require the Defendants to respond to paragraphs 12 and 13 of the Complaint, see Plaintiffs' Motion to Strike Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor Patient Privilege [Doc. 10], filed May 14, 2014 (Doc. 13), which the Court did on March 12, 2015, see Order at 2, filed March 12, 2015 (Doc. 65)("Because there is no federal physician-patient privilege, the

Court will order the Defendants to amend their Answer to either admit, deny, or claim insufficient knowledge or information to form a belief about the truth of the Plaintiffs' allegations in paragraphs 12 and 13 of the Complaint."). On March 17, 2015, the Defendants amended their Answer to admit that Smith was diagnosed with PTSD and to admit that the VA assigned him a disability rating of thirty percent. See Defendants Martin Smith, the City of Albuquerque, and the City of Albuquerque Police Department's Amended Answer to Plaintiffs' Complaint for Alleged Civil Rights Violations ¶ 8 at 2, filed March 17, 2015 (Doc. 66). Because the Defendants have admitted that Smith suffered from PTSD and received a thirty percent disability rating from the VA, the Plaintiffs do not need to conduct discovery to uncover this information.

Third, Smith's contradictory statements do not entitle the Plaintiffs to discovery. If Smith made contradictory statements, the Plaintiffs do not need to conduct discovery to reconcile these statements. Instead, the contradictory statements create a factual dispute.[51] See Whidbee

---

[51]The Plaintiffs have not argued that the Court should disregard the Smith Aff. as a sham affidavit. If they had, however, the Court would find that the Smith Aff. is not a sham affidavit. The Tenth Circuit has held that, "in determining whether a material issue of fact exists, an affidavit may not be disregarded merely because it conflicts with the affiant's prior sworn statements." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001) (internal quotation marks omitted)(quoting Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)). To determine whether contradictory statements make an affidavit a sham, the Tenth Circuit considers three factors: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d at 973 (quoting Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)). Here, Smith was not cross-examined during the March 20, 2012, Interview or the March 26, 2012, Interview. It is unknown whether Smith had received additional evidence to which he did not have access during the previous interview. Most important, the March, 2012, interviews and the Smith Aff. contain little -- if any -- conflicting information that is important. See supra note 15 (conflicting in regards to whether Smith walked towards the SUV's rear panel or the SUV's front window); supra note 19 (conflicting in regards to whether the SUV's front window was open); supra note 23 (conflicting in regards to whether Tillison drover forward before reversing); supra note 25 (conflicting in regards to whether Smith walked towards his patrol car before shooting the SUV's

v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 73 (2d Cir. 2000)("Especially in light of the conflicting statements made by Grable, . . . we conclude that summary judgment on this issue would be inappropriate."); Overstreet v. Kentucky Cent. Life Ins. Co., 950 F.2d 931, 943 (4th Cir. 1991)("Conflicting statements concerning the extent of such misconduct create a jury issue that must survive a motion for summary judgment.").  The Plaintiffs do not need to confront Smith about these statements to oppose the Motion.  Rather, if Smith made two conflicting statements, one of which favors the Plaintiffs and one of which favors Smith, the Plaintiffs need only point out these discrepancies and, in viewing the evidence in a light most favorable to the Plaintiffs, the Court will either disregard Smith's asserted fact or will accept the Plaintiffs' version of events as true, assuming there is evidentiary support.  Discovery is unnecessary. Accordingly, because discovery is not essential to the Plaintiffs' opposition to the Motion, the Court will deny the Plaintiffs' rule 56(d) requests.

II.    **THE PLAINTIFFS HAVE A SUFFICIENT SUBJECTIVE EXPECTATION OF PRIVACY TO ASSERT THAT SMITH   UNLAWFULLY   SEIZED   THE MITSUBISHI MONTERO.**

The Plaintiffs have a sufficient subjective expectation of privacy to assert that Smith unlawfully seized the Mitsubishi Montero.[52]   Smith argues that, because Tillison had no

_____

rear tire and whether the SUV was moving when Smith shot the tire); supra note 29 (conflicting in regards to whether Tillison was driving forward or in reverse when Smith saw the cellular telephone in his right hand).   While these conflicts may seem like a large number of contradictions, they are relatively minor in resolving the Motion and in determining whether Smith's conduct was reasonable, and most of the conflicts can likely be chalked up to a faulty memory, rather than an intent to defraud the Court.

[52]While the Tenth Circuit has consistently referred to the test of whether a search or seizure implicates a person's Fourth Amendment rights as one of standing, see, e.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."), the question is one that "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing," Minnesota v. Carter, 525 U.S. 83, 87 (1998)(internal quotation marks

possessory interest in the SUV, his estate lacks the ability to assert that the vehicle was unlawfully seized.  See Motion at 10.[53]  Smith argues that the SUV was stolen and that Tillison was not in lawful possession of it.  See Motion at 12.  Smith maintains that, because Tillison did not have lawful possession of the vehicle, he had no privacy interest in it.  See Motion at 12.  The problem with Smith's argument is that it is disputed whether Tillison was in lawful possession of the vehicle.

As a purportedly undisputed fact, Smith asserts that the SUV was reported stolen on March 13, 2012, and that Kerry Vanamburg is the SUV's registered owner.  See Motion ¶ 6, at 2.  To support this fact, however, Smith relies on a police report that is inadmissible hearsay.  See supra note 6.  In the Reply, Smith attempts to rectify the hearsay issue by stating that the March

---

omitted)(quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978)).  See United States v. Davis, 750 F.3d 1186, 1190 (10th Cir. 2014)("Although this principle is often called 'standing,' the idea that personal Fourth Amendment rights must be at stake is more properly subsumed under substantive Fourth Amendment doctrine."  (internal quotation marks omitted)(citation omitted)). While the substantive Fourth Amendment law is "invariably intertwined" with the "concept of standing," Rakas v. Illinois, 439 U.S. at 139, and while courts, including the Tenth Circuit, consistently refer to this concept as one of standing, see, e.g., Marshall v. Rudek, 570 F. App'x 823, 829 (10th Cir. 2014)(unpublished)("But it is well established that an eviction terminates any reasonable expectation of privacy in a dwelling, and thus, a former occupant lacks standing to assert a Fourth Amendment challenge."), the Court will not refer to Smith's challenge as one of standing, because the "reference to 'standing' in a Fourth Amendment context is a misnomer because such standing is not jurisdictional," United States v. Creighton, 659 F.3d 1281, 1286 n.2 (10th Cir. 2011)(stating that referring to the defendant's challenge as standing is a "misnomer," but consistently referring to it as one of standing throughout the opinion).  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1127 (D.N.M. 2014)(Browning, J.)("[T]he analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test.").

[53]Smith originally argued that Jobe, D.T., J.T., and I.M. lack standing to assert any civil rights claims.  See Motion at 12.  At the hearing, however, the Plaintiffs clarified that Jobe, D.T., J.T., and I.M. are asserting state law claims only, and not federal ones.  See Tr. at 17:4-19 (Carpenter, Court).  Smith conceded that Jobe, D.T., J.T., and I.M. have standing to bring these state law claims, and that Tillison's estate has standing to bring the federal claims.  See Tr. at 17:20-18:11 (Griffin, Court).

13, 2012, CAD shows that the SUV was reported stolen, and by stating that he "has requested a certified copy of a title history of this vehicle and will supplement the record once it is received." Motion at 4. Smith has not supplemented the record, and the March 13, 2012, CAD merely shows that the vehicle was reported stolen on March 13, 2012, and not that Kerry Vanamburg is the registered owner. See March 13, 2012, CAD at 1.

The Court is left with the following undisputed facts: (i) the Mitsubishi Montero was reported stolen on March 13, 2012; (ii) as of March 19, 2012, no one reported that the vehicle was recovered; (iii) on March 19, 2012, the vehicle was not listed in the NCIC as being stolen; and (iv) Tillison was in the vehicle on March 19, 2012. The Court is left with two possibilities. First, the vehicle had not been recovered, and the NCIC had just not been updated to show that the vehicle was stolen. Second, the vehicle had been recovered and returned to its owner, but the APD had not updated its records to show that the vehicle was recovered. Accordingly, the Court can either infer that the NCIC record had not been updated -- which is an inference that is favorable to Smith -- or it can infer that the APD's records had not been updated -- which is an inference that is favorable to the Plaintiffs. Because the Court must draw all reasonable inferences in the Plaintiffs' favor, see, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, the Court will infer that the vehicle had been recovered and that the APD's records had not been updated, rather than assuming that the NCIC's records had not been updated. Moreover, because the Court does not have any admissible evidence -- such as a title -- showing who the owner is, and because Tillison was driving the car, it is reasonable to infer that Tillison is the owner or at least had permission to drive the vehicle. Tillison thus has sufficient interest in the vehicle for his estate to have the ability to assert its seizure claim. The United States Court of Appeals for the Ninth Circuit has explained: "The fact that property was seized from the claimant's possession, for example, may be sufficient evidence, when coupled with a claim of ownership, to

establish standing at the summary judgment stage."   United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 639 (9th Cir. 2012).

The United States may rebut the reasonable inferences that the Court has made if it presents sufficient evidence showing that Tillison had no possessory interest in the vehicle.  For example, the United States can -- as it said it would -- present a certified title history showing that the vehicle did not belong to Tillison.  Similarly, the United States may present an affidavit from the vehicle's true owner, stating that Tillison did not have permission to drive the vehicle.  The United States has not done either of these things.  All the Court has is that the vehicle was reported stolen, it was not listed on the NCIC report as stolen, it was not reported as being recovered, and Tillison had possession of the vehicle.  Because the Court must draw all reasonable inferences in the Plaintiffs' favor, the Court concludes that Tillison's estate has the ability to bring its seizure claim for Smith's seizure of the Mitsubishi Montero.

## III.   SMITH DID NOT UNLAWFULLY SEIZE TILLISON OR THE SUV BEFORE THE SHOOTING.

Smith did not unlawfully seize Tillison or the SUV before the shooting.  First, Smith did not seize Tillison, because Tillison never submitted to Smith's authority.  Second, even if Smith had seized Tillison, the seizure was lawful, because Smith had probable cause to believe that the Mitsubishi Montero was stolen.

### A.   SMITH DID NOT SEIZE TILLISON.

Smith did not seize Tillison.  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority,' terminates or restrains his freedom of movement."  Brendlin v. California, 551 U.S. 249, 254 (2007)(quoting Florida v. Bostick, 501 U.S. 429, 434 (1991)). If an officer attempts to seize a suspect, either through physical force or through a show of

authority, but fails to do so, there is no seizure.  See United States v. Beamon, 576 F. App'x 753, 757-58 (10th Cir. 2014)(unpublished)("[The officer's] exercise of physical force was only an attempted seizure and therefore did not implicate the Fourth Amendment."  (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845 n.7 (1998)("Attempted seizures of a person are beyond the scope of the Fourth Amendment.")))).  Even going so far as shooting a fleeing suspect does not constitute a seizure unless the shooting stopped the suspect.  See Brooks v. Gaenzle, 614 F.3d 1213, 1224-25 (10th Cir. 2010)(affirming district court's grant of summary judgment and conclusion that the defendants did not seize the plaintiff by shooting him as he fled).

Here, Tillison did not submit to Smith's authority.  Smith approached the SUV with his firearm drawn while ordering Tillison to put his hands out the window, but Tillison never did.  Instead, Tillison placed the SUV in reverse, hitting Smith's police car.  Smith shot the SUV's back tire, and Tillison drove the SUV forward into the wall.  Again, Tillison put the SUV into reverse, at which point Smith shot him.  Even though Smith had his gun drawn, ordered Tillison to put his hands out the window, and shot the SUV's rear tire, Tillison never obeyed or submitted to Tillison's force or authority.  The Plaintiffs argue that Smith seized Tillison when he parked his patrol vehicle behind Tillison's SUV.  See Response at 14-15.  They do not explain, however, how Tillison submitted to Smith's authority or show of force.

This case is similar to the United States Court of Appeals for the Fifth Circuit's case of United States v. Holloway, 962 F.2d 451, 455-58 (5th Cir. 1992), which the Tenth Circuit cited with approval in United States v. Salazar, 609 F.3d 1059, 1065-66 (10th Cir. 2010).  In United States v. Holloway, two police officers parked their patrol vehicle in the street to block the defendant's car.  See 962 F.2d at 453.  The two officers got out of their vehicle, drew their guns, displayed their badges, and yelled "police, police, police."  962 F.2d at 453.  The defendant momentarily stopped his vehicle while another patrol car parked behind him.  See 962 F.2d

- 116 -

at 454.  Instead of surrendering, the defendant put his vehicle in reverse and rammed the patrol

car behind him with enough force to disable both vehicles.  See 962 F.2d at 454.  The Fifth

Circuit, in an opinion that the Honorable Emilio M. Garza, United States Circuit Judge for the

Fifth Circuit, authored, and Judges Davis and Jones joined, held that the defendant was not

seized until he crashed his vehicle into the patrol car.  See 962 F.2d at 458.  Judge Garza

reasoned that, because the defendant refused to submit to the officer's show of authority by

attempting to flee, the defendant was not seized when the officers first pulled in front of him and

drew their firearms.  See 962 F.2d at 456-57.

> [The officers] never laid their hands upon [the defendant] -- they never even came
> within fifteen feet of [the defendant's] person until after he attempted to flee and
> damaged his vehicle beyond repair -- and, in fact, [the defendant] was able to
> break away from [the officers] and travel far enough to pick up enough speed to
> irreparably damage both his vehicle and the one occupied by [the other officers].
> Only then was [the defendant's] movement restrained -- meaning *under the*
> officers' control.

962 F.2d at 457 (footnote omitted).

Here, Smith parked his patrol car behind Tillison's vehicle, approached with his gun

drawn, and ordered Tillison to put his hands out the window.  Tillison never submitted, however,

to Smith's authority.  Instead, Tillison attempted to flee by reversing into Smith's patrol vehicle,

driving forward, and reversing again.  Smith's show of authority and force did not seize Tillison,

because Tillison never submitted.

Smith's shooting of the SUV's rear tire does not change the analysis.  In Bella v.

Chamberlain, the Tenth Circuit, in an opinion that the Honorable Deanell R. Tacha, United

States Circuit Judge for the Tenth Circuit, authored, and Judge Brorby and the Honorable Byron

R. White, then-retired Associate Justice of the United States Supreme Court, sitting by

designation, held that shooting a fleeing helicopter did not constitute a seizure, because the shots

did not cause the pilot to submit the officers' authority.  See 24 F.3d at 1256.  Judge Tacha wrote

that "[t]he shots constituted an assertion of authority, but they did not cause [the pilot] to submit nor did they otherwise succeed in stopping him." 24 F.3d at 1256 (footnotes omitted). The Tenth Circuit took this rationale one step further in <u>Brooks v. Gaenzle</u>, where it held, in an opinion that the Honorable Wade Brorby, United States Circuit Judge for the Tenth Circuit, authored and Judges O'Brien and Gorsuch joined, that an officer does not seize a fleeing suspect by shooting him or her unless the shot terminates the suspect's movement or causes the officer to have physical control over the suspect. <u>See</u> 614 F.3d at 1224.

Here, Smith shot Tillison's vehicle. The shot did not stop Tillison from attempting to flee. After the shot, Tillison drove forward and then reversed the vehicle. Tillison did not stop the vehicle, and the shot did not disable it. Therefore, Smith did not seize Tillison when Smith shot the vehicle's rear tire.

The Plaintiffs argue that the Tenth Circuit has held that a person can be seized inside his or her own house while disobeying officers' orders to exit the house. <u>See</u> Tr. at 32:19-33:2 (Carpenter)(citing <u>United States v. Maez</u>, 872 F.2d at 1450-51). In <u>United States v. Maez</u>, the Tenth Circuit did not hold that a person can be seized inside his or her house while disobeying officers' orders to exit the house. <u>United States v. Maez</u> stands for the well-established rule that a person is seized when he or she submits to an officer's show of authority. There, the police surrounded the suspect's home, pointed rifles at the home, and used loudspeakers to order the suspect, his wife, and child to exit the home. <u>See</u> 872 F.2d at 1450. Instead of disobeying the officers' orders -- as the Plaintiffs assert the suspect did -- the suspect submitted to the officers' authority by exiting the home. <u>See</u> 872 F.2d at 1450.

> Given the presence of some ten officers, the drawn weapons of the SWAT team surrounding the trailer, the use of the loudspeakers, and the frightening circumstances his family faced, a reasonable person would have believed he had to come out of the home and submit to the show of authority. Accordingly, we hold that [the suspect] was arrested while in his home.

United States v. Maez, 872 F.2d at 1450.  Similarly, the Court has held that a seizure can occur

through a telephone call when an officer calls a suspect, orders him or her to exit the house, and

the suspect complies.  See Smith v. Kenny, 678 F. Supp. 2d 1124, 1173-75 (D.N.M. 2009)

(Browning, J.).  In both situations, the police asserted authority by ordering the suspects to exit

their houses, and the suspects complied by submitting to the assertions of authority.  Here,

Tillison never submitted to Smith's assertion of authority.  Accordingly, Smith did not seize

Tillison before he shot him.[54]  The Court will thus dismiss Count I of the Complaint.[55]

---

[54]In Count I -- their seizure claim -- the Plaintiffs allege that Tillison was seized when Smith "park[ed] his patrol car directly behind Daniel Tillison's black SUV," and when Smith pointed a gun at Tillison and ordered him to show his hands.  Complaint ¶¶ 107-111, at 14-15.  The Plaintiffs do not allege that Smith unlawfully seized Tillison when he shot him.  The Plaintiffs' excessive force claim covers the shooting.  See Complaint ¶¶ 115-119, at 15-16.  The Court has, thus, only considered and decided whether Smith seized Tillison before the shooting and not whether Smith seized Tillison when he shot him.  The Plaintiffs' decision to limit their unlawful seizure claim solely to Smith's conduct before the shooting is likely because they believe that Smith had probable cause to arrest/seize Tillison at the time he shot Tillison.  The Plaintiffs may believe that, when Smith initially arrived on the scene, he lacked probable cause, but that, when Tillison rammed Smith's patrol car, Smith had probable cause to arrest Tillison.  The Fifth Circuit's case of United States v. Holloway is illustrative.  There, the Fifth Circuit concluded that the suspect was not seized when officers blocked the suspect's path and pointed guns at him, because the suspect attempted to flee by reversing his car and hitting a patrol car behind him.  See 962 F.3d at 459.  The Fifth Circuit, thus, did not consider whether the officers had probable cause to arrest the suspect when they blocked his path, but concluded that, after the suspect rammed his car into the patrol car, the officers had probable cause to arrest him, because of the suspect's attempted flight and his ramming of the patrol car.  See 962 F.3d at 460-61.  Similarly, here, even if Smith lacked probable cause to arrest Tillison when he first approached the SUV, Tillison's attempted flight and ramming of Smith's patrol car would have given Smith probable cause to arrest Tillison.

[55]The Plaintiff's seizure claim -- Count I -- is for the seizure of Tillison's person and the SUV.  See Complaint ¶¶ 105-114, at 14-15.  The Plaintiffs allege that Smith seized Tillison when he parked his patrol car behind Tillison's SUV and when he ordered Tillison to show his hands.  See Complaint ¶ 106-111, at 14-15.  The Plaintiffs do not allege that Smith or the APD seized Tillison's SUV after the shooting.  Even though the Court concludes that the Plaintiffs have standing to bring a cause of action for the seizure of the SUV, because they allege only that Smith seized the SUV before the shooting, which the Court concludes he did not, the Court will dismiss the Plaintiff's Count I in its entirety, including the Plaintiffs' claim for the seizure of Tillison and of the SUV.

**B.     EVEN IF SMITH SEIZED TILLISON, HE HAD PROBABLE CAUSE TO DO SO.**

Even if Smith seized Tillison, he had probable cause to do so.  Once a stop becomes an arrest, probable cause must support the arrest.  See Wilson v. Jara, 866 F. Supp. 2d at 1292 ("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'").  "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be seized has committed or is about to commit a crime." Manzanares v. Higdon, 575 F.3d 1135, 1144 (10th Cir. 2009)(quoting Cortez v. McCauley, 478 F.3d at 1116).  "In the context of a qualified immunity defense on an unlawful search or arrest claim, [the Tenth Circuit] ascertain[s] whether a defendant violated clearly established law 'by asking whether there was 'arguable probable cause' for the challenged conduct." Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014)(quoting Kaufman v. Higgs, 697 F.3d 1297, 1300 (10th Cir. 2012)).  "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." Stonecipher v. Valles, 759 F.3d at 1141 (quoting Cortez v. McCauley, 478 F.3d at 1120).  "A defendant 'is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff.'" Stonecipher v. Valles, 759 F.3d at 1141 (quoting Cortez v. McCauley, 478 F.3d at 1120).

Several courts have held that an officer has probable cause to arrest the driver of a vehicle for stealing the vehicle or for knowingly operating a stolen vehicle if the vehicle has been reported stolen.  See, e.g., Miller v. City of Nichols Hills Police Dep't, 42 F. App'x 212, 216 (10th Cir. 2002)(unpublished)("The NCIC report indicating that the vehicle had been reported as stolen, as relayed to the officers by the dispatcher, was sufficient to provide probable cause for

the arrest."); <u>Rohde v. City of Roseburg</u>, 137 F.3d 1142, 1144 (9th Cir. 1998)("If an officer has reliable information, such as a police report, indicating that the vehicle has been stolen, he thus has probable cause to believe that the driver has committed the crime of either stealing the car or knowingly operating a stolen vehicle."); <u>Pittman v. City of New York</u>, No. CIV 14-4140 ARR/RLM, 2014 WL 7399308, at *3 (E.D.N.Y. Dec. 30, 2014)(Ross, J.)("[T]he electronic record indicating plaintiffs' vehicle was still reported as being stolen, though inaccurate, was sufficient to establish probable cause to stop the plaintiffs and investigate the matter . . . ."); <u>Palmer v. Town of Jonesborough</u>, No. CIV 08-345, 2009 WL 1255780, at *6 (E.D. Tenn. May 1, 2009)(Mattics, J.)("At the time of the arrest, Rice and Hawkins knew that Plaintiff had possession of a vehicle reported to the NCIC as stolen and, therefore, had probable cause to arrest Plaintiff."); <u>Tinch v. United States</u>, 189 F. Supp. 2d 313, 319 (D. Md. 2002)(Chasanow, J.) ("Probable cause was unquestionably established by the fact that the car was reported as stolen in the NCIC, thereby precluding the Fourth Amendment claim.").

In this case, Smith received a call from the dispatcher that a suspicious person was attempting to sell possibly stolen stereo equipment out of the Mitsubishi Montero.   The dispatcher then told Smith that the Montero was reported stolen a week earlier, but that it was not listed as stolen on the NCIC database.   The dispatcher told Smith that there was no information showing that the SUV was recovered.   Smith was, thus, left with conflicting information.   The SUV was reported stolen and was not reported recovered, but was not listed as stolen on the NCIC database.   If the SUV was listed as stolen on the NCIC database, Smith would undoubtedly have had probable cause to arrest Tillison.   <u>See, e.g.</u>, <u>Miller v. City of Nichols Hills Police Dep't</u>, 42 F. App'x at 216 ("The NCIC report indicating that the vehicle had been reported as stolen, as relayed to the officers by the dispatcher, was sufficient to provide probable cause for

the arrest.").  The conflicting information makes probable cause less-than crystal clear, but the Court still concludes that, as a matter of law, Smith had probable cause to arrest Tillison.

Receiving conflicting information does not, in and of itself, preclude a finding of probable cause.  In Stonecipher v. Valles, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") agents searched the suspects' house, believing that he had been convicted of domestic violence and was in possession of a firearm, in violation of 18 U.S.C. § 922(g)(9).  759 F.3d at 1139.  The ATF agents obtained state court documents which showed that the suspect had pled guilty to a misdemeanor domestic assault charge and that he had a suspended imposition of sentence which required the suspect to serve one year of probation.  See 759 F.3d at 1139.  The agents obtained a report from the National Instant Background Check System ("NICS"), indicating that the suspect had been denied the right to purchase a firearm in 2007 because of his domestic assault conviction.  See 759 F.3d at 1139.  The agents also obtained a NCIC report, which stated that the suspect pled guilty to the domestic assault charge.  See 759 F.3d at 1139. The NICS and NCIC reports also stated, however, that the suspect had zero convictions, that suspended imposition of sentence dispositions are not considered convictions, and that the records are closed when probation is completed.  See 759 F.3d at 1144.  Additionally, the NICS report stated that the suspect's denial of his right to purchase a fire arm was later overturned. See 759 F.3d at 1144.  It turned out that the suspect's domestic assault conviction was not a qualifying conviction under § 922(g)(9).  See 759 F.3d at 1140.

The Tenth Circuit held, in an opinion that the Honorable Timothy M. Tymkovich, United States Circuit Judge for the Tenth Circuit, authored, and Judges Kelly and McHugh joined, that the officers had arguable probable cause to search the suspect's house.  See 759 F.3d at 1145. Judge Tymkovich wrote that, because the conflicting information was confusing, because the documents required the reader to know state law probation requirements, and because an

Assistant United States Attorney agreed with the officers' conclusion, the officers had arguable probable cause to search the house.  See 759 F.3d at 1145.

Based on the totality of the circumstances, Smith had probable cause to arrest Tillison, despite the conflicting reports.  The Mitsubishi had been reported stolen, and the dispatcher did not have any information showing that it was recovered.  Additionally, someone called to report that a suspicious person was selling a stereo system out of the Mitsubishi, which the dispatcher reported to Smith was possibly stolen.  The stereo system further adds to the probable cause that the Mitsubishi was stolen, and that the driver either stole it or was knowingly driving a stolen vehicle.  Smith could have reasonably believed that the driver was selling a stolen vehicle's stereo system or that the driver was using a stolen vehicle to commit further crime.  That the Mitsubishi was not listed as stolen on the NCIC report does not undercut, or undercut much, Smith's probable cause determination.   The vehicle was reported stolen, there was no information that it was recovered, and the driver was selling possibly stolen stereo equipment out of the vehicle.  In light of this evidence, it was reasonable for Smith to believe that a clerical error or some other oversight led to the vehicle not being listed on the NCIC report.  Smith, thus, had arguable probable cause to believe that the SUV was stolen, which justified him arresting Tillison.

## IV.    THERE IS A MATERIAL ISSUE OF DISPUTED FACT WHETHER SMITH USED EXCESSIVE FORCE IN SHOOTING TILLISON.

There is a material issue of disputed fact whether Smith used excessive force in shooting Tillison.  "If a particular use of force is considered deadly force, then an officer's use of that force is reasonable only 'if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.'"  Thomson v. Salt Lake Cnty., 584 F.3d at 1313 (emphasis omitted)(quoting Estate of Larsen ex

rel. Sturdivan v. Murr, 511 F.3d at 1260).  The Tenth Circuit uses a nonexclusive list of factors to ascertain "the degree of threat the suspect poses to the officers," which includes "'(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'"  Thomson v. Salt Lake Cnty., 584 F.3d at 1313 (quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260).  "In determining the objective reasonableness of an officer's conduct [the Tenth Circuit] look[s] to the totality of the circumstances, viewing the situation 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'"  Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d at 1154 (quoting Graham v. Connor, 490 U.S. at 396).

There is a genuine issue of material fact whether Smith had probable cause that Tillison posed a threat of serious physical harm to Smith or to others.  In the Motion, Smith argues that Tillison posed a serious threat because he tried to run over Smith with the SUV, because Smith was "at or within [Tillison's] path of travel," and because, even though the SUV was in reverse when Smith shot Tillison, Tillison "could have easily put the vehicle in drive and driven it into Officer Smith within a split second."  Motion at 23.  Smith also argues that Tillison posed a threat, because he was pointing a black object at Smith.  See Motion at 23.  At the hearing, Smith argued that he shot Tillison because of the black object, and not because Tillison was about to run over him, but Smith stated that the SUV was still a component of the threat.  See Tr. at 7:1-17 (Griffin).  Viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes that neither the SUV nor the black object created probable cause, as a matter of law, for Smith to believe that Tillison posed a threat to himself or to others.

First, the SUV did not pose a threat to Smith or to others.  In the Motion, Smith contends that he was in the direct path of Tillison's SUV.  See Motion at 23.  This contention is contrary to the record.  The Video Recreation shows that the SUV never faced Smith until after Smith shot Tillison.  See Video Recreation at 0:01-0:10.  Similarly, according to Stewart's report, Smith was never in the SUV's direct path.  Stewart opines that Tillison reversed the SUV into Smith's patrol car.  See Stewart Report at 5.  Stewart attaches to his report a diagram showing that, when the SUV backed into the patrol vehicle, the SUV was facing forwards, towards the wall, and not towards Smith.  See Stewart Report at 12.  Stewart opines that Smith moved to the northwest quadrant of the parting space to the West and that Tillison drove the SUV forward, hitting the wall.  See Stewart Report at 12.  Stewart attaches to his report a diagram, showing that, when the SUV hit the wall, it was turned slightly to the right and away from Smith.  See Stewart Report at 13.  Accordingly, from the time that the SUV hit Smith's patrol car and the time that it hit the wall, Tillison turned the SUV away from Smith, which means that Smith was never in the SUV's path.  Stewart next opines that Tillison placed the SUV in reverse and that Smith shot Tillison through the driver side window when Smith's body was parallel with the SUV's driver side.  See Stewart Report at 5.

The pictures from the incident scene, which Smith provided, also show that the SUV was not facing Smith when he fired.  Smith's Picture From His Shooting Position is a picture of the incident scene, and it shows that the SUV's windshield was intact after the shooting.  See Smith's Picture From His Shooting Position at 1.  Kleinfeld's Pictures of the Front Left Side of the SUV contains two pictures of the SUV's driver side, one in which the driver side window is covered with a plastic sheet and one in which the window is open.  See Kleinfeld's Picture of the Front Left Side of the SUV at 1.  Because the SUV's windshield is intact, and because the driver side window was either broken or open, Smith must have, as Stewart opines, shot Tillison

through the driver side window.  Smith was, thus, to the side of the SUV and not in front of it.
Moreover, viewing the evidence in a light most favorable to the Plaintiffs, Smith was, as Stewart
opines, directly beside the SUV when he shot Tillison.  A reasonable juror could thus find, or
thus conclude, that it was unreasonable for Smith to shoot Tillison, because the SUV did not
pose a direct threat to Smith or to others.

   This case is similar to two Tenth Circuit cases.  In Cordova v. Aragon, the Tenth Circuit
held that it was unreasonable for an officer to shoot a fleeing suspect during a high-speed pursuit.
See 569 F.3d at 1192.  There, police officers began pursuing the suspect who was driving a
stolen truck that was pulling a trailer with heavy excavation equipment in it.  See 569 F.3d
at 1183.  During the pursuit, the suspect nearly rammed a patrol car, twice drove off the road to
avoid spike strips, ran multiple red lights, refused to stop for patrol cars that had their lights and
sirens activated, and drove at speeds between thirty and fifty miles per hour.  See 569 F.3d
at 1186.  Eventually, the suspect entered a highway and began driving on the wrong side of the
highway.  See 569 F.3d at 1186.  Two officers drove ahead of the suspect in an attempt to deploy
stop sticks.  See 569 F.3d at 1186-87.  The suspect drove the truck too close to the officers for
them to deploy the stop sticks, so one officer drew his firearm and fired at the truck, killing the
suspect.  See 569 F.3d at 1187.  Of the four to five shots the officer fired, only one hit the front
of the truck -- the remaining hit the side of the truck -- and the fatal shot hit the suspect in the
back of his head.  See 569 F.3d at 1187.  The officer argued that he shot the suspect, because he
was in immediate danger, and because the truck was about to run him over.  See 569 F.3d
at 1187.

   The Tenth Circuit, in an opinion that the Honorable Michael W. McConnell, United
States Circuit Judge for the Tenth Circuit, authored and Judge Anderson joined, held that the
officer's conduct in shooting the suspect was unreasonable.  See Cordova v. Aragon, 569 F.3d

at 1192.  The Tenth Circuit first concluded that the suspect did not pose an imminent threat to other motorists.  See 569 F.3d at 1190.  The Tenth Circuit noted that, even though the suspect was driving recklessly on the wrong side of a highway, the record did not contain any facts showing that, at that time, there were any motorists in the vicinity.  See 569 F.3d at 1190.  The Tenth Circuit held that the mere possibility that the suspect's behavior could endanger motorists who might come along was insufficient to justify killing the suspect.  See 569 F.3d at 1190 ("Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.").  The Tenth Circuit held that "the general risks created by a motorist's fleeing from the police are, without more, [not] enough to justify a shooting that is nearly certain to cause that suspect's death."  569 F.3d at 1190.  The Tenth Circuit next held that the suspect did not pose an imminent threat to the officers.  See 569 F.3d at 1191.  The Tenth Circuit focused on the fact that several shots hit the side of the truck and that the fatal shot struck him in the back of his head to conclude that a reasonable jury could find that the officer was not "in immediate danger when he fired the fatal shot."  569 F.3d at 1191.[56]

In Zia Trust Co. ex rel. Causey v. Montoya, the Tenth Circuit held that an officer's actions were unlawful in shooting a suspect.  See 597 F.3d at 1155.  There, the officer responded to a domestic violence call in which the dispatcher informed the officer that the suspect suffered from mental health issues and that there were two firearms present in the house.  See 597 F.3d at 1153.  The officer arrived at the residence and approached a van that had been backing out of

---

[56]Even though the Tenth Circuit concluded, in Cordova v. Aragon, that there was a genuine issue of material fact whether the officer violated the suspect's constitutional rights, the Tenth Circuit held that the officer was entitled to qualified immunity, because the officer could have relied on the Supreme Court's case of Scott v. Harris -- which involved the use of force during a high speed pursuit -- to believe that his actions were lawful.

the residence's driveway, but was stuck on a pile of rocks on the side of the driveway.  See 597 F.3d at 1153.  The officer walked toward the van, and stopped between one and fifteen feet in front of the van, and slightly to its right.  See 597 F.3d at 1153.  The van's wheels were pointed at the officer, and the van's headlights were on.  See 597 F.3d at 1153.  While stuck on the rocks, the van leaped forward about a foot when the driver revved the van's engine, and the officer shot the van's driver, hitting him in the neck.  See 597 F.3d at 1153.  The Tenth Circuit held, in an opinion that the Honorable Monroe G. McKay, United States Circuit Judge for the Tenth Circuit, authored, and Judges Lucero and Hartz joined, that, viewing the facts in a light most favorable to the plaintiff, the officer violated the driver's constitutional rights.  See 597 F.3d at 1155.  The Tenth Circuit focused on four facts: (i) the driver may not have known that the officer was a law enforcement officer; (ii) given the poor lighting, it was disputed whether the officer could have known which direction the tires were pointing; (iii) the officer may have been fifteen feet away from the van; and (iv) given the poor lighting and the officer's distance from the van, it was disputed whether the officer could see the driver change gears.  See 597 F.3d at 1154-55.

In this case, similar to Cordova v. Aragon, Smith was to the side of the SUV -- not in front of it -- when he shot Tillison.  A reasonable jury could find that Smith could not have reasonably believed that he was in imminent danger of being hit, when he was not in the SUV's path.  Smith may be correct in stating that Tillison could have changed directions to run over Smith.  See Motion at 23; Tr. at 10:10-19 (Griffin).  This scenario, however, would have required Tillison to back up the SUV, turn the SUV to face Smith, put the SUV in drive, and then drive forward to run over Smith, and Smith to have remained in the same spot that toward which Tillison maneuvered.  This uncertain possibility is too remote to justify the use of deadly force.  If Smith was justified in shooting Tillison because of this uncertain possibility, then every officer is justified in shooting a suspect who is sitting in a parked vehicle, or who is attempting to flee in

a vehicle, based on the remote possibility that the suspect may maneuver the vehicle to face an officer and then attempt to run over the officer.  As Cordova v. Aragon make clears, the remote possibility of danger to others is insufficient to justify the use of lethal force.  See 569 F.3d at 1190 ("[T]hat risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.").  Accordingly, because Smith was never in danger of the SUV hitting him, Tillison's driving and the SUV did not justify Smith's use of deadly force.

Smith also -- and now primarily -- argues that he was justified in shooting Tillison, because Tillison was holding a black object in his right hand in a manner that he described as "gangster style."  Motion at 23.  At the hearing, Smith clarified that this argument is his main justification for shooting Tillison.  See Tr. at 7:1-7 (Griffin).  Smith asserts that, while Tillison had his left hand on the steering wheel, Tillison reached his right hand over his left arm and pointed his right hand through the window.  See Motion ¶¶ 29-30, at 7.  Smith asserts that Tillison had a black object in his hand, which he was holding "gangster style."  Motion ¶¶ 30-31, at 7.  If Smith reasonably believed that the object in Tillison's hand was a firearm, then Smith's actions may be justified.  See Slattery v. Rizzo, 939 F.2d 213, 216-17 (4th Cir. 1991)(Powell, J., sitting by designation)(holding that an officer was entitled to qualified immunity when he mistakenly believed that a beer bottle in a suspect's hand was a gun).  There is, however, a material dispute whether Smith did not know that Tillison was holding cellular telephone in his right hand.

Viewing the facts in a light most favorable to Tillison, it is disputed whether Smith did not know that Tillison was holding a cellular telephone.  It is undisputed that Tillison was unarmed and that the object in his right hand was a black cellular telephone.  The shooting took place in the middle of the afternoon, just after 1:00 p.m.  Smith does not assert that it was raining or snowing, that it was exceptionally cloudy, or that there was any weather condition that may

have affected his ability to clearly see Tillison and the object.  Smith was also standing very close to Tillison.  The parties do not present evidence showing how far away Smith was standing, other than he was standing in the adjacent parking space.  In their Response, the Plaintiffs contend that Smith was standing between five and ten feet away.  See Response at 18. They do not, however, cite to any evidence stating the exact distance.[57]  From an aerial photograph, the spaces appear to be average sized, if not below average sized.  See Stewart Report at 8.  While the Court cannot say the exact distance Smith was from Tillison -- likely less than ten feet -- it was close enough that it is disputed whether Smith could not tell that the object in Tillison's hand was a cellular telephone.

The parties did not provide evidence stating how large the cellular telephone is or what it looks like.  In their Response, the Plaintiffs contend that it is less than five inches long.  See Response at 21.  All the Court knows about the cellular telephone is that it is black.  See Smith Aff. ¶ 34, at 7.  Viewing the evidence in a light most favorable to the Plaintiffs, the Court assumes that the cellular phone was not shaped like a firearm, but that it was a normal looking telephone.  Additionally, Smith asserts that Tillison had his hand out the SUV's window.  See Smith Aff. ¶ 34, at 7.  Tillison was not holding the cellular telephone inside the SUV in a manner that concealed it from view, or where it was likely darker and harder to see.  Instead, the cellular telephone was outside the SUV and visible in the afternoon light.  Finally, while Smith states that Tillison held the cellular telephone "gangster style," which Smith states is "like he was pointing a gun . . . sideways while aiming it at" Smith, Smith Aff. ¶ 34, at 7, holding a cellular telephone sideways -- likely where the face or back is facing the ground -- is not an unusual manner in which to hold a cellular telephone.

---

[57]City of Albuquerque's zoning code requires automobile parking spaces to be at least eight and half feet wide.  See Albuquerque, N.M., Zoning Code § 14-16-1-5.

Viewing all of this evidence, it is disputed whether Smith knew that Tillison was holding a cellular telephone and not a firearm.  Smith was standing close to Tillison and the cellular telephone.  It was in the middle of the afternoon, so the cellular telephone should have been clearly visible.  Tillison held the cellular telephone out the SUV's window, such that it was closer to Smith and when the shadow inside the SUV did not conceal the telephone.  Additionally, holding a cellular telephone sideways is innocuous; it is not threatening or menacing.  Viewing the evidence in the Plaintiffs' favor and drawing all inferences in their favor, the Court concludes that a reasonable juror could conclude that Smith knew that Tillison was holding a cellular telephone or at least knew that Tillison was not holding a gun.  And if Smith knew that Tillison did not have a gun, he could not have reasonably believed that he was in danger of physical harm.  Tillison was holding a cellular telephone, and Smith was close enough that, in the middle of the afternoon, he should have known that it was a cellular telephone -- or at least it is disputed whether he knew that it was a telephone.  Because a cellular telephone could not cause Smith severe bodily harm, a reasonable jury could find that his actions in shooting Tillison were unreasonable.

The Tenth Circuit's factors from Estate of Larsen ex. rel Sturdivan v. Murr are relatively inapplicable in this case, because it is disputed whether Smith knew that Tillison was unarmed.  In Estate of Larsen ex. rel Sturdivan v. Murr, the Tenth Circuit provided a non-exhaustive list of factors that courts should use in assessing the degree of threat that an officer faced, which includes: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260.  Here, the first two factors are inapplicable, because Tillison was not holding a weapon and a

reasonable jury could conclude that Smith was close enough that he should have known that Smith was not holding a weapon.  On the other hand, if Smith thought it was a weapon, he gave no command; he fired.  Moreover, Smith does not indicate that Tillison made any hostile motions with the object towards him -- just that he held it out the window in a particular way.  Taken this was, the first two factors, if applicable at all, support the Court's conclusion.  The second two factors support the Court's conclusion that it is disputed whether Smith could have reasonably believed that Tillison posed a threat.  Smith was standing close to Tillison.  While in some situations, the closer a suspect is to an officer, the greater the risk, Smith's proximity to Tillison lessened the risk.  Tillison was not in a position in which he could have quickly jumped at Smith and assaulted him.  Tillison was seated in the SUV.  Moreover, the SUV was not pointed at Smith; Smith was standing parallel to the SUV when he fired.  The only threat the Smith faced was if Tillison was holding a firearm.  However, the short distance Smith was standing from the SUV lessens any perceived threat, because Smith was close enough to the SUV for a reasonable jury to conclude that he could see that Tillison was not holding a firearm.

The fourth factor also supports that Smith was not facing a serious threat.  Tillison's conduct showed that his manifest intent was to flee.  He reversed the SUV into Smith's patrol car, drove forward, and reversed again.  It appears that Tillison was trying to get away and not trying to attack Smith.  After reversing and hitting Smith's patrol car, Tillison drove forward in a relatively straight line that resulted in the SUV being turned slightly to the right, and away from Smith.  See Stewart Report at 13.  If Tillison was attempting to hit Smith with the SUV, he would have turned the SUV to the left and towards Smith.  Tillison's actions in turning the SUV slightly to the right and in reversing indicate that his manifest intent was to flee, and not to harm Smith.  It has long been established that an officer may not use deadly force against a fleeing suspect when the suspect does not pose an immediate threat to the officer or to others.  See, e.g.,

Tennessee v. Garner, 471 U.S. 1, 11 (1985)("It is not better that all felony suspects die than that they escape.  Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

Smith maintains that this case is similar to Thomas v. Durastanti, where, according to Smith, the Tenth Circuit held that law enforcement officers were entitled to qualified immunity. See Reply at 16.  Thomas v. Durastanti is distinguishable.  There, videotape evidence showed that one officer was not only standing in the path of the plaintiff's car, but the plaintiff's car hit the officer, causing him to roll off the car's hood.  See Thomas v. Durastanti, 607 F.3d at 661. The officer thus faced a threat of serious bodily injury, justifying the use of deadly force.  See 607 F.3d at 665-66.  Here, Smith was never in the SUV's path, and it is disputed whether Smith knew that Tillison was holding a cellular telephone, and not a gun.  The officer in Thomas v. Durastanti faced an imminent threat of serious bodily injury; a reasonable jury could conclude that Smith faced no such threat.

The Court is aware that a number of courts have granted summary judgment in excessive force cases when officers shoot suspects who have unidentified objects in their hands.  Many of those cases are distinguishable because the officers could not have known what the suspects were holding in their hands.  Many cases concern situations that involve low lighting and decreased visibility.  See Slattery v. Rizzo, 939 F.2d at 214-15 (4th Cir. 1991)(noting that the shooting took place at night); Bowles v. City of Porterville, 571 F. App'x 538, 540 (9th Cir. 2014) (unpublished)(noting that the darkness contributed to the reasonableness of the officers' conduct); Harris v. Green, No. CIV 04-2299, 2008 WL 5000172, at *2-3 (E.D. Ark. Nov. 17, 2008)(Wright, J.)(noting that the incident took place in the early evening and that the officers used flashlights to search for the suspect); Teague v. Gallegos, No. CIV 06-2005, 2007 WL

3232082, at *2 (D. Colo. Oct. 30, 2007)(Blackburn, J.)(stating that the shooting took place after

10:40 p.m.); Hudspeth v. City of Shreveport, No. CIV 04-0587, 2006 WL 3747446 at *1 (W.D.

La. Dec. 18, 2006)(Hicks, J.)(noting that the incident took place at night); Little v. Smith, 114

F. Supp. 2d 437 (W.D.N.C. 2000)(Horn, C.M.J.)(stating that there was little lighting and that the

officers had to use flashlights to see the suspect).   Other cases involve a suspect making a

menacing gesture towards the police with the object.  See Thompson v. Hubbard, 257 F.3d 896,

899 (8th Cir. 2001)(finding officer's conduct reasonable when the suspect was reaching as if to

pull out a firearm); Little v. Smith, 114 F. Supp. 2d at 440 (stating that the suspect pointed a

black object at the officer in "a two-handed gun position" that the officer believed to be a

"shooting stance"); Bowles v. City of Porterville, No. CIV 10-0937, 2012 WL 1898911, at *8

(E.D. Cal. May 23, 2012)(noting that the suspect immediately squatting down and turning to face

the officers with an object in his hands led to the officers' conduct being reasonable), aff'd 571

F. App'x 538 (9th Cir. 2014); Hudspeth v. City of Shreveport, 2006 WL 3747446, at *2 (stating

that the suspect walked towards the officer and then raised his hands into "a two handed shooting

stance"); Hill v. Witt, No. CIV 09-0270, 2010 WL 2902246, at *1 (N.D. Okla. July 22,

2010)(Frizzell, J.)(noting that the suspect turned around quickly and raised his arm with a black

object facing the officer).  In other cases, the officer had information indicating that the suspect

was armed.  See McDonald v. City of Tacoma, No. CIV 11-5774, 2013 WL 1345349, at *1

(W.D. Wash. Apr. 2, 2013)(Leighton, J.)(noting that the suspect shot his girlfriend, fled with the

firearm, and told his parents that he would rather die than go to prison); Morales v. Holly, No.

CIV 09-0175, 2012 WL 4511068, at *6 (M.D.N.C. Sept. 29, 2012)(Auld, M.J.)(relying on

evidence that the suspect had just been involved in an armed robbery of an undercover officer,

which resulted in the officer being shot, to conclude that the officer's conduct was reasonable);

Harris v. Green, 2008 WL 5000172, at *5 (relying on the fact that a person matching the

suspect's description stole a .22 caliber pistol and fired it at a homeowner to conclude that the officer's shooting was reasonable); Teague v. Gallegos, 2007 WL 3232082, at *1 (noting that the officers believed that a person, who was wanted for attempted homicide, and who was known to have multiple firearms and ammunition, was staying at the residence); Hill v. Watt, 2010 WL 2902246, at *1, *5 (stating that the suspect had possibly been involved in two recent armed robberies); Carnaby v. City of Houston, No. CIV 08-1366, 2009 WL 2633849, at *10 (S.D. Tex. Aug. 26, 2009)(Ellison, J.)(relying on the facts that the suspect had a concealed hand gun license and that the suspect may have told an officer that he was armed to conclude that the officer's conduct was reasonable).  Still other cases involve the suspect hiding his or her hands from the officers.  See Thompson v. Hubbard, 257 F.3d at 898 (noting that the suspect had his back to the officer and obscured his hand from the officer's view).

Unlike those cases, this shooting took place in the middle of the afternoon, in an open parking lot.  A reasonable jury could conclude that a reasonable officer should have had sufficient light to see what the object was in Tillison's hand.  Smith received information that the SUV was stolen and that Tillison may have been trying to sell stolen stereo equipment from the SUV, but Smith did not receive any information that would lead him to believe that Tillison was armed.  Also, Tillison did not move in a fast or aggressive manner that would cause Smith to believe that the cellular telephone was a gun.  Smith does not allege that Tillison moved his right hand in quick or jerk-like motion that was so fast that Smith could not tell what was in his hand.  Rather, Smith states that Tillison "moved his right hand over his left arm."  Smith Aff. ¶ 33, at 7.  Viewing the facts in a light most favorable to the Plaintiffs, the Court will not assume that Tillison's movements were fast or sudden, especially when Smith does not allege that they were.  Tillison held the telephone out the window of the SUV, but this action should have made it more

likely that Smith recognized it was a telephone, not less likely.[58]   The telephone was closer to Smith, and was not concealed or partially hidden inside the SUV.  It was outside in the afternoon light.

Several courts have denied summary judgment when it is disputed whether the shooting officer knew that the suspect was not holding a weapon.  In Whitfield v. Municipality of Fajardo, 279 F. Supp. 2d 115 (D.P.R. 2003)(Pieras, J.), the defendants argued that they shot the fleeing plaintiff, because the plaintiff turned around to face them while holding a dark metal object, which the defendants believed to be a firearm.  See 279 F. Supp. 2d at 120.  The plaintiff argued that the defendants could not have reasonably believed that he was holding a firearm, because he was holding a donut-shaped metal engine part that could not reasonably appear to be a firearm.  See 279 F. Supp. 2d at 121.  The plaintiff also argued that, because he was three stories down from where he defendants saw him, he could not have posed a threat to them.  See 279 F. Supp. 2d at 121.  The Honorable Jaime Pieras, Jr., Senior United States District Judge for the District of Puerto Rico, denied the defendants' request for summary judgment, by holding that these factual disputes created a genuine issue of material fact whether the defendants could have reasonably believed that the plaintiff posed a threat.  See 279 F. Supp. 2d at 121.  In Galvan v. City of La Habra, No. CIV 12-2103, 2014 WL1370747 (C.D. Cal. Apr. 8, 2014)(Bernal, J.), the defendant asserted that he shot the plaintiff after he ordered the plaintiff to drop the object he was holding, and after the plaintiff raised the object and pointed it at a bystander and then at the defendant.   See 2014 WL 1370747, at *7.   The plaintiff disputed the defendant's factual

---

[58]It is unclear why Tillison would hold the cellular telephone outside the SUV's window. He may have been trying to flee while at the same time trying to comply with Smith's commands to put his hand out the window -- to show that he was not armed -- so that Smith would not shoot him. Tillison also may have pointed the telephone closer to Smith so that the person on the other end of the line could more easily hear what was happening, so that Tillison could later have a witness who could testify to what was said during the interaction.  Because Smith killed Tillison, the Court does not know Tillison's reasons for holding the telephone out the window.

assertions, by contending that he told the defendant that the object was a cellular telephone, that he dropped the object, and that he raised his hands in the air as if to surrender.  See 2014 WL 1370747, at *7.  The Honorable Jesus G. Bernal, United States District Judge for the Central District of California, concluded that, because he had to resolve all disputed facts in the plaintiff's favor, he should deny the defendant's motion for summary judgment, because there was a genuine issue of material fact whether the defendant's use of force was objectively reasonable.  See 2014 WL 1370747, at *16.

In this case, there are a number of undisputed facts that support the reasonableness of Smith's decision, but there is also one key fact that is disputed, which, if decided in the Plaintiffs' favor, undermines the reasonableness of Smith's actions.  Smith was investigating a potential felony.  He had probable cause to believe that the SUV's driver -- Tillison -- had either stolen the SUV or was knowingly driving a stolen vehicle.  Smith announced that he was a police officer and ordered Tillison to place his hands out the window, yet Tillison refused to comply with his orders.  Instead, Tillison moved around inside the SUV and reached into the back of the SUV.  While refusing to obey Smith's commands, Tillison suddenly put the SUV in reverse and rammed Smith's patrol car.  Smith shot the SUV's rear tire, but the shot did not slow down or stop the SUV.  Tillison drove forward, hitting the wall in front of the SUV.  Either while driving forward or while reversing, Tillison moved his right hand over his left arm.  Up until this point, Smith knew that he was dealing with a potential felon, who refused to obey his orders, and who was not averse to ramming a police vehicle with an SUV.  Tillison, however -- up until this point -- had not created an imminent threat to Smith or to anyone else.  See Tennessee v. Garner, 471 U.S. at 11 (holding that it is unconstitutional to use deadly force against a fleeing suspect when there is no probable cause that the suspect poses a threat of serious physical harm to the officer or to others); Cordova v. Aragon, 569 F.3d at 1191-92 (holding that police officers may not use

deadly force against a fleeing suspect merely because he or she is driving recklessly).  The entire case, thus, hinges on what Tillison was holding in his right hand, or, more precisely, what would a reasonable officer have perceived that Tillison was holding in his right hand.

There are three things a reasonable officer could have seen in Tillison's hand: (i) a gun; (ii) an unknown object; or (iii) a cellular telephone.  If a reasonable officer would have either (i) perceived the cellular telephone to be a gun; or (ii) not have been able to tell what the object was, then Smith's actions were reasonable.  In light of Tillison's conduct and the circumstances surrounding the shooting, if a reasonable officer could not have known what was in Tillison's hand, then it is reasonable for Smith to assume that Tillison is holding a firearm.  He is a potential felon, who is recklessly fleeing from the police, and who is pointing an unknown black object at Smith.  Smith would, thus, have probable cause to believe that Tillison posed an imminent threat of serious bodily injury.  If, however, a reasonable officer would have perceived the cellular telephone to be what it was -- a telephone -- then Smith acted unreasonable by shooting Tillison, regardless of Tillison's earlier conduct.  It does not matter that Tillison was ignoring Smith's commands, that Tillison moved around inside the SUV, or that Tillison rammed a police vehicle.  If a reasonable officer would have known that Tillison was holding a cellular telephone, and not a firearm, the officer could not have reasonably believed that Tillison posed an imminent threat of serious bodily injury, and Smith's conduct was unreasonable.

The entire case, thus, comes down to one question: Would a reasonable officer know that Tillison was holding a cellular telephone?  Because of the distance between Smith and Tillison, the time of day, and the manner in which Tillison was holding the cellular telephone, the Court concludes that it is disputed whether a reasonable officer could have believed that Tillison was not holding a telephone.  There are facts supporting a finding that a reasonable officer would not have known what Tillison was holding in his hand -- specifically that the SUV was moving and

that Tillison was moving the cellular telephone.  There are also facts supporting a finding that a reasonable officer would have known that Tillison was holding a telephone, specifically, the distance Smith was standing from the SUV -- about the width of a parking space -- the time of day -- that it was in the afternoon -- and that Tillison was holding the telephone out the window.  Questions that turn on what facts are deemed more important are the very questions that a jury -- and not an unelected judge -- should answer.

The nation's legal system is grounded in the notion that, after the elites and the professionals have resolved the legal issues, a case should be laid before a group of common people to make the final factual findings.  This practice furthers the perception of justice that our society has of the judicial system.  In a case, like this one, where a violent act took a man's life and the perpetrator's liability hinges on a close factual determination, society is not well served if an unelected judge makes the final determination behind closed doors.  Having a single judge resolve such a factual question that is best answered by a jury undermines the appearance of justice.  "The Court has often emphasized that the appearance of justice is as important as actually dispensing justice."  United States v. Rodella, No. CR 14-2783 JB, 2015 WL 711931, at *39 n.12 (D.N.M. Feb. 2, 2015)(Browning, J.).  Especially in Albuquerque and in the nation at large, where police shootings are heated topics of debate, courts should be reluctant to resolve factual issues.  When a police officer kills an unarmed person, and there is a factual question whether the officer should have known that the person was unarmed, society's faith in the justice system is undermined when an unelected judge declares -- as a matter of law -- that no reasonable jury could find that a reasonable officer would have known that the victim was unarmed, while at the same time refusing to test this declaration by presenting the case to a jury.

Rather, for these factual issues, the question should be presented -- in open court -- to a panel of jurors, where ordinary citizens are the ones to make the important factual determination.

The Tenth Circuit's summary judgment standard highlights the importance of juries, by permitting summary judgment only "if no reasonable jury viewing the evidence could return a verdict for the nonmoving party." Saville v. Int'l Bus. Machines Corp., 188 F. App'x 667, 669 (10th Cir. 2006)(unpublished)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). The Court is not saying that the Smith violated Tillison's constitutional rights or that a jury will find for the Plaintiffs, but only that a jury should be the one to make that determination. As the Honorable Neil M. Gorsuch, United States Circuit Judge for the Tenth Circuit, has written:

> After trial, . . . a jury might choose to discredit certain of [the plaintiff's] factual assertions that we must take as true in this appeal. At this point, we simply hold that, on the record as it currently exists, we cannot say, as we must to grant summary judgment, that no reasonable jury could find that the deputies' use of force was excessive.

Herrera v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 361 F. App'x 924, 928-29 (10th Cir. 2010) (unpublished). Because the question whether a reasonable officer would have known that Tillison was holding a cellular telephone is a question on which a reasonable jury could come out either way, it is a question that a jury -- more than a court -- should answer, making summary judgment inappropriate.

If the Court were to grant the Motion and conclude that, as a matter of law, Smith reasonably believed that Tillison was holding a firearm in his right hand, the Court would not be proceeding in a manner consistent with the basic tenets of summary judgment -- to view the evidence in a light most favorable to the nonmoving party and to draw all inferences in his or her favor. If the Court concluded that Smith did not know what Tillison held in his hand, it would be giving lip service to the summary judgment standard. See Figueroa v. Gates, 207 F. Supp. 2d 1085, 1093 n.13 (C.D. Cal. 2002)(Collins, J.)("Defendants give lip service to this standard, but persist in presenting the facts in the light most favorable to the shooting officers."). Neither the Tenth Circuit nor the Supreme Court has held that, when considering a motion for summary

judgment involving qualified immunity, a different summary judgment standard applies.  To the contrary, both have maintained that, even in the qualified immunity context, courts should still view all facts in a light most favorable to the nonmoving party.  See, e.g., Plumhoff v. Rickard, 134 S. Ct. 2012, 2017 (2014)("Because this case arises from the denial of the officers' motion for summary judgment, we view the facts in the light most favorable to the nonmoving party. . . ."); Puller v. Baca, 781 F.3d 1190, 1196 (10th Cir. 2015)("We review de novo a grant of summary judgment on the basis of qualified immunity.  We review the evidence in the light most favorable to the nonmoving party."  (citations omitted)(internal quotation marks omitted)).  If the Court were to conclude otherwise, it would be close to saying that, anytime a police officer says he or she did not know what the object in the plaintiff's hand was -- regardless of the circumstances -- the officer is justified in shooting.  That bright-line rule is not consistent with the need to examine the facts of each case.[59]

----

[59]This bright-line rule, which is contrary to the law, is more consistent with author Malcolm Gladwell's pop-social-science theories than it is with Fourth Amendment law. Gladwell, largely from anecdotal examples, theorizes that people have the ability to look at another person and make a split-second decision about what that person is thinking, based solely on his or her facial expressions.  See Malcolm Gladwell, Blink 197-206 (2005).  Gladwell also theorizes that certain levels of stress can allow a person to think and function at optimal levels -- usually when a person's heart rate is between 115 and 145 beats per minute -- but that if a person is under extreme stress -- resulting in a heart rate of over 175 beats per minute -- his or her forebrain begins to shut down and there is "an absolute breakdown of cognitive processing." Malcolm Gladwell, supra, note 59, at 225-26.  Gladwell opines this breakdown in cognitive processing under extreme stress explains the number of excessive force incidents that occur after a high-speed pursuit.  See Malcolm Gladwell, supra note 59, at 226-28.  He believes that this breakdown in cognitive processing, thus, leads to a decrease in -- or entire inability to -- read another person's mind.  See id. at 228-29.  Gladwell concludes that many police shootings, especially of unarmed individuals, can be attributed to the officer's inability to read the victim's mind, because of the officer's stress levels, leading to faulty initial determinations.  See id. at 237-44.  Under Gladwell's theory, Smith may not be faulted for not seeing what Tillison was holding in his hand, regardless of how apparent it was.  Smith was under stress, and thus his mindreading cognitive ability was impaired.  Under this theory, police officers should not be held accountable for shooting an unarmed person holding a cellular telephone.

Gladwell is not a psychologist, nor is he a scientist; he is an author and a history major. See Malcolm Gladwell, Wikipedia.org, http://en.wikipedia.org/wiki/Malcolm_Gladwell#Early_

Viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes that

a reasonable jury could find that Smith either knew that Tillison was holding a cellular telephone

---

life (last visited May 22, 2015).  Moreover, his views are not uniformly held.  <u>See</u> Michael R. LeGault, <u>Think!: Why Crucial Decisions Can't Be Made in the Blink of an Eye</u> 14 (2006)(criticizing Gladwell's mind-reading theory by stating that Gladwell "enthusiastically celebrates the apparent success of the practice [of mind reading], despite hosts of scientific tests showing that claims of clairvoyance rarely beat the odds of random chance guessing").  The Court has had an expert witness, who practiced as a psychologist for forty years, testify, under oath, that he was highly skeptical of Gladwell's theories about being able to read facial expressions to discern emotions and thoughts, and who even testified that, if Gladwell's theories were true, they "would be the most startling finding in the history of psychology . . . [and] would be much more startling than any of Freud's discoveries."  <u>United States v. Harry</u>, 20 F. Supp. 3d 1196, 1205 & 1212 (D.N.M. 2014)(Browning, J.).  Moreover, merely because Smith may have been under stress that impaired his ability to make accurate snap decisions, Smith should not be given deference for continuing to act on this faulty, snap decision.  In addressing several scholars' reliance on Gladwell's theories to conclude that "courts should give police 'hunches' more deference, for 'gut' police reactions," Professor Andrew E. Taslitz, of Howard University School of Law, argues:

> [T]his approach ignores the many risks of error in making judgments based on first impressions, which is the situation facing most police; the difficulty of telling when 'hunches' are in error and when not; and the constitutional mandate of the Fourth Amendment to *limit* police discretion rather than blindly defer to it.

Andrew E. Taslitz, <u>Police Are People Too: Cognitive Obstacles to, and Opportunities for, Police Getting the Individualized Suspicion Judgment Right</u>, 8 Ohio St. J. of Crim. L. 7, 14-15 (2010)(emphasis in original).

Finally, in assessing the reasonableness of Smith's actions, the Court should not and cannot rely on the most recent popular literature in psychology, but must assess "whether the totality of the circumstances justified the use of force," and must "pay careful attention to the facts and circumstances of the particular case."  <u>Estate of Larsen ex rel. Sturdivan v. Murr</u>, 511 F.3d at 1260 (quoting <u>Sevier v. City of Lawrence</u>, 60 F.3d at 699)(internal quotation marks omitted).  Even if Smith made a faulty, initial, snap decision -- because of extreme stress -- whether Tillison intended to harm Smith, the totality of the circumstances may still make his actions unreasonable.  Thus reasonableness determination is "judged from the perspective of a reasonable officer on the scene," <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989), not by some bright-line rule or by a pop-psychology theory.  It is disputed whether a reasonable officer would have known that Tillison was holding a cellular telephone.  If Smith wrongly thought that Tillison intended to harm him, and could not reasonably have thought that Tillison was holding a gun, then Smith's conduct was unreasonable, and he was not justified in shooting Tillison.  Gladwell's theory that officers under extreme stress are unable to accurately read minds does not provide officers free reign to shoot every time they are in a stressful situation, and they make an initial wrong decision.  The Fourth Amendment requires reasonable conduct by reasonable officers, even in stressful situations, which are common.

-- and not a gun -- or that it is at least disputed whether he knew.  If Smith could not reasonably

think that Tillison was holding a firearm, he could not have reasonably believed that that Tillison

posed a serious threat to himself or to others.  Accordingly, a reasonable jury could reasonably

conclude that Smith's actions in shooting Tillison were unreasonable and that he violated

Tillison's constitutional rights.[60]

## V.   TILLISON'S RIGHTS WERE CLEARLY ESTABLISHED AT THE TIME OF THE SHOOTING.

Tillison's rights were clearly established at the time of the shooting.  Smith argues that it

is clearly established "that deadly force is justified . . . if a reasonable officer faced with the same

circumstances would have probable cause to believe that there was a threat of serious physical

harm to themselves or to others," even if the officer is mistaken in his or her assessment of the

danger.  Motion at 25.  Smith is correct; however, he is wrong about the legality of what actions

must be clearly established.  The legal issue is not whether an officer may use deadly force when

there is probable cause to believe that there is a threat of serious physical harm, but instead

whether an officer may use lethal force against a fleeing motorist when the officer can see that

---

[60]The Plaintiffs argue that the law required Smith to warn that he was going to use deadly force before using such force.  See Response at 17-18.  The Plaintiffs are correct that a warning is required, but only where feasible.  See Samuel v. City of Broken Arrow, 506 F. App'x 751, 754 (10th Cir. 2012)("Finally, it is clear that 'some warning' must be given before an officer uses deadly force if 'feasible.'" (quoting Tennessee v. Garner, 471 U.S. at 12)); Harris v. Roderick, 126 F.3d at 1201 ("Moreover, whenever practicable, a warning must be given before deadly force is employed.").  Because a reasonable jury could conclude that Tillison did not pose an imminent threat, it also could conclude that Smith was not entitled to use deadly force, regardless whether he warned Tillison that he would shoot.  Nevertheless, the lack of a warning is another factor which supports a conclusion that there is a genuine issue whether Smith used excessive force.  If, however, Tillison either pointed the SUV at Smith and drove towards him, or if Tillison was holding a firearm at Smith, no warning was required.  A warning is required only where feasible.  If Tillison drove toward Smith, or if Tillison pointed a firearm at Smith, such a warning would not have been feasible.  It might have been too late for Smith to give it. Regardless, because a reasonable jury could conclude that Tillison did not pose an imminent threat, a reasonable jury could also conclude that Smith's use of deadly force was unreasonable, even if Smith had first given a warning.

the motorist is unarmed, and the officer -- or anyone else -- is not in the fleeing motorist's path. It was "beyond debate" in 2012 that Smith may not shoot a fleeing motorist merely because the motorist is holding a cellular telephone.  Reichle v. Howards, 132 S. Ct. at 2093.  See Tennessee v. Garner, 471 U.S. at 11 (holding that it is unconstitutional to use deadly force against a fleeing suspect when there is no probable cause that the suspect poses a threat of serious physical harm to the officer or to others).

In Cordova v. Aragon, the Tenth Circuit clearly established that officers may not use deadly force against a fleeing motorist merely because the motorist is driving in a reckless manner.  See 569 F.3d at 1191-92.  While the Tenth Circuit, in that case, ultimately held that the law was not clearly established, because the officer could have relied on the Supreme Court's case of Scott v. Harris[61] to conclude that in a high-speed pursuit an officer may use deadly force, see Cordova v. Aragon, 569 F.3d at 1192-93, this case did not involve a high-speed pursuit and Cordova v. Aragon clearly established that, in the absence of imminent danger to the officer or to others, reckless driving is insufficient to justify the use of deadly force, see 569 F.3d at 1191-92. Moreover, Zia Trust Co. ex rel. Causey v. Montoya reaffirmed the long-standing rule that it is clearly established that an officer may not use deadly force when it is unnecessary, and when the suspect does not pose an immediate threat to the officer or to others.  See 597 F.3d at 1155 (concluding that officer violated the suspect's clearly established rights by using deadly force without probable cause that the suspect posed a serious threat of physical harm to the officer or to others)(citing Tennessee v. Garner, 471 U.S. at 11 ("Where the suspect poses no immediate

---

[61]In Scott v. Harris, the Supreme Court held that a police officer may use force that places a fleeing motorist at risk of serious injury or death to "terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders."  550 U.S. at 386.

threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.")).

A reasonable jury could conclude that Smith lacked probable cause to believe that Tillison posed a threat of serious physical harm to Smith or to others. The law is clearly established that Smith could not use deadly force if these factual circumstances existed. Every reasonable officer in Smith's shoes would have known that it was unlawful to use deadly force against a fleeing suspect merely because the suspect was holding a cellular telephone or because the suspect was driving in a reckless manner, but not in a manner that created an imminent threat to anyone. Accordingly, the Court concludes that there is a genuine issue of material fact whether Smith violated Tillison's clearly established constitutional rights, and the Court will deny the Motion as far as it requests the Court to dismiss Count II of the Complaint.[62]

---

[62]The Supreme Court recently held that officers involved in a shooting were entitled to qualified immunity, because the law was not clearly established. See City & Cnty. of San Francisco v. Sheehan, No. 13-1412, slip op. at 17 (May 18, 2015). That case, however, is inapplicable. There, the plaintiff, a mentally ill woman, threatened to kill a social worker by claiming that she had a knife. See No. 13-1412, slip op. at 2. The social worker called the police, and, when the officers arrived, they entered the plaintiff's room. See No. 13-1412, slip op. at 2-3. The plaintiff reacted violently by grabbing a kitchen knife and approaching the officers while saying that she would kill them. See No. 13-1412, slip op. at 3. The officers retreated from the room. See No. 13-1412, slip op. at 3. Because the officers knew that the plaintiff was unstable, had threatened to kill three people, and had a weapon, and because they were afraid that the plaintiff might either arm herself with more weapons or might try to escape -- although the officers did not know whether she had the means to escape -- the officers decided to reenter the room and to subdue the plaintiff. See No. 13-1412, slip op. at 3-4. The officers did not consider whether they should try to accommodate the plaintiff's disability. See No. 13-1412, slip op. at 4. The officers reentered the room and tried to subdue the plaintiff with pepper spray. See No. 13-1412, slip op. at 4. The pepper spray failed to dissuade the plaintiff as she walked toward one of the officers with a knife in her hand. See No. 13-1412, slip op. at 4. When she was a few feet away from the officer, the officers shot her. See No. 13-1412, slip op. at 3-4.

In conducting a qualified immunity analysis, the Supreme Court noted, in an opinion that the Honorable Samuel Alito, Jr., Associate Justice for the Supreme Court, authored, that it was undisputed that, had the plaintiff not been disabled, the officers' conduct in entering the room and shooting the plaintiff was reasonable. See No. 13-1412, slip op. at 11-12. The Supreme Court stated that the only question was whether the officers violated the Americans with

## VI.   THE NEW MEXICO LEGISLATURE HAS WAIVED SMITH'S IMMUNITY UNDER THE NMTC FOR THE PLAINTIFFS' ASSAULT AND BATTERY CLAIMS, BUT NOT FOR THEIR FALSE ARREST AND FALSE IMPRISONMENT CLAIMS.[63]

The New Mexico Legislature has waived Smith's immunity under the NMTCA for the

Plaintiffs' assault and battery claims, but not for their false arrest and false imprisonment claims.

The NMTCA states that a "governmental entity and any public employee while acting within the

scope of duty are granted immunity from liability for any tort except as waived" by state statute.

N.M. Stat. Ann. § 41-4-4(A).  Section 41-4-12 provides a list of torts for which law enforcement

officers' immunity is waived:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities

---

Disabilities Act of 1990, 104 Stat. 327, 42 U. S. C. §§1210-12213, by failing to accommodate the plaintiff's disability.  See No. 13-1412, slip op. at 12.  Thus, for the second prong of the qualified immunity analysis, the Supreme Court needed to "simply decide whether the officers' failure to accommodate [the plaintiff's] illness violated clearly established law."  No. 13-1412, slip op. at 12.  The Supreme Court held that, because there was no Supreme Court or United States Court of Appeals for the Ninth Circuit case that states that officers must try to accommodate for the mental illness of a person who is armed and making threats, the law was not clearly established and the officers were entitled to qualified immunity.  See No. 13-1412, slip op. at 13-15.

Turning to the present case, in 1985, the Supreme Court clearly established, in Tennessee v. Garner, that an officer may not use deadly force to apprehend a fleeing suspect unless the suspect poses a threat of serious physical harm to the officer or to others.  See 471 U.S. at 11.  In 2009, the Tenth Circuit, in Cordova v. Aragon, clearly established that an officer may not use deadly force merely because a fleeing motorist is driving in a reckless manner, unless the motorist poses an imminent threat of serious injury to the officer or to others.  See 569 F.3d at 1192.  Because a cellular telephone does not create a threat of serious physical harm, and because neither Smith nor anyone else was in imminent danger of being run over by the SUV, the law was clearly established that Smith could not use deadly against Tillison if he could see that the cellular telephone was not a weapon.

[63]This section is the only section of this Memorandum Opinion and Amended Order that differs from the Order that the Court issued on March 31, 2015.

secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.   Section 41-4-12 lists all of the Plaintiffs' four claims alleged in Count III -- assault, battery, false arrest, and false imprisonment as torts for which the Legislature has waived immunity.   Smith does not argue that the Legislature did not waive the NMTCA immunity for the claims that the Plaintiffs allege.   Instead, Smith argues that his conduct does not constitute assault, battery, false arrest, or false imprisonment, and, therefore, the NMTCA immunity covers his actions.   See Motion at 26-27.   The Court, thus, construes the Motion as attacking the merits of the Plaintiffs' claims.   If Smith's conduct did not constitute assault, battery, false arrest, or false imprisonment, the Legislature has not waived his immunity under the NMTCA.

The Court concludes that, because Smith had probable cause to arrest Tillison, he cannot be liable for false arrest or for false imprisonment.   The torts of false arrest and false imprisonment require a lack of probable cause.   See Sisneros v. Fisher, 685 F. Supp. 2d 1188, 1221 (D.N.M. 2010)(Browning, J.)("False imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so -- i.e., for an officer, he has no probable cause."  (alterations omitted)(internal quotation marks omitted)); Dickson v. City of Clovis, 2010-NMCA-058, 242 P.3d 398, 404 ("As established above, Defendant Parkin had probable cause to make the arrest.   Plaintiff's claims [for false imprisonment, false arrest, and malicious prosecution] were properly dismissed."); Santillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-159, at ¶12 ("[I]n order for Plaintiff to prevail on her claims of false imprisonment[ and] false arrest, . . . she must show that a factual question exists as to whether Agent Carter had probable cause to believe that Plaintiff was unlicensed when she sold alcohol.").   The Court has already concluded that Smith had probable

cause to arrest Tillison.  See supra Analysis Section III.B.  Because Smith had probable cause to arrest Tillison, the Plaintiffs' false arrest and false imprisonment claims fail.  Moreover, because Smith's conduct did not constitute false arrest or false imprisonment, the Legislature has not waived his immunity under the NMTCA.

For the Plaintiffs' battery and assault claims, the Court has already concluded that a reasonable jury could conclude that Smith was not justified in using deadly force.  See supra Analysis Section IV.  There is a genuine issue of material fact whether Smith used excessive force, and, as such, there is also a material issue of genuine fact whether Smith committed assault and battery.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1229 (D.N.M. 2013) (Browning, J.)("An officer can be held liable for assault and battery if he uses excessive force." (quoting Adegbuji v. Middlesex Cnty., No. CIV 03-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006)(Sheridan, J.)(internal quotation marks omitted)).  Contrary to Smith's contention, a reasonable jury could conclude that his actions were not lawful.  See Motion at 27.  Accordingly, § 41-4-12 waives Smith's immunity.  The Court will, thus, grant summary judgment in favor of Smith on the Plaintiffs' false imprisonment and false arrest claims, but will deny summary judgment on the Plaintiffs' assault and battery claims.

**IT IS ORDERED** that the requests in Defendant Martin Smith's Motion for Summary Judgment Requesting Dismissal of Plaintiffs' Complaint on Qualified Immunity and Other Grounds, and Memorandum in Support, filed May 12, 2014 (Doc. 11)("Motion"), are granted in part and denied in part.  The Motion is granted as far as it concerns the Plaintiffs' Count I for unreasonable seizure, and the Plaintiffs' false arrest and false imprisonment claims in Count III.  Smith's remaining requests in the Motion are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Frances Crockett Carpenter
Hans Peter Erickson
Frances Crockett, LLC
Albuquerque, New Mexico

     *Attorney for the Plaintiffs*

Jessica Hernandez
  City Attorney
Stephanie M. Griffin
  Assistant City Attorney
Albuquerque, New Mexico

     *Attorneys for the Defendants*