## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VERONICA DORATO, as PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH CLAIM OF DANIEL TILLISON,
deceased, and BRUCE THOMPSON, as
guardian ad litem for D.T. and J.T.,
minor children; MARIA TOUCHET, as
guardian ad litem for I.M., a minor child;
and MARY JOBE,

        Plaintiffs,

vs.                                                                                    No. CIV 14-0365 JB/GBW

OFFICER MARTIN SMITH, in his official
and individual capacities; JOHN/JANE DOE
SUPERVISOR, in his/her official and individual
capacities; ALBUQUERQUE POLICE
DEPARTMENT; and CITY OF
ALBUQUERQUE,

        Defendants.

## MEMORANDUM OPINION AND AMENDED ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion to Strike

Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor Patient Privilege [Doc.

10], filed May 14, 2014 (Doc. 13)("MTS"); (ii) Defendant Martin Smith's Motion for Protective

Order, and Memorandum in Support, filed August 4, 2015 (Doc. 101)("MPO"); (iii) the

---

[1]The Court earlier entered two Orders.  The first Order, filed March 12, 2015 (Doc.
65)("MTS Order"), granted in part and denied in part the Plaintiffs' Motion to Strike
Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor Patient Privilege [Doc.
10], filed May 14, 2014 (Doc. 13)("MTS"). The Court stated that it "may, however, at a later
date issue a memorandum opinion more fully detailing its rationale for this decision."  MTS
Order at 1 n.1.  This Memorandum Opinion and Amended Order is the promised opinion.  The
second Order, filed October 2, 2015 (Doc. 117)("MPO/MCD Order"), required the disclosure of
various categories of records and the preparation of a privilege log for other records.
    The Court is amending the MPO/MCD Order to add clarity and make it consistent with
the parties' recent agreements.  This Memorandum Opinion and Amended Order thus modifies
existing disclosure requirements and supersedes the MPO/MCD Order.

Plaintiffs' Opposed Second Motion to Compel Discovery, filed August 25, 2015 (Doc. 106)("MCD"); and (iv) the Defendants' Motion, and Memorandum in Support, for the Court to Certify the Court's Order [Doc. 117] and Pending Memorandum Opinion for Interlocutory Appeal, filed October 12, 2015 (Doc. 121)("MTC").  The Court held hearings on September 14, 2015, September 24, 2015, and November 16, 2015.  The primary issues are: (i) whether the Court should strike any of the Defendants' affirmative defenses and responses, including their responses based on the physician-patient privilege; (ii) whether the Court should grant a protective order for Defendant Officer Martin Smith's psychological records, because they are allegedly irrelevant to Plaintiff Veronica Dorato's federal claim, privileged, or otherwise excluded from disclosure; (iii) whether the Court should compel the production of internal Albuquerque Police Department ("APD") documents despite Smith's privacy rights and the self-critical analysis privilege; and(iv) whether the Court should certify its Order, filed October 2, 2015 (Doc. 117)("MPO/MCD Order"), to the United States Court of Appeals for the Tenth Circuit, because its decisions on the parties' discovery dispute involve an allegedly controlling issue of law, and because an immediate appeal would allegedly materially advance the ultimate termination of the litigation.  First, the Court will grant the MTS in part and deny it in part.  The Court will deny Dorato's request to strike the Defendants' affirmative defenses, because it does not apply the heightened pleading standards in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), to affirmative defenses.  The Court will grant Dorato's request that the Defendants revise their responses to paragraphs 12 and 13 of the Complaint.  Federal privilege law applies to Dorato's federal claims, even though some evidence must be produced for the federal claims that would not need to be produced if there were only

state claims, and the disclosed evidence may be used for both federal and state claims. The Defendants cannot rely on the non-existent federal physician-patient privilege in their responses.

Second, the Court concludes that, although there is a federal psychotherapist-patient privilege, Smith waived that privilege as to both records and examinations which he knew would be disclosed to others, and those documents generated at the direction of and for the benefit of the City of Albuquerque if it would see them. Any psychotherapy records within a third party's control must be disclosed to the Defendants' attorney, who must prepare a privilege log.[2] The Court thus grants the MPO to the extent that it covers privileged information and denies it to the extent that it covers non-privileged information. Finally, the Court concludes that its MPO/MCD Order did not decide a controlling legal issue, that there is no substantial ground for difference of opinion about the relevant issues, and that an immediate appeal would not materially advance this litigation's termination. It thus denies the Defendants' motion and declines to certify the matter to the Tenth Circuit.

**FACTUAL BACKGROUND**

The Court takes its facts from the First Amended Complaint for Civil Rights Violations, filed April 8, 2015 (Doc. 73)("Amended Complaint"). The Amended Complaint contains facts that are common to all Counts, and gives two versions of events that Smith has provided to

---

[2]The parties and the Court have used the term "Vaughn index" to refer to the list of documents withheld from production and corresponding privilege assertions that the Defendants must prepare for any psychotherapy records within the City of Albuquerque and its contractors' custody and control. Plaintiffs' Response to Defendant Smith's Motion for Protective Order [Doc. 101] at 3,11, filed August 18, 2015 (Doc. 105)("Response to MPO"); MPO/MCD Order at 2. Vaughn indices refer to the privilege logs that the United States Court of Appeals for the District of Columbia Circuit discussed in Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973). 484 F.2d at 827. "Vaughn index" is more of an East-coast term. Because in New Mexico, the Court and the bar generally refer to Vaughn indices as privilege logs, the Court will use "privilege log" instead of "Vaughn index." Because the content of privilege logs and Vaughn indices are the same, the change in terminology will not alter the parties' obligations in discovery.

explain his actions.  The Court will describe the facts that are common to all Counts, and then will describe Smith's two versions of events, as the Amended Complaint alleges them.

     1.      **Facts Common to Both Versions.**

Smith served as an Army Ranger in Afghanistan, where he was involved in multiple engagements "resulting in extended exposure, conflict, loss of life, and other horrors of war." Amended Complaint ¶¶ 7-9, at 2.  After returning to Albuquerque, Smith was diagnosed with Post Traumatic Stress Disorder ("PTSD"), and the Veterans Affairs Hospital gave him a one-hundred-percent disability rating "based on the severity of his PTSD."  Amended Complaint ¶¶ 9-10, at 2.  The APD of the City of Albuquerque, New Mexico knew that Smith had received a one-hundred-percent disability rating when it re-hired[3] him.  See Amended Complaint ¶ 11, at 3. The APD also knew that Smith suffered from PTSD, and from symptoms that included flashbacks, blackouts, and waking-nightmares.  See Amended Complaint ¶ 12, at 3.  The APD nonetheless assigned Smith to the Southeastern quadrant of Albuquerque in an area that is commonly known as the "War Zone."  Amended Complaint ¶ 13, at 3.  Smith told his fellow officers that he often suffered from PTSD symptoms, including flashbacks, while on the job as an APD officer.  See Amended Complaint ¶ 14, at 3.

On March 19, 2012, at approximately 1:08 p.m. Smith responded to a call from dispatch concerning a black Sports Utility Vehicle ("SUV") that was parked at an apartment complex at 8201 Marquette NE in Albuquerque.  See Amended Complaint ¶ 15, at 3.  An anonymous caller had informed the dispatcher that someone was possibly selling stolen items in the apartment complex's parking lot.  See Amended Complaint ¶ 16, at 3.  The dispatcher advised Smith that

---

[3]The Court includes the following facts only to provide a cohesive narrative, as they are not clear from the pleadings.  Smith originally joined the APD in 1994.  The APD "re-hired" Smith in March of 2000.  Smith also completed military duty at some point between 2000 and 2007, and returned to the APD on April 3, 2007.

the National Crime Information Center ("NCIC") database did not list the SUV's plates as stolen.  See Amended Complaint ¶ 17, at 3.

At "approximately 1:13:55 pm," Smith notified the dispatcher that he had arrived at 8201 Marquette Avenue NE.  Amended Complaint ¶ 18, at 3.  At 1:15:05 p.m., Smith called into dispatch "to 'clear the air' and [state] that he had made contact with the vehicle's occupant, Daniel Tillison."  Amended Complaint ¶ 18, at 3.  Smith conducted a felony stop by parking his patrol car directly behind the SUV.  See Amended Complaint ¶ 19, at 4.  He approached the SUV's driver side window with his gun drawn and ordered Tillison to show his hands.  See Amended Complaint ¶ 20, at 4.  The SUV's driver side window was open, and Tillison was talking on a black cellular telephone during the entire encounter with Smith.  See Amended Complaint ¶ 21, at 4.  Tillison told Smith that he did not do anything wrong, and he raised his hands, while holding the cellular telephone in his right hand.  See Amended Complaint ¶ 22, at 4.  Smith then suffered a PTSD related episode and fatally shot Tillison.  See Amended Complaint ¶ 23, at 4.

Between 1:16:09 p.m. and 1: 16:19 p.m., Smith called over his police radio "shots fired" and that the "subject tried running over me."  Amended Complaint ¶¶ 24-25, at 4.  At 1:17:20 p.m., Smith told dispatch that Tillison appeared dead.  See Amended Complaint ¶ 26, at 4.  Officer George Trujillo arrived at the scene five seconds later.  See Amended Complaint ¶ 27, at 4.  At 1:17:38 p.m., Smith told the dispatcher that Tillison was the only person in the car, and that he was still in the car.  See Amended Complaint ¶ 28, at 4.  Other officers who arrived at the scene found that the SUV was in gear in reverse.  See Amended Complaint ¶ 29, at 4.  By 1:19:00 p.m., Tillison was gasping for air.  See Amended Complaint ¶ 31, at 3.  Tillison died at

the scene.  See Amended Complaint ¶ 32, at 5.  APD confirmed that the stereo equipment in Tillison's SUV was not stolen.  See Amended Complaint ¶ 33, at 5.

Smith later told his co-workers that he blacked out and had a PTSD moment when he shot Tillison.  See Amended Complaint ¶ 81, at 11.  Smith did not issue any warnings that he was going to shoot.  See Amended Complaint ¶ 82, at 11.  Tillison did not utter any fighting words or any words that would indicate to Smith that he was a theat.  See Amended Complaint ¶ 86, at 11.  An APD police training expert testified, in another case, that APD's training on use of deadly force is unreasonable.  See Amended Complaint ¶ 90, at 11.  Smith violated APD policy by firing his gun at the SUV and at Tillison.  See Amended Complaint ¶ 95, at 13.

### 2. **Version One.**

Smith stated that, on March 19, 2012, he was performing his regular shift as a patrol officer.  He was wearing a police uniform and driving a marked police car.  See Amended Complaint ¶ 35, at 5.  At approximately 1:08 p.m. on March 19, 2012, an APD dispatcher directed him to respond to a call at 8201 Marquette NE.  See Amended Complaint ¶ 35, at 5. The anonymous caller had reported to the APD that someone was possibly selling stolen items in a parking lot and that the person's car was a black SUV.  See Amended Complaint ¶ 36, at 5. The dispatcher provided Smith with the SUV's license plate number and advised him "that there was a 'history' with that plate."  Amended Complaint ¶ 37, at 5.  Smith ran a "form inquiry" check on the plate, which indicated that it had been reported as stolen within the last week. Amended Complaint ¶ 37, at 5.  He also ran an NCIC check, which indicated that the SUV was not stolen.  See Amended Complaint ¶ 37, at 5.  He then searched the area for the SUV.  See Amended Complaint ¶ 38, at 5.

Smith located the black SUV in an apartment complex parking lot at 1:13 p.m. and stated that he was "on scene."  Amended Complaint ¶ 39, at 6.  After he informed dispatch that the SUV appeared to be occupied, the APD instructed all other radio traffic to remain silent.  See Amended Complaint ¶ 40, at 6.

Smith pulled into the parking lot, and parked his car at a semi-angle to the left side of the SUV.  See Amended Complaint ¶ 40, at 6.  There was a truck parked on the other side of the SUV, in the parking space directly to its right.  See Amended Complaint ¶ 40, at 6.  Smith saw a man moving inside the SUV.  See Amended Complaint ¶ 41, at 6.  He exited his patrol car and moved towards the SUV's open window, ordering Tillison to put his hands outside the window.  See Amended Complaint ¶ 41, at 6.  Tillison then began moving around inside the SUV.  See Amended Complaint ¶ 44, at 6.  He looked back at Smith, reached down to his right side, and then reached around his seat into the back area.  See Amended Complaint ¶ 44, at 6.  Smith pointed his gun at the window and screamed: "Let me see your hands, let me see your hands. Put them outside the window now."  Amended Complaint ¶ 44, at 6.  Tillison began to open the SUV's window with his left hand, but Smith could not see Tillison's right hand.  See Amended Complaint ¶¶ 45-46, at 6.  Tillison tried to open the SUV's door, but Smith pushed the door shut, continuing to order Tillison to show his hands.  See Amended Complaint ¶ 47, at 6.

When Smith was about an arm's length away from the SUV, Tillison put the SUV in reverse and rammed it into Smith's car and the truck that was parked on the other side of the SUV.  See Amended Complaint ¶ 49, at 7.  Smith began to move away from the SUV, and Tillison drove forward.  See Amended Complaint ¶¶ 53-54, at 7.  Smith discharged his firearm at the SUV's tire, but he is unsure if the SUV was driving forward, driving in reverse, or not moving when he fired at the tire.  See Amended Complaint ¶¶ 52-53, at 7.  Tillison drove the

SUV towards Smith, and, through the SUV's window, Smith saw that Tillison had a black object in his hand that looked like a weapon.  See Amended Complaint ¶¶ 55-56, at 7.  At this time, Smith was between five and ten feet away from Tillison.  See Amended Complaint ¶ 56, at 7.  Smith states that he had minimal room to escape.  See Amended Complaint ¶ 54, at 7.

Smith believed that Tillison was going to shoot him, so Smith shot Tillison through the window.  See Amended Complaint ¶ 57, at 7.  Smith, initially, felt threatened by the SUV driving towards him, but he was able to move out of its way.  See Amended Complaint ¶ 58, at 7.  Smith was afraid of the black object in Tillison's hand, and, because the SUV was still moving forward, he shot Tillison a second time, killing him.  See Amended Complaint ¶¶ 58-59, at 7-8.  Tillison fell back in his seat, and the SUV continued backwards between the truck and Smith's car.  See Amended Complaint ¶ 60, at 8.  Smith retreated to the back of his patrol car, and reported to the dispatcher that shots had been fired and that Tillison had tried to run him over.  See Amended Complaint ¶ 61, at 8.  He made this call sixty-four seconds after making contact with the SUV.  See Amended Complaint ¶ 61, at 8.

Smith returned to the SUV and found that Tillison's hands were empty.  See Amended Complaint ¶ 62, at 8.  Tillison did not appear to be breathing, so Smith took him out of the SUV and laid him on the ground.  See Amended Complaint ¶ 63, at 8.  Smith called for rescue and applied a combat bandage to Tillison.  See Amended Complaint ¶ 64, at 8.  Trujillo arrived at the scene, and he began to perform CPR on Tillison.  See Amended Complaint ¶ 64, at 8.  Other officers arrived, and they took Smith from the scene to be processed.  See Amended Complaint ¶ 64, at 8.  Smith was carrying a tape recorder, but said that there was not any tape in it, because his department was not issuing any more cassette tapes.  See Amended Complaint ¶ 66, at 9.

Smith had a lapel camera, but he stated that he did not have time to turn it on before the shooting. See Amended Complaint ¶ 66, at 9.

### 3.   **Version Two.**

Smith approached the black SUV with his firearm drawn, because he believed that the occupant had been selling stolen goods, and because he believed that the SUV was stolen. See Amended Complaint ¶ 67, at 9. Smith "announced himself several times" and walked to the SUV driver's door. Amended Complaint ¶ 68, at 9. He told Tillison to show his hands and identified himself as "Albuquerque Police," but Tillison did not comply. Amended Complaint ¶¶ 68-69, at 9. Tillison looked directly at Smith and then began to reach around inside the SUV. See Amended Complaint ¶ 70, at 9-10. Tillison first reached down to the left side next to his seat. See Amended Complaint ¶ 70, at 9-19. He then turned in his seat to reach into the rear of the SUV. See Amended Complaint ¶ 70, at 9-19. When he came back around, Smith could see his left hand, but not his right hand. See Amended Complaint ¶ 70, at 9-19. Tillison tried to open the SUV's door with his left hand, but Smith closed the door and told Tillison to stay in the vehicle and to show his hands. See Amended Complaint ¶ 71, at 10. Tillison drove the SUV forward two or three feet, then placed it in reverse, and started reversing. See Amended Complaint ¶ 72, at 10. Smith then turned away from the SUV. See Amended Complaint ¶ 73, at 10. The SUV hit Smith's vehicle, and Smith fired a round into the SUV driver side's rear tire. See Amended Complaint ¶¶ 74-75, at 10. The SUV lurched forward, and Smith backed up until he was in about a five square feet area. See Amended Complaint ¶¶ 76-77, at 10. Smith saw that Tillison's left hand was on the steering wheel, while his right hand came across his body, holding a dark object, which Smith later learned was a cellular telephone. See Amended Complaint ¶ 78, at 10. Smith shot Tillison. See Amended Complaint ¶ 79, at 10. Tillison slumped down into his

seat, and the SUV started to move backwards until it rammed the truck, pushing it backwards.

See Amended Complaint ¶ 79, at 10.  After "a couple of seconds," Smith opened the SUV's door

and tied a combat bandage around Tillison.  Amended Complaint ¶ 80, at 10-11.  At this point,

Trujillo arrived and began performing CPR on Tillison.  Amended Complaint ¶ 80, at 10-11.

## PROCEDURAL BACKGROUND

Plaintiff Veronica Dorato[4] filed suit in state Court on March 14, 2014, see Complaint for

Civil Rights Violations at 1, filed March 14, 2014 in state court, filed April 18, 2014 in federal

court (Doc. 1-1)("Complaint") and the Defendants[5] removed the case to federal court on April

18, 2014, see Notice of Removal, filed April 18, 2014 (Doc. 1).  The original Complaint alleged

nine counts.  Count I alleged that Smith violated Tillison's Fourth Amendment right to be free

from unreasonable seizure of himself and his black SUV.  See Complaint ¶¶ 105-114, at 14-15.

Count II alleged that Smith used excessive force in shooting Tillison.  See Complaint ¶¶ 115-

119, at 15-16.  Count III alleged state law tort claims against Smith, including assault, battery,

false arrest, and false imprisonment.  See Complaint ¶¶ 120-128, at 16.  Count IV alleged that

Defendant City of Albuquerque was negligent in hiring, training, supervising, and retaining

---

[4]The plaintiffs originally included: (i) Veronica Dorato, as Personal Representative of the Wrongful Death Claim of Daniel Tillison; (ii) Bruce Thompson, as guardian ad litem for D.T. and J.T., Tillison's minor children; (iii) Maria Touchet, as guardian ad litem for I.M., Tillison's minor child; and (iv) Mary Jobe, Tillison's ex-girlfriend and the mother of his children.  See Complaint ¶¶ 2-5, at 2.  Veronica Dorato is now the only remaining plaintiff.  See Order, filed March 20, 2015 (Doc. 69).  The Court refers to the relevant Plaintiffs as "Dorato" throughout this opinion to avoid confusion.

[5]The Complaint named as defendants: (i) Smith, in his official and individual capacities; (ii) John/Jane Doe Supervisor, in his/her official and individual capacities; (iii) the Albuquerque Police Department; and (iv) the City of Albuquerque.  See Complaint ¶¶ 6-9, at 2-3.  The Albuquerque Police Department is no longer a defendant.  See Stipulated Notice of Voluntary Dismissal of Defendant Albuquerque Police Department Without Prejudice, filed December 10, 2014 (Doc. 63); Order, filed March 20, 2015 (Doc. 70).  The Court will refer to all possible defendants as the "Defendants" to avoid confusion.

Smith.  See Complaint ¶¶ 129-132, at 17-18.  Count V alleged a negligent assault and battery claim against the City of Albuquerque under a respondeat superior theory.  See Complaint ¶¶ 133-137, at 18.  Count VI alleged loss of consortium for I.M., the child of Plaintiff Mary Jobe, Tillison's "girlfriend/fiancé" at the time of his death.  Complaint ¶ 5, at 2; id. ¶¶ 138-143, at 18-19.  Counts VII and VIII alleged loss of consortium for D.T. and J.T., Jobe and Tillison's children.  See Complaint ¶¶ 4-5, at 2; id. ¶¶ 144-155, at 19-20.  Count IX alleged loss of consortium for Jobe.  See Complaint ¶¶ 156-161, at 20-21.

The Defendants answered the Complaint on April 25, 2014.  See Defendants Martin Smith, the City of Albuquerque, and the City of Albuquerque Police Department's Answer to Plaintiffs' Complaint for Alleged Civil Rights Violations, filed April 25, 2014 (Doc. 10)("Answer").  Paragraphs 12 and 13 of the Complaint alleged:

> 12.    Upon information and belief, when Officer Smith returned to Albuquerque following his tour(s) of duty, he was diagnosed with Post Traumatic Stress Disorder (hereinafter "PTSD").
>
> 13.    Upon information and belief, the Veterans Affairs Hospital (hereinafter "VA Hospital") gave Martin Smith a one hundred percent disability rating based on the severity of his PTSD.

Complaint ¶¶ 12-13, at 3.  The Answer neither admitted nor denied these allegations, invoking "the physician patient privilege."  See Answer ¶ 8, at 2.  It included nine conclusory affirmative defenses: (i) lack of standing; (ii) failure to allege claims for which relief can be granted; (iii) the APD's non-suable entity status; (iv) reasonable suspicion and probable cause; (v)  qualified immunity and immunity under the New Mexico Tort Claims Act ("NMTCA"), N.M.S.A. §§ 41-4-1 to -29; (vi) no clearly established constitutional violation; (vii) reasonable use of force under the totality of the circumstances; (viii) unspecified bars to recovery within the NMTCA; and (ix) Daniel Tillison's contributory negligence or intentional misconduct.  See Answer at 9-10.

1.     **The MTS.**

Dorato filed the MTS on May 14, 2014.  See MTS at 1.  The MTS makes two primary

arguments.  See MTS at 2, 9.  First, Dorato contends that the Answer's nine affirmative defenses

fail to meet the pleading standards that Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal

require.  See MTS at 5 (explaining that, "[a]lthough no federal appellate court has determined

whether *Iqbal* and *Twombly* apply to affirmative defenses, the majority rule among district courts

is that that they do").  Dorato points out that the Defendants asserted nine affirmative defenses

without providing any supporting facts.  See MTS at 6.  She argues that other supposed

affirmative defenses "are actually denials."  MTS at 8.  She concludes that allowing these

defenses to remain in the Answer would "unnecessarily complicate this case by allowing

irrelevant and burdensome discovery, requiring briefing on meritless issues, and confusing the

jury."  MTS at 2-3.

Dorato also argues that the Defendants cannot assert the physician-patient privilege to

avoid responding to paragraphs 12 and 13 of the Complaint.  See MTS at 9.  She contends that

"there is no longer a physician-patient privilege in New Mexico."  MTS at 9 (quoting Smith v.

Ashby, 1987-NMSC-098, ¶ 5, 743 P.2d 114, 116).  Furthermore, she notes that "the physician

patient privilege is invoked in order to prevent ex-parte communications between opposing

counsel and the adverse party's physician."  MTS at 9.  Because Smith's health is directly at

issue, she argues, the privilege has no application here.  See MTS at 9.

The Defendants responded on May 30, 2014.  See Defendants' Response to Plaintiff's

Motion to Strike Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor

Patient Privilege, filed May 30, 2014 (Doc. 17)("Response to MTS").  They acknowledge that

there was no physician privilege at common law, but contend that New Mexico has created a

statutory privilege at N.M. R. Evid. 11-504.  <u>See</u> Response to MTS at 1-2.  They note that Smith "is not relying on any diagnosed physical, mental or emotional condition as a claim or defense," thus placing the case outside the statute's exception.  Response to MTS at 2 (citing N.M. R. Evid. 11-504).  They explain that the reasonableness determination under the Fourth Amendment of the Constitution of the United States is objective, making it independent of an officer's state of mind.  <u>See</u> Response to MTS at 3.  The Defendants then argue that <u>Bell Atlantic Corp. v. Twombly</u> and <u>Ashcroft v. Iqbal</u> do not apply to answers.  <u>See</u> Response to MTS at 4-6.

Dorato replied to the Defendants on July 1, 2014.  <u>See</u> Plaintiffs' Reply to Defendants [sic] Response to Plaintiffs' Motion to Strike Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor Patient Privilege [Doc. 17], filed July 1, 2014 (Doc. 28)("Reply to MTS").  Dorato repeats her arguments on the nine affirmative defenses.  <u>See</u> Reply to MTS at 1-2.  She also raises four points on the physician-patient privilege argument.  <u>See</u> Reply to MTS at 2-8.  First, she says, the identity of the party asserting a defense based on Smith's health is irrelevant -- the Defendants are required to admit or deny the allegations regardless.  <u>See</u> Reply to MTS at 2.  Second, she notes that the Answer came from both Smith and his employer, and his employer had no standing to assert the privilege.  <u>See</u> Reply to MTS at 3.  Finally, she argues that a "federal court considering a section 1983 claim applies the federal common law of privilege, and there is no federal physician-patient privilege."  Reply to MTS at 3.  Dorato cites <u>Vondrak v. City of Las Cruces</u>, 760 F. Supp. 2d 1170 (D.N.M. 2009)(Browning, J.), which states that, "where there is a federal cause of action and pendent state-law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state-law claims . . . federal privilege law should apply."  Reply to MTS at 5 (quoting <u>Vondrak v. City of Las Cruces</u>, 760 F.Supp.2d at 1175).  Fourth, Dorato contends that Smith waived any privilege by disclosing

his mental and physical health issues to the APD during his application process.  See Reply to MTS at 6-9.

The Court ruled on the MTS on March 12, 2015.  See Order, filed March 12, 2015 (Doc. 65)("MTS Order").   The Court denied the MTS "insofar as it requests the Court to strike Defendants' affirmative defenses . . . ."  MTS Order at 1.  It granted the MTS, however, "insofar as it requests the Court to order the Defendants to either admit or deny the truth of the allegations asserted in paragraphs 12 and 13," because, as it noted, "there is no federal physician-patient privilege."  MTS Order at 2.

### 2.      **The MPO.**

Dorato filed the Amended Complaint on April 8, 2015.  See Amended Complaint at 1. The Amended Complaint consolidates the excessive and unnecessary use of force, and unlawful seizure, claims into Count I.  See Amended Complaint ¶¶ 100-104, at 13-14.  It retains the state tort claims for assault, battery, false arrest, and false imprisonment in Count II.  See Amended Complaint ¶¶ 105-113, at 14-15.  Count III alleges that Defendant City of Albuquerque was negligent in hiring, training, supervising, and retaining Smith.  See Amended Complaint ¶¶ 114-117, at 15-16.

On July 22, 2015, Dorato served a Notice of Videotaped Deposition of Officer Martin Smith on Smith and the other Defendants via electronic mail.  See Certificate of Service, filed July 22, 2015 (Doc. 98).  The parties set the deposition for August 12, 2015.  See MPO at 2.

The Defendants filed the MPO on August 4, 2015.  See MPO at 1.  The MPO seeks a protective order covering "information concerning the details of [Smith's] military deployments and history; his disability rating; and confidential healthcare information."  MPO at 1.  The Defendants make two primary arguments: (i) the information in question is irrelevant to any of

the federal or state claims; and (ii) New Mexico's physician-patient and psychotherapist-patient privileges apply to Dorato's causes of action against the City of Albuquerque under state law. <u>See</u> MPO at 1-5.  On the first point, the Defendants note that, in excessive force claims, the court must examine the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene" rather than with "20/20 hindsight."  MPO at 3 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396-97 (1989)).  The Defendants explain that "Officer Smith's past military service, medical and psychological history, and disability rating have no bearing on this objective inquiry."  MPO at 4.  They contend that the same principle applies to assault and battery tort claims.  <u>See</u> MPO at 4.  They also argue that none of the information in question is relevant to Dorato's negligent-hiring-and-retention claims because the APD "re-hired" Smith in 2000, before the Iraq War and before he developed PTSD.  MPO at 4.  The Defendants take care to note that "Officer Smith . . . has not conveyed his privileged communications with his treatment providers, his disability rating, or the circumstances of that rating or the details of his military service to the upper level management who make the hiring/firing recommendations or decisions for the City of Albuquerque."  MPO at 5.

On the second point, the Defendants acknowledge that there is no federal physician-patient privilege, but argue that state law privileges should apply to their state law claims.  <u>See</u> MPO at 5.  They cite rule 501 of the Federal Rules of Evidence, which states that, "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."  MPO at 5 (citing Fed. R. Evid. 501).  The Defendants also quote the Court's decision in <u>Vondrak v. City of Las Cruces</u>: "The United States Court of Appeals for the Tenth Circuit has . . . held that, where there are federal and state law claims, '[a]s to state causes of action, a federal court should look to state law in deciding privilege questions.'"  760 F. Supp. 2d

at 1176 (quoting <u>Motley v. Marathon Oil Co.</u>, 71 F.3d 1547, 1551 (10th Cir. 1995)).  The MPO again requests that the Court prevent Dorato from asking any questions on Smith's military service, medical and psychological history/communications, or disability rating.  <u>See</u> MPO at 6.

Dorato responded to the MPO on August 18, 2015.  <u>See</u> Response to MPO at 1.  First, she argues that all of her requested materials are relevant.  <u>See</u> Response to MPO at 3-11.  She mentions the great breadth of discovery under rule 26 of the Federal Rules of Civil Procedure. <u>See</u> Response to MPO at 3.  She then cites <u>Hutton v. City of Martinez</u>, 219 F.R.D. 164 (N.D. Cal. 2003), in which the United States District Court for the Northern District of California found an officer's medical records relevant to determine why he fired at a fleeing suspect rather than chasing him.  <u>See</u> 219 F.R.D. at 165.  She contends that she has "alleged the same," arguing that Smith's physical and mental condition is relevant to determine whether it caused him to "employ a heightened level of force which may have been excessive under the circumstances." Response to MPO at 7-8.  She also argues that Smith's physical and mental condition is relevant to his credibility as a witness.  <u>See</u> Response to MPO at 8.  She notes that the Court can instruct the jury that it may consider the witnesses' ability to hear, see, or know the subjects about which the witnesses testify.  <u>See</u> Response to MPO at 9.  Smith's alleged PTSD and hearing impairment, Dorato states, are relevant to his credibility as the only direct witness to the events in question.  <u>See</u> Response to MPO at 10.

Second, Dorato repeats her arguments on the federal physician-patient privilege, noting that "the federal claims asserted in a federal question case are governed by federal common law." Response to MPO at 4.  She quotes the Court's MTS Order, which states that "there is no federal physician-patient privilege."  Response to MPO at 11 (quoting MTS Order at 2).  She argues

that, "[w]here the application of state law would be clearly inconsistent with federal law, state law privileges do not apply."  Response to MPO at 2.

Third, Dorato asserts that Smith waived any privileges applicable to the information in question.  See Response to MPO at 18.  She explains that

> Officer Smith in applying for his job at APD had to disclose any mental or physical health issues he has or had and he was informed that APD had a right to review as well as he had a continuing duty to inform his employer as to any mental or physical health condition he may suffer from.

Response to MPO at 18.  Dorato contends that the privilege is lost "when the material subject to protection is disclosed to a third party."  Response to MPO at 18 (citing United States v. Ryans, 903 F.2d 731, 741 n.13 (10th Cir. 1990)).  She adds that the Tenth Circuit has rejected the "selective waiver doctrine" even if two primary parties, such as an employer and an employee, agree not to disclose confidential information to third parties.  Response to MPO at 18.

The Defendants filed their Reply on September 4, 2015.  See Defendant Martin Smith's Reply to Plaintiff's Response to Motion for Protective Order, filed September 4, 2015 (Doc. 108)("Reply to MPO").  The Defendants recognize that there is no federal physician-patient privilege, but argue that Smith could invoke New Mexico's privilege because Dorato also brought a state law claim against the City of Albuquerque.  See Reply to MPO at 1-2.  The Defendants repeat that Smith's medical and psychological condition is irrelevant under the "objectively reasonable officer" standard.  Reply to MPO at 2.  They deny that Smith would "claim that any alleged disabilities provided the objectively reasonable basis to use deadly force against decedent."  Reply to MPO at 2-3.  They contend that the records are not relevant to Smith's credibility, because Dorato "has not cited to any credible medical evidence that a person diagnosed with PTSD has hallucinations and/or otherwise lacks the capacity to testify as a witness."  MPO at 5.  They mention that many cases ordering discovery of psychological records

required the plaintiffs to first present them to the court for in camera review.  <u>See</u> Reply to MPO at 6.

The Defendants, for the first time, assert that the federal psychotherapist-privilege covers any possible PTSD records.  <u>See</u> Reply to MPO at 7.  They also attempt to distinguish <u>Hutton v. City of Martinez</u>, 219 F.R.D. 164, arguing that the case involved records "connected to the officer's employment" and a surgical procedure on an officer who complained of back and neck pain at the time of his interview with investigators.  <u>See</u> Reply to MPO at 7.  The Defendants add that evidence of any mental or physical limitations that caused Smith to use excessive force would "tend to support a claim for negligence, not excessive force" and would thus be irrelevant to Dorato's current claims.  Reply to MPO at 8.

The Defendants also explain why the Court should not apply federal privileges to Dorato's state law claims:

> In *Vondrak*, this Court reasoned that the federal law privilege should apply because the medical information in *Vondrak* was relevant to both the federal and state law claims. *Id.* Here, as explained in Defendant's motion, Plaintiff only seeks this information to prove her state law claim of Negligent Hiring and Retention.

Reply to MPO at 10.

The Defendants also dispute that Smith has waived any privileges.  First, they note that the "Plaintiff cites to no authority that Officer Smith's submission to a psychological exam as a condition of employment acts as a blanket waiver of his psychotherapist-patient privilege to anyone and everyone."  Reply to MPO at 11.  They rely on one case for the proposition that, where a psychological fitness evaluation report to the police department is kept completely confidential, the privilege is not waived.  <u>See</u> Reply to MPO at 11 (citing <u>Caver v. City of Trenton</u>, 192 F.R.D. 154, 162 (D.N.J. 2000)(Hughes, J.)).  The Defendants conclude that, "if

there was any such waiver, it would be limited in scope to only that information which may have been disclosed outside the psychotherapist-patient relationship." Reply to MPO at 11.

The Court held a hearing on September 14, 2015. See Transcript of Hearing (taken September 14, 2015)("Sept. 14 Tr.").[6] The Court opened the hearing by asking Dorato whether, absent unusual facts about a police officer's mental and physical health, she would be entitled to discovery on those topics in a standard excessive force case. See Sept. 14 Tr. at 2:18-3:1 (Court). Dorato responded that she would be, because that information "affects the officer's credibility." Sept. 14 Tr. at 2:17-18 (Carpenter). Dorato recognized the Graham v. Connor "objective reasonableness" standard, but argued that evidence on Smith's state of mind could be used to convince a jury to question his testimony. See Sept. 14 Tr. at 5:20-6:7 (Carpenter). Dorato mentioned specifically that PTSD may cause a skewed sense of time. See Sept. 14 Tr. at 5:12-14 (Carpenter). She also clarified she does not seek the psychotherapist's notes on conversations with Smith, but rather other unspecified evidence of Smith's alleged impairments. See Sept. 14 Tr. at 6:14-7:5 (Carpenter). The Court and Dorato then attempted to draw a line between cases in which plaintiffs could retrieve all of an officer's mental health records and cases in which they could not. See Sept. 14 Tr. at 8:13-10:3 (Carpenter, Court). Dorato declined the Court's proposal that the Defendants turn over only documents related to hearing, saying that she wanted additional mental health-related records. See Sept. 14 Tr. at 13:3-16 (Carpenter). Dorato used the example of a psychological evaluation that recommends that an officer be assigned to desk duty. See Sept. 14 Tr. at 12:20-14:6 (Carpenter, Court). The Court noted, however, that this evidence might be irrelevant under the objective test applied in § 1983 cases. See Sept. 14 Tr. at 15:22-16:11 (Court).

---

[6]The Court's citations to all hearing transcripts refer to the court reporter's original, unedited versions. Any final versions may contain slightly different page and/or line numbers.

The Court then discussed privilege issues with the Defendants.  See Sept. 14 Tr. at 17:20-18:10 (Court, Griffin).  The Defendants drew a distinction between Smith's "own personal psychological medical records" and "records that we would have [which] would pertain to any issue that came up on the job as far as him going to employee health or any injury related issue that occurred on the job."  Sept. 14 Tr. at 20:1-14 (Griffin).  The Defendants said that they had no access to records in the first category and that Smith would have to waive the privilege before anyone could recover them.  See Sept. 14 Tr. at 20:1-8 (Griffin).  The Court made another proposal, offering to limit the permissible questions during Smith's deposition, and to order the Defendants to obtain and conduct a psychotherapist-patient privilege review on Smith's records. See Sept. 14 Tr. at 21:11-22:17 (Court).  The Court specifically noted that "it seems to me that the plaintiff is going to be entitled to this hearing issue, the physical impairment[.]  The mental health records, I'm less certain that they can be gotten under [§] 1983."  Sept. 14 Tr. at 22:7-13 (Court).  The Court added that it believed that Dorato would receive the hearing-related records even under the state claim.  See Sept. 14 Tr. at 22:18-19 (Court).

The Defendants referred the Court to their pleadings on the MTS, which they said laid out New Mexico's evidentiary rules on the patient-physician and psychotherapist-patient privileges.  See Sept. 14 Tr. at 23:1-13 (Court, Griffin).[7]  The Court then examined how these

---

[7]The Defendants also contend that "any law or legal standard that would compel an employer to go and get somebody's American medical or psychological records, especially dealing with the military . . . .  That sounds like it's a discriminatory practice to me."  Sept. 14 Tr. at 25:10-24 (Griffin).  The Defendants continued to argue that this sort of requirement could violate federal laws that prohibit discrimination against returning veterans.  See Sept. 14 Tr. at 26:1-6 (Griffin).  Dorato countered that police departments could evaluate Smith's psychological health and place him in a desk duty position without violating antidiscrimination laws.  See Sept. 14 Tr. at 28:9- 29:16 (Carpenter).  Because the Court does not decide any of the relevant Motions based on this issue, it will not discuss it in depth.  See Sept. 14 Tr. at 30:21-23 (Court)("That seems to me to be an issue not necessarily raised by this motion.  I note that it may eventually get to that point.").

privileges would apply in practice.   The Defendants maintained that questions during the upcoming deposition on Smith's communications with his psychotherapist would clearly implicate the privilege, as they would be "no different than what you discuss with your lawyer." Sept. 14 Tr. at 33:14-18 (Court, Griffin).  The Defendants allowed that Dorato could directly ask Smith whether he was able to hear during the incident.  See Sept. 14 Tr. at 34:15-19 (Griffin).

The Court explained that Smith would have to execute a waiver, get his medical records, and ship them to his attorneys rather than to Dorato.   See Sept. 14 Tr. at 35:3-7 (Court).   It suggested that the Defendants prepare a privilege log for Smith's relevant psychotherapy records.  See Sept. 14 Tr. at 35:3-19 (Court, Griffin).  The Defendants continued to argue in response that the information was irrelevant to the federal claims.  See Sept. 14 Tr. at 37:9-17; 38:1-25 (Griffin).

Dorato then attempted to distinguish Jaffee v. Redmond, 518 U.S. 1 (1996).  See Sept. 14 Tr. at 39:6-41:18 (Carpenter).  In that case, Dorato explained, the plaintiff sought a clinical social worker's case notes for up to fifty counseling sessions with a police officer defendant.  See Sept. 14 Tr. at 39:9-17 (Carpenter).  According to Dorato, the Supreme Court of the United States focused on the communications between the police defendant and the therapist.  See Sept. 14 Tr. at 40:6-15 (Carpenter).  Dorato reassured the Court that she would not ask Smith about the content of Smith's conversations with any treating psychotherapists.  See Sept. 14 Tr. at 41:4-10 (Carpenter).  The questions would instead include: "Mr. Smith[,] were you diagnosed with PTSD?  When were you diagnosed with PTSD?  Who diagnosed you with PTSD? Did you tell your employers?"  Sept. 14 Tr. at 40:18-25 (Carpenter).  Dorato also raised the possibility of an injury to Smith's left knee, which, along with the hearing and alleged PTSD problems, could account for his "100 percent disability rating."  Sept. 14 Tr. at 45:2-20 (Carpenter).  She argued

that this knee injury could indicate whether Smith's actions were objectively reasonable.  See Sept. 14 Tr. at 47:4-48:4 (Carpenter, Court)(considering whether the decision to use force would have been necessary with a reasonable officer who "was fit for duty both mentally and physically").

> The Court then analyzed <u>Vondrak v. City of Las Cruces</u>:
>
> [I]f I order the documents to be produced under the federal claim, I'm not going to s[i]t here and restrict their you know, say well you can't use them in any way for the state claim for discovery purposes, you know, but at the same time, if they're not going to be discoverable for federal, it seems to me that the state privileges limits you more.

Tr. at 48:16-22 (Court).

The Defendants requested specific limits on Smith's deposition.  They contended that "asking about his military service that occurred almost 10 years prior to this shooting" would be inappropriate, citing a similar case that Karen Molzen, Chief Magistrate Judge of the United States District Court for the District of New Mexico, decided.  Sept. 14 Tr. at 50:3-21 (Griffin). In that case, the Defendants argued, Chief Magistrate Judge Molzen blocked a plaintiff's attempt to inquire into a police shooting defendant's alleged PTSD.  See Sept. 14 Tr. at 50:16-21 (Griffin).  Chief Magistrate Judge Molzen allegedly found this line of questioning irrelevant, despite that the case, like this one, involved a municipal liability claim.  See Sept. 14 Tr. at 50:24-51:10 (Griffin).

The Court ended the hearing by explaining its decision.  The Court: (i) required Smith to execute a waiver of his privileges as to his medical records; (ii) required Smith's attorney to serve a subpoena with the signed waiver; (iii) required Smith's attorney to produce a privilege log for the psychotherapy records (but not for medical records); (iv) allowed Dorato to make "robust questioning" at Smith's deposition, including: "Have you seen a psychotherapist?" and

questions on the dates Smith met with the psychotherapist; and (v) required the Defendants to produce all of the medical records related to Smith's hearing under a protective order.  Sept. 14 Tr. at 53:19-56:15 (Carpenter, Court, Griffin).

### 3. **The MCD**.

Dorato filed her MCD on August 25, 2015.  See MCD at 1.  The MCD first addresses a number of specific discovery disputes.  See MCD at 1-4.  Dorato seeks a copy of Smith's APD personnel file and related documents, including his application, background check, training, evaluations, complaints, and medical/psychological history.  See MCD at 1-4.  She argues that the Defendants have no legitimate reason to withhold any of these materials.  See MCD at 1-4.

Second, Dorato attacks the Defendants' argument that Smith has privacy rights that prevent disclosure.  She notes that "public employees do not have a reasonable expectation of privacy in the facts contained within their investigation or personnel files."  MCD at 5 (citing Flanagan v. Munger, 890 F.2d 1557, 1570-71 (10th Cir. 1989)).  Police internal investigation files, she says, are not protected if the "documents relate[] simply to the officers' work as police officers."  MCD at 5 (quoting Denver Policemen's Protective Ass'n v. Lichtenstein, 660 F.2d 432 (10th Cir. 1981)).  Dorato agrees to redact highly sensitive information such as Smith's home address, date of birth, and social security number.  See MCD at 6.

Dorato also contends that the self-critical privilege analysis does not apply here.  See MCD at 7.  She states that any "matters of opinion," such as files on citizen complaints against particular police officers, should be produced to the Court for in camera review or released outright.  MCD at 7.  She explains that "[t]he majority of courts conclude that public officers do not have a privacy interest in their interactions with the public."  MCD at 6.

Finally, Dorato contends that the attorney-client privilege does not shield certain documents related to the APD's internal affairs investigations.  See MCD at 9.  She notes that the privilege "protects communications generated or received by an attorney giving legal advice, but does not protect communications derived from an attorney . . . acting in some other capacity." MCD at 9 (citing State ex rel. State Highway Comm'n v. Steinkraus, 1966-NMSC-134, ¶ 4, 417 P.2d 431, 432).

The Defendants responded to the MCD on September 11, 2015.  See Defendants' Response to Plaintiff's Second Motion to Compel, filed September 11, 2015 (Doc. 111)("Response to MCD").  The Response to MCD accuses Dorato of misrepresenting the Defendants' discovery responses and notes that "the main issue of dispute concerns the relevancy of documents that concern matters of opinion and internal investigations and whether such documents should be disclosed pursuant to a protective order so that they will remain confidential."  Response to MCD at 1.

The Defendants first focus on Smith's internal affairs documents.  See Response to MCD at 3.  The Defendants point out that Dorato refused their offer to produce most of these documents under a protective order forbidding disclosure to non-parties and non-attorneys-of-record.  See Response to MCD at 3.  The Defendants cite to the "self-policing" or "self-critical analysis privilege," which they say promotes candidness during internal investigations -- if police officers' disparaging statements became public in every case, it would "have a chilling effect on their willingness" to speak freely during future investigations.  Response to MCD at 5 (citing King v. Conde, 121 F.R.D. 180, 192 (E.D.N.Y. 1988)(Weinstein, J.)).  The Defendants say that the disclosure of documents wholly irrelevant to the shooting does not serve any compelling state interest and infringes on Smith's right to privacy.  See Response to MCD at 6.

The Defendants then argue that the Court should impose a protective order.  See Response to MCD at 8-9.  They explain that "confidential information should be subject to a protective order."  Response to MCD at 8 (citing Kelly v. Romines, No. MC 11-0047, 2012 WL 681806, at *6 (D.N.M. Feb. 27, 2012)(Browning, J.)).  In this case, they say, "[w]ith the exception of citizen complaints, internal affairs documentation and investigations by the Police Oversight Board are deemed to be confidential in accordance with City Ordinance, the Albuquerque Police Department Standard Operating Procedures[,] and the City's contractual agreement with the Albuquerque Police Officer's Association."  Response to MCD at 8.  They argue that these facts constitute good cause for the entry of a protective order.  See Response to MCD at 8-9.

The Defendants also update the Court on ongoing negotiations with Dorato.  They ask the Court to step in and perform an in camera review of four documents, Bates numbers COA1, COA12, COA46, COA52, to determine whether they are relevant or privileged.  See Response to MCD at 9.  They note that they are working with Dorato to narrow the request for training records.  See Response to MCD at 9-10.  Finally, the Defendants state that they already provided Smith's performance evaluations to Dorato.  See Response to MCD at 10.

The Court held initial discussions on the MCD as part of its September 14, 2015 hearing.  See Sept. 14 Tr. at 62:1-3 (Court).  Dorato argued that Smith had waived the privilege as to all files "already in the possession of the police department or the city."  Sept. 14 Tr. at 62:10-20 (Carpenter).  The Defendants countered that either entity would require a release form to provide any records -- that their mere possession of information "doesn't mean that it's discoverable, or that it's waived to the entire world."  Sept. 14 Tr. at 62:18-23 (Griffin).

The parties debated the possibility of producing internal affairs records subject to a protective order.  Dorato made it clear that she opposed any exceptions related to Smith's psychological history.  See Sept. 14 Tr. at 65:1-7 (Carpenter).  The Defendants first stated that they would need a court order to retrieve any psychological records from City of Albuquerque or APD employees.  See Sept. 14 Tr. at 66:5-7 (Griffin).  The Defendants also noted that other courts in similar situations ordered in camera reviews to determine whether documents were relevant.  See Sept. 14 Tr. at 66:14-19 (Griffin).  The Defendants again complained that the Court was "making a predetermination that everything is relevant."  Sept. 14 Tr. at 66:21-23 (Griffin).  The Court replied that the Defendants would "have a hard time convincing me that the psychological materials . . . in the city's possession, custody or control are not producible," but mentioned that the credit reports were less likely to be relevant to a shooting case.  Sept. 14 Tr. at 67:6-11 (Court).

Dorato's counsel then stated that she had been able to obtain psychological reports in other cases evaluating APD officers' judgment and whether they should be assigned to street patrols.  See Sept. 14 Tr. at 68:1-15 (Carpenter).  She added that the APD would have created a report for Smith in 2000, and that the Defendants would know which of the APD's employees or contractors performed the tests.  See Sept. 14 Tr. at 68:16-25 (Carpenter).  The Court then concluded the hearing.  It stated that it would grant the MCD and issue an opinion at a later date. See Sept. 14 Tr. at 70:10-11 (Court).

On September 14, 2015, the Defendants' counsel sent an electronic mail transmission to the Court stating that she was "unclear" about the timeframe for records she should disclose and requesting a "brief telephonic hearing" on the issue.  Electronic Mail Transmission from Stephanie Griffin, Deputy City Attorney, to K'Aun Wild, Courtroom Deputy, dated September

14, 2015 (Doc. 136)("First Email").  The Court told Ms. Wild that the City of Albuquerque should talk to Dorato to determine whether there was any disagreement on its instructions.  Ms. Wild responded to the electronic mail transmission by telephone the same day.  The next day, the Defendants' counsel sent a second electronic mail transmission.  See Electronic Mail Transmission from Stephanie Griffin, Deputy City Attorney, to K'Aun Wild, Courtroom Deputy, dated September 15, 2015, filed September 15, 2015 (Doc. 136)("Second Email").  The Second Email expanded the topics under discussion to include: (i) the timeframe for any medical record releases Smith had to sign; (ii) the precise scope within which the Court found that Smith had waived the psychotherapist privilege; and (iii) the timeframe for the City of Albuquerque to disclose records within its possession and control.  See Second Email at 1.  The Court instructed Ms. Wild to respond by telephone, and provided its hand-written responses on a printed version of the Second Email.  See Second Email at 1.  Ms. Wild again responded by telephone.

On September 18, 2015, the Defendants followed the Court's instruction to confer with Dorato on the three points they raised in their Second Email.  See Defendants' Unopposed Motion for Expedited Telephonic Hearing at ¶¶ 8-9, at 3, filed September 18, 2015 (Doc. 113)("MTH").  The Defendants moved for an expedited telephonic hearing later the same day. See MTH at 1.  Their motion raised three primary issues.  First, they objected to any disclosure of records that post-dated the shooting incident.  See MTH ¶ 9, at 3.  Second, they argued that the Court had to "specify the scope, if any, the Court finds that the psychotherapist-patient privilege is waived."  MTH ¶ 10, at 3-4.  Third, they disputed whether "the Court directed that Officer Smith sign a release for the psychological records that may be in the custody and control of a psychologist who is on contract for the City."  MTH ¶ 11, at 4.

4.      **The Status Conference.**

The Court held a telephonic status conference hearing on September 24, 2015.  See Transcript of Hearing (taken September 24, 2015)("Sept. 24 Tr.").  The Court began by stating its position on the issues that the Defendants raised in the MTH.  It repeated that its discovery order would apply from "ten years prior to the date of [the] incident to the present."  Sept. 24 Tr. at 3:3-4 (Court).  It explained that the City of Albuquerque had to disclose all documents in its possession because the scope of the waiver was relatively expansive.  See Sept. 24 Tr. at 3:5-11 (Court).  It also explained that Smith had to "do what he needs to do to make these [records] available," including signing a release.  Sept. 24 Tr. at 2:19-3:24 (Court).

Second, the Court addressed the possibility that some of the City of Albuquerque's records would come from a psychiatrist or psychologist who helps officers deal with the emotional fallout from police shootings.  See Sept. 24 Tr. at 5:5-14 (Court).  The Court noted that these documents "would not be something that the city would ever see and that . . . it's almost like a service that the city is providing."  Sept. 24 Tr. at 5:11-14 (Court).  It thus refused to require the Defendants to produce these records.  See Sept. 24 Tr. at 5:16-21 (Court).

The Defendants questioned whether the Court could actually compel Smith to "waive his privilege," given that the medical release forms state that release is contingent on voluntary consent without coercion.  Sept. 24 Tr. at 6:14-24 (Griffin).  The Defendants said they might be unable to obtain any records without a written order or a subpoena.  Sept. 24 Tr. at 6:25-7:18 (Griffin).  The Court proposed that Dorato prepare a draft order "that we can give . . . to the psychotherapist and get these documents in Ms. Griffin's hands."  Sept. 24 Tr. at 8:3-5 (Court).

Dorato then argued that the Court should broaden its required disclosures to encompass psychological records from earlier than ten years before the date of the shooting.  See Sept. 24

Tr. at 8:13-12:6 (Carpenter, Court).  She noted that the APD likely gave Smith a psychological examination when it initially hired him and another when it re-hired him in 2000.  See Sept. 24 Tr. at 8:13-9:11 (Carpenter).  She stated that she had the "right to those regardless of time frame."  Sept. 24 Tr. at 11:17-18 (Carpenter).  The Defendants replied with a different understanding of the scope of this part of the order.  See Sept. 24 Tr. at 15:21-18:22 (Griffin).

The Court attempted to resolve this problem by restating the temporal scope of various categories of documents.  See Sept. 24 Tr. at 18:24-21:18 (Carpenter, Court, Griffin).  The Defendants would need to produce records from third party providers from ten years before the date of the incident to the present.  See Sept. 24 Tr. at 18:24-19:2 (Court).  Documents of any date under the control of the City of Albuquerque's contractual psychiatrist/psychotherapist, and created for the City of Albuquerque's benefit, would be disclosed, although there would likely only be seven years available.  See Sept. 24 Tr. at 19:2-25 (Court).  Documents under the City of Albuquerque's direct control in its employment, medical, and any other files would have to be disclosed regardless of date.  See Sept. 24 Tr. at 19:2-17 (Court).  The Court clarified that "for the City of Albuquerque's benefit" included visits the City of Albuquerque required Smith to make, but excluded pure employee assistance programs.  See Sept. 24 Tr. at 20:1-21:18 (Carpenter, Court).  Visits to the City of Albuquerque's chosen psychiatrist/psychologist would be excluded from disclosure if Smith saw him only for his personal benefit.  See Sept. 24 Tr. at 19:2-10 (Court).  The same distinction would apply to records at the Department of Veterans Affairs.  See Sept. 24 Tr. at 21:22-22:5 (Court).

The Court concluded the hearing by warning Smith that he was choosing a risky strategy. See Sept. 24 Tr. at 27:24-28:9 (Court).  If Smith asserted the privilege as to certain documents, the Court explained, it would likely bar him from using those documents to defend himself at

trial.  See Sept. 24 Tr. at 25:16-26:15 (Court).  The Court noted specifically that Dorato appeared

to have many of the underlying documents through separate records requests.  See Sept. 24 Tr. at

28:4-8 (Court).

### 5.      The MTC.

On October 12, 2015, the Defendants moved for the Court to certify its Order to the

Tenth Circuit for interlocutory appeal.  See MTC at 1.  The Defendants quote the relevant

statute:

> When a district judge, in making in a civil action an order not otherwise
> appealable under this section, shall be of the opinion that such order involves a
> controlling question of law as to which there is substantial ground for difference
> of opinion and that an immediate appeal from the order may materially advance
> the ultimate termination of the litigation, he shall so state in writing in such order.
> The Court of Appeals which would have jurisdiction of an appeal of such action
> may thereupon, in its discretion, permit an appeal to be taken from such order, if
> application is made to it within ten days after the entry of the order . . . .

MTC at 1-2 (quoting 28 U.S.C. § 1292(b)).  The Defendants first argue that there is a controlling

question of law with substantial grounds for difference of opinion.  They note that "both parties

cited cases from different jurisdictions in support of their respective positions which either

supported or did not support the disclosure of this information."  MTC at 2.  Their argument

centers on whether state or federal privilege law applies to Dorato's state law claims.  See MTC

at 2 (citing Vondrak v. City of Las Cruces).

Second, the Defendants complain that the Court arbitrarily, without analysis or

explanation: (i) failed to "set any time limitations for the disclosure of records" from the City of

Albuquerque and its contractors; and (ii) required the Defendants to provide records from third-

party service providers from ten years before the incident to the present.  MTC at 3.  The

Defendants argue that these rulings "deviate[] from [the Court's] prior rulings and the ruling by

the Chief Magistrate Judge for this District."  MTC at 3.

Dorato responded two weeks later.   See Plaintiff's Response in Opposition to Defendant's Motion to Certify Order for Interlocutory Appeal [Doc. 121], filed October 26, 2015 (Doc. 123)("Response to MTC").   Dorato emphasizes that certification "should be limited to extraordinary cases in which extended and expensive proceedings probably can be avoided by immediate final decision of controlling questions encountered early in the action."   Response to MTC at 2 (quoting State of Utah By & Through Utah State Dep't of Health v. Kennecott Corp., 14 F.3d 1489, 1495 (10th Cir. 1994)(citation and quotation marks omitted)).   She explains that the question of law is not controlling, because its answer "will not end the matter pending," given that she has other evidence on Smith's fitness for duty.   Response to MTC at 2 (quoting In re Grand Jury Proceedings June 1991, 767 F. Supp. 222, 225 (D. Colo. 1991)).   Dorato contends that the Court's rulings were consistent with its prior opinions and, in any case, even uncertainty on a given issue is "not in itself sufficient to establish a substantial ground for difference of opinion."   Response to MTC at 3 (quoting Adams v. Burlington N. R. Co., 843 F. Supp. 686, 688 (D. Kan. 1994)).   She also notes that the Defendants will ultimately have adequate recourse through an appeal on a fully developed record.   See Response to MTC at 4.

The Defendants replied on November 12, 2015.   See Defendants' Reply to Plaintiff's Response to Defendants' Motion for the Court to Certify the Court's Order [Doc. 117] and Pending Memorandum Opinion for Interlocutory Appeal, filed November 12, 2015 (Doc. 134)("Reply to MTC").   The Defendants state that the Court's rulings are inconsistent with Motley v. Marathon Oil Co., 71 F.3d at 1551, because "the Tenth Circuit clearly said that state law privileges apply to state causes of action even when there are both federal and state law claims in a case."   Reply to MTC at 1-2.   They quote a 2009 Supreme Court decision stating:

> The preconditions for § 1292(b) review -- "a controlling question of law," the
> prompt resolution of which "may materially advance the ultimate termination of

the litigation" -- are most likely to be satisfied when a privilege ruling involves a
new legal question or is of special consequence, and district courts should not
hesitate to certify an interlocutory appeal in such cases.

Reply to MTC at 3 (quoting Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100, 110-11 (2009)).

Finally, the Defendants argue that the Court's ruling will open a "Pandora's box" with "special

and significant consequences [for] all law enforcement officials and military veterans."  Reply to

MTC at 3-4.

### 6.   **The Final Hearing**.

The Court held a final hearing on the MPO, MCD, and MTC on November 16, 2015.

See Transcript of Hearing (taken November 16, 2015)("Nov. 16 Tr.").   The Court began

discussion of the MPO/MCD Order by asking the Defendants to state its most significant error.

See Nov. 16 Tr. at 29:5-11 (Court).   The Defendants replied that their main objection "is the

breadth and scope of the privilege and also the breadth and scope of the documents that the Court

has ordered produced that pertain to Mr. Smith's protected health information."  Nov. 16 Tr. at

29:12-16 (Griffin).   First, the Defendants contended that the Court had ordered more discovery

than Dorato had requested.  See Nov. 16 Tr. at 29:19-25 (Griffin).   According to the Defendants,

Dorato initially requested only medical records related to Smith's hearing, but the Court required

production of all medical records.  See Nov. 16 Tr. at 29:25-30:10 (Griffin).   The Defendants

also objected to the production of records that post-dated the shooting incident.  See Nov. 16 Tr.

at 30:11-24 (Griffin).   Second, the Defendants argued that they should only have to disclose

psychological records related to pre-hiring testing, rather than all records created "for the benefit

of the city" at any time.  Nov. 16 Tr. at 31:3-19 (Griffin).   Third, the Defendants asserted that

courts "traditionally" conduct in camera review instead of requiring direct disclosures to

opposing counsel.  Nov. 16 Tr. at 31:19-25 (Griffin).   Fourth, the Defendants argued that they

should be able to assert privilege on a general, good-faith basis as to facially privileged information, including communications between Smith and his physician, instead of preparing a privilege log.  See Nov. 16 Tr. at 31:25-33:9 (Griffin)(drawing analogy to the attorney-client privilege).  The Defendants' counsel explained that

> I have been practicing for a very long time, and I have never ever had a Court direct . . . me to go out and get a city employee's -- all of their medical records from every single procedure and to do a privilege log because the Court seems to think in order for me to invoke the privilege, I have to at least have the records before me.

Nov. 16 Tr. at 32:10-17 (Griffin).  Fifth, the Defendants again pointed to the consent problems with compelling Smith to release his records.  See Nov. 16 Tr. at 33:9-24 (Griffin).

The Defendants then made their argument in favor of the MTC.  They directed the Court to Mohawk Indus., Inc. v. Carpenter, which they said held that, "if you're talking about a privilege issue where the law is inconsistent and can be broad based enough to affect more than what's involved in this case, then that is something that could be ripe for appeal for purposes of interlock."  Nov. 16 Tr. at 35:2-6 (Griffin).  The Defendants also emphasized the importance of the issue: "[W]hat the court is deciding here today . . . not only affects Officer Smith, but I think it can affect all pending civil rights cases against police officers."  Nov. 16 Tr. at 36:4-7 (Griffin).

The Defendants and the Court then returned to debating the merits of the Court's prior rulings.  The Court asked whether the Defendants' counsel had litigated a case in which a plaintiff "put at issue the police officer's health?"  Nov. 16 Tr. at 36:9-11 (Court).  The Defendants responded that they had not seen such a case, but argued that Smith had not waived his privilege as to all medical records that the City of Albuquerque happened to have in its possession.  See Nov. 16 Tr. at 37:16-38:19 (Court, Griffin).  The Defendants used the example

of a "mobile health van that employees are allowed to go to during work hours," saying that "it's just a benefit."  Nov. 16 Tr. at 37:19-23 (Griffin).

The Court then asked to hear from Frederick Mowrer, an attorney for the Albuquerque Police Officer's Association, who came to the hearing.  See Nov. 16 Tr. at 41:17-19 (Court)("Tell me as an officer, as somebody representing these officers what's scaring you the most [] about what I'm doing over here?").  Mr. Mowrer expressed concerns related to the officers' privileges, the scope of the records to be disclosed, and the ten-year duration.  See Nov. 16 Tr. at 41:20-72:15 (Mowrer).  First, he noted that there is a "very thin line" between documents generated for the City of Albuquerque's benefit and those generated for the officer's benefit.  Nov. 16 Tr. at 45:18-46:4 (Mowrer).  He indicated that he could accept, however, a "clear distinction" between visits in which a psychologist or psychiatrist is expected to report the results to the City of Albuquerque, and visits for the officer's benefit.  See Nov. 16 Tr. at 47:10-20 (Court, Mowrer).  The Court responded to Mr. Mowrer's suggestion of an in camera review by noting that it could not "start doing the attorneys' work" before they even produced a privilege log.  Nov. 16 Tr. at 49:1-3 (Court).

Second, Mr. Mowrer questioned why the disclosures included all of Smith's physical issues instead of only conditions relevant to his work.  See Nov. 16 Tr. at 50:7-19 (Mowrer).  Mr. Mowrer raised the specter of unintended consequences -- including employee litigation against the City of Albuquerque to prevent it from disclosing sensitive and confidential medical records, such as STD diagnoses.  See Nov. 16 Tr. at 50:20-51:7 (Mowrer).  The Court confirmed that Mr. Mowrer would be "comfortable with the plaintiff listing out the ailments that they want the City to review for."  Nov. 16 Tr. at 51:10-15 (Court, Mowrer).

Third, Mr. Mowrer suggested limiting the relevant production to five or three years instead of ten years, unless a specific issue like hearing justified a more in-depth search for diagnoses.  See Nov. 16 Tr. at 51:18-52:6 (Mowrer).

After a brief break, the Court asked for Dorato's input.  See Nov. 16 Tr. at 52:11-20 (Court).  Dorato agreed with the Court's proposed distinction between records prepared for the City of Albuquerque and those related to Smith's personal care.  See Nov. 16 Tr. at 53:9-11 (Carpenter).  Dorato further explained that she was focused on physical ailments other than hearing, including possible shoulder injuries, because they could have impeded Smith's ability to evade Tillison's car.  See Nov. 16 Tr. at 55:11-21 (Carpenter).  She rejected the Defendants' proposal that she select relevant categories of medical records in advance, noting that it was "like me asking for a description of what heaven looks like when I don't know if heaven really exists." Nov. 16 Tr. at 57:4-6 (Carpenter).  She responded to the Court's concern that other plaintiffs could abuse such a rule by noting that courts can evaluate each case on its particular facts.  See Nov. 16 Tr. at 57:19-58:5 (Carpenter).  She cited a recent case in which the plaintiffs requested treatment records related to PTSD based only on speculation and the defendant's military history, contrasting it with her documents showing a Department of Veterans Affairs disability rating.  See Nov. 16 Tr. at 58:6-59:2 (Carpenter).

The Court then suggested that the Defendants could obtain all of the records, but not necessarily produce all of them to Dorato.  See Nov. 16 Tr. at 58:6-59:2 (Carpenter).  Dorato appeared willing to compromise, at times allowing that permitting plaintiffs total access to police officers' medical files would be troubling, see Nov. 16 Tr. at 59:4-8 (Carpenter, Court); that the Defendants could prepare a sort of privilege log for relevance to avoid turning over irrelevant medical records, see id. at 61:1-9 (Carpenter); and that the Defendants could "call up and say . . .

here's a batch of records that deal with [an ingrown] toenail" and not produce those, id. at 63:21-25 (Carpenter).  Dorato repeated, however, that she was interested in Smith's physical ailments beyond just his hearing.  See Nov. 16 Tr. at 64:7-16 (Carpenter, Court).  She specifically mentioned an on-base explosion in 2008, which led to Smith taking "medical military leave for a very long time."  Nov. 16 Tr. at 70:2-10 (Carpenter).

Dorato also emphasized the importance of Smith's role as a "perception witness" in her arguments for a broad temporal scope of production.  Nov. 16 Tr. at 65:5-10 (Carpenter).  She explained that PTSD and hearing problems could affect the weight of Smith's testimony, and that he may have sought treatment for ailments present at the time of the incident well after the incident occurred.  See Nov. 16 Tr. at 66:1-67:2 (Carpenter).

Dorato responded to the Defendants' arguments on the MTC.  First, Dorato said that the issue was not controlling, because she had enough information to proceed with the case regardless of the Court's ruling.  See Nov. 16 Tr. at 67:3-18 (Carpenter).  Second, Dorato contended that the issue was not ripe for review, because the parties were not even sure whether the requested documents were relevant.  See Nov. 16 Tr. at 67:18-25 (Carpenter).  Third, Dorato argued that the issue would not "materially advance the ultimate termination of the litigation," because it was "not dispositive in any way."  Nov. 16 Tr. at 68:6-9 (Carpenter).

The parties closed by debating specific modifications to the Court's MPO/MCD Order.  Dorato asserted that the Court need not modify the MPO/MCD Order, as paragraphs two and four already drew the distinction the Court had discussed with Mr. Mowrer.  See Nov. 16 Tr. at 71:3-12 (Carpenter).  The Defendants suggested that the Court modify paragraph 3 of the MPO/MCD Order, which they said applied to "any and all third party medical records" regardless whether they resulted from an examination for the benefit of the City of Albuquerque

or for Smith's personal benefit.  See Nov. 16 Tr. at 74:18-22 (Griffin).  The Court agreed that it

could amend its MPO/MCD Order to make it consistent with this distinction.  See Nov. 16 Tr. at

71:23-24 (Court).  The Court also noted the Defendants' suggestion not to "include any

psychotherapist notes" in its MPO/MCD Order.  Nov. 16 Tr. at 75:2-8, 16-19 (Court, Griffin).

The Court denied the MTC, because there was no controlling issue of law that would

advance the case.  See Nov. 16 Tr. at 76:1-23 (Court).  The Court noted that it would roll several

opinions into one and amend its existing MPO/MCD Order to reflect the parties' agreements.

See Nov. 16 Tr. at 76:25-79:19 (Carpenter, Court, Griffin).

## LAW REGARDING MOTIONS TO STRIKE UNDER RULE 12(f)[8]

Rule 12(f) of the Federal Rules of Civil Procedures provides:

> **(f)**    **Motion to Strike.** The court may strike from a pleading an insufficient
> defense or any redundant, immaterial, impertinent, or scandalous matter.
> The court may act:
>
> **(1)**    on its own; or
>
> **(2)**    on motion made by a party either before responding to the
> pleading or, if a response is not allowed, within 21 days
> after being served with the pleading.

Fed. R. Civ. P. 12(f).  Professors Charles Wright and Arthur Miller have recognized, however,

that such motions are not favored and, generally, should be denied:

> The district court possesses considerable discretion in disposing of a Rule 12(f)
> motion to strike redundant, impertinent, immaterial, or scandalous matter.
> However, because federal judges have made it clear, in numerous opinions they
> have rendered in many substantive contexts, that Rule 12(f) motions to strike on
> any of these grounds are not favored, often being considered purely cosmetic or
> "time wasters," there appears to be general judicial agreement, as reflected in the

---

[8]The Court recognizes that several amendments to the Federal Rules of Civil Procedure
became effective on January 1, 2015.  See Proposed Amendments to the Federal Rules of Civil
Procedure, UNITED STATES COURTS, 2015, http://goo.gl/4yvqaN.  The Court applies the rules
dating from before December 1, 2015, because the parties briefed and argued the case using the
older rules.

> extensive case law on the subject, that they should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action. Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party.

5C Charles Alan Wright, et al., Arthur R. Miller, et al., Federal Practice & Procedure § 1382 (3d. ed. 2015)(footnotes omitted). Accord Burget v. Capital W. Sec., Inc., No. CIV 09-1015-M, 2009 WL 4807619, at *1 (W.D. Okla. Dec. 8, 2009)(Miles-LaGrange, J.)(citing Scherer v. U.S. Dep't of Educ., 78 F. App'x 687, 689 (10th Cir. 2003)(unpublished)[9])("While motions to strike are generally disfavored, the decision to grant a motion to strike is within the discretion of the court.").

"Allegations will not be stricken as immaterial under this rule unless they have no possible bearing on the controversy." Estate of Gonzales v. AAA Life Ins. Co., No. CIV 11-0486 JB/WDS, 2012 WL 1684599, at *5 (D.N.M. May 8, 2012)(Browning, J.)(quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., No. CIV 09-0455 CVE/FHM, 2010 WL 132414, at *5 (N.D. Okla. Jan. 8, 2010)). "The Court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defenses succeed." Friends of Santa Fe Cnty. v. LAC Minerals, Inc.,

---

[9]Scherer v. U.S. Department of Education is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).

The Court finds that Scherer v. U.S. Department of Education, 78 F. App'x 687 (10th Cir. 2003); Miller v. Regents of the University of Colorado, 188 F.3d 518, 1999 WL 506520 (10th Cir. 1999); and In re Hopkins, 162 F.3d 1173, 1998 WL 704710 (10th Cir. 1998) have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Amended Order.

892 F. Supp. 1333, 1343 (D.N.M. 1995)(Hansen, J.)(quoting Carter-Wallace, Inc. v. Riverton Lab., Inc., 47 F.R.D. 366, 368 (S.D.N.Y. 1969)(Cannella, J.))(internal quotation marks omitted). Professors Wright and Miller have also commented on what constitutes "immaterial" matter in the context of a motion to strike.  "'Immaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material."  5C WRIGHT & MILLER, supra, § 1382 (footnotes omitted).  Scandalous allegations are those that degrade a party's moral character, contain repulsive language, or detract from the court's dignity.  See Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc., 173 F.R.D. 275, 285 (D. Colo. 1997)(Nottingham, J.).

"Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly.  Motions, briefs, . . . memoranda, objections, or affidavits may not be attacked by the motion to strike."  Dubrovin v. Ball Corp. Consol. Welfare Ben. Plan for Emps., No. CIV 08-0563 WYD/KMT, 2009 WL 5210498, at *1 (D. Colo. Dec. 23, 2009)(Daniel, J.).  Accord Ysais v. N.M. Judicial Standard Comm'n, 616 F.Supp.2d 1176, 1184 (D.N.M. 2009)(Browning, J.)("Generally . . . motions, briefs, and memoranda may not be attacked by a motion to strike.")(citing Searcy v. Soc. Sec. Admin., 956 F.2d 278, 1992 WL 43490, at *1, *4 (10th Cir. 1998)(unpublished table decision)).  "The Federal Rules of Civil Procedure define 'pleadings' as a complaint or third-party complaint; an answer to a complaint, a third-party complaint, a counterclaim, or a crossclaim; and, 'if the court orders one, a reply to an answer.'"  Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (quoting Fed. R. Civ. P. 7(a)).

"Striking a pleading or part of a pleading is a drastic remedy and because a motion to strike may often be made as a dilatory tactic, motions to strike under Rule 12(f) generally are disfavored."[10] Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *5 (quoting Sai Broken Arrow C, LLC v. Guardian Emergency Vehicles, Inc., No. CIV 09-0455 CVE/FHM, 2010 WL 132414, at *5 (N.D. Okla. Jan. 8, 2010)(Egan, J.))(internal quotation marks omitted)). "The exception to this principle is that a Court may 'choose to strike a filing that is not allowed by local rule, such as a surreply filed without leave of court.'" Ysais v. N.M. Judicial Standard Comm'n, 616 F. Supp. 2d at 1184 (citing In re Hopkins, 162 F.3d 1173, 1998 WL 704710, at *3 n.6 (10th Cir. 1998)(unpublished table decision)).

For example, in Skyline Potato, Co., Inc. v. Hi-Land Potato, Co ., Inc., No. CIV 10-698, 2012 WL 6846386 (D.N.M. Dec. 31, 2012)(Browning, J.), the Court denied a motion to strike a letter filed with the Court, because the letter was not a pleading, and did not pertain to either party's legal defenses or arguments -- the letter expressed one party's position regarding whether the Court should rule on summary judgment motions pending at the close of a bench trial. See 2012 WL 6846386, at *6. Similarly, in Great American Insurance Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500 (D.N.M. Aug. 23, 2012)(Browning, J.), the Court denied a plaintiff's motion to strike exhibits attached to the defendant's motion to dismiss, because they

---

[10]As the Court explained in a recent opinion,

> If the Court struck from the record everything it did not consider on a motion, it would spend a lot of time polishing the record. Also, with the Court being paperless and everything appearing on CM/ECF, it is unclear what the procedural difference in the modern computer world is between striking some information and ignoring it.

Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *18 (D.N.M. Aug. 23, 2012)(Browning, J.)

were neither pleadings nor irrelevant.  See 2012 WL 3656500, at *18.  In Applied Capital, Inc. v. Gibson, the Court refused the plaintiff's request to strike a motion to dismiss because rule 12(f) applies only to pleadings and not to a motion to dismiss.  See 2007 WL 5685131, at *18.  In Estate of Anderson v. Denny's, Inc., No. CIV 12-0605 JB/GBW, 2013 WL 690809 (D.N.M. Feb. 7, 2013)(Browning, J.), the Court denied the plaintiff's request to strike a notice of completion of briefing for similar reasons.  See 2013 WL 690809, at *12.

In Lane v. Page, 272 F.R.D. 581 (D.N.M. 2011)(Browning, J.), the plaintiff filed a motion to strike parts of the defendants' answer because it was "devoid of factual allegations and assert[ed] improper defenses."  272 F.R.D. at 588.  Specifically, the plaintiff argued that the defendants' affirmative defenses should "put the plaintiff on notice of how the defense applies."  272 F.R.D. at 588.  The plaintiff therefore asked the Court not only to strike some of the defendants' answers, but also to "require the Defendants to amend their answers."  272 F.R.D. at 588.  The defendants argued that rule 8 does "not require them to provide factual support for their affirmative defenses" and contended that their answers adequately responded to the plaintiff's complaint.  272 F.R.D. at 588.  The Court "decline[d] to extend the heightened pleading standard the Supreme Court established in Bell Atlantic v. Twombly and Ashcroft v. Iqbal to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses."  272 F.R.D. at 588.

## RELEVANT LAW REGARDING DISCOVERY

Rule 34 of the Federal Rules of Civil Procedure governs discovery requests for documents.  See Fed. R. Civ. P. 34.  Rule 34(a) states:

A party may serve on any other party a request within the scope of Rule 26(b):

(1) to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:

(A) any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or

(B) any designated tangible things; or

(2) to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a).  Rule 26(b)(1) explains that the proper scope of discovery is "any nonprivileged matter that is relevant to any party's claim or defense."  Fed. R. Civ. P. 26(b)(1).  Information sought is relevant "if the discovery appears reasonably calculated to lead to discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  Federal courts have held that the scope of discovery under rule 26 is broad.  See Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally construed to achieve the full disclosure of all potentially relevant information.").  The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. 495, 507 (1947).  As a result of this policy, rule 26 "contemplates discovery into any matter that bears on or that reasonably could lead to other matter that could bear on any issue that is or

may be raised in a case." Anaya v. CBS Broad., Inc., 251 F.R.D. 645, 649-50 (D.N.M. 2007)(Browning, J.)(internal quotations marks omitted).

A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim." McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002). "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'" Rivera v. DJO, LLC, No. CIV 11-1119 JB/RHS, 2012 WL 3860744, at *1 (D.N.M. Aug. 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. CIV 00-7697 WK, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002)(Knapp, J.)). See Hardrick v. Legal Servs. Corp., 96 F.R.D. 617, 618 (D.D.C. 1983)(Burnett, J.)(noting that courts do, and should, remain concerned about "fishing expeditions, discovery abuse and inordinate expense involved in overbroad and far-ranging discovery requests")(internal quotation marks omitted). "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

Courts have recognized that, while it is true that relevancy in discovery is broader than that required for admissibility at trial, "the object of inquiry must have some evidentiary value before an order to compel disclosure of otherwise inadmissible material will issue." Zenith Elecs. Corp. v. Exzec, Inc., No. CIV 93-5041 BMM, 1998 WL 9181, at *2 (N.D. Ill. Jan. 5, 1998). Courts have also recognized that "[t]he legal tenet that relevancy in the discovery context is broader than in the context of admissibility should not be misapplied so as to allow fishing expeditions in discovery." Zenith Elecs. Corp. v. Exzec, Inc., 1998 WL 9181, at *2 (internal quotation marks omitted).

Rule 26(b)(1) was amended in 2000.  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.   The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here in redline form with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which~~ is relevant to ~~the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant</u> ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the changes to the last sentence -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in

1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions. [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, DISCOVERY AND DISCLOSURE PRACTICE, PROBLEMS, AND PROPOSALS FOR CHANGE] 44-45 (1997). The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party. The court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. See Discovery and Disclosure Practice, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. See 8 Federal Practice & Procedure § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. Cf. Crawford-El v. Britton, 118 S. Ct. 1584, 1597 (1998) (quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

One gets the impression from reading the advisory committee's notes that the amendment

was not intended to exclude a delineable swath of material so much as it is intended to send a

signal to district judges to become more hands-on in the process of regulating -- mostly limiting -

- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus,

be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on the basis of relevance. The change in substantive scope from "subject matter," to "claim or defense," would, therefore, seem to exist more to "add teeth" to the relevance standard than to effectuate a substantive narrowing. It is not surprising that Congress would want to increase judicial presence: "relevance" is a wide-open concept even in the context of trial, Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."), and it is often said that relevance for discovery is an even broader concept. One might then say that old rule 26(b)(1)'s discovery provisions were toothless. It is likewise unsurprising that the rulemakers are unable to articulate precise language narrowing the substantive scope of discovery: no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, and availabilities of information by other means. The determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers wanted when they: (i) encouraged district judges to take a firmer grasp on the scope of discovery; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Of course, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to

any one claim or defense -- <u>e.g.</u>, a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In <u>In re Cooper Tire & Rubber Co.</u>, 568 F.3d 1180 (10th Cir. 2009), the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R. Civ. P. 26(b)(1))(citations omitted)(footnote omitted)(alteration in original).

## <u>LAW REGARDING PROTECTIVE ORDERS</u>

"Federal district courts have broad discretion over discovery." <u>Morales v. E.D. Etnyre & Co.</u>, 229 F.R.D. 661, 662 (D.N.M. 2005)(Browning, J.). The trial court has discretion to grant a protective order pursuant to rule 26(c). <u>See Morales v. E.D. Etnyre & Co.</u>, 229 F.R.D. at 663. Rule 26(c) provides that, upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which may include forbidding disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A). <u>Accord</u> <u>Miller v. Regents of the Univ. of Colo.</u>, 188 F.3d 518, 1999 WL 506520, at *12 (10th Cir.

1999)(unpublished)(reasoning that "[t]he district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties").

"It is the party seeking the protective order who has the burden to show good cause for a protective order." Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.).  The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted).

Although rule 26(c) is silent regarding the time within which the movant must file for a protective order, "the United States Court of Appeals for the Tenth Circuit has held that a motion under rule 26(c) for protection . . . is timely filed if made before the date set for production." Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 2383822, at *5 (D.N.M. June 8, 2012)(internal quotation marks and brackets omitted)(citing In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982)).

## LAW REGARDING MOTIONS TO COMPEL

Rule 37 provides enforcement mechanisms for rule 34.  According to rule 37, if a party does not respond to an interrogatory or to a request for production, the party requesting the discovery may move the Court to compel the opposing party to respond.  See Fed. R. Civ. P. 37(a)(2)(B).  "[A]n evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(3).  Accord Lewis v. Goldberry, No. CIV 11-0283 JB/ACT, 2012 WL 681800, at *4 (D.N.M. Feb. 27, 2012)(Browning, J.).  Rule 37(a) provides:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery.  The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

Fed. R. Civ. P. 37(a).  Under rule 37(a)(4), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4). If a party refuses to turn over documents through proper discovery, a defendant should move to compel production pursuant to rule 37.  See Lane v. Page, 727 F. Supp. 2d 1214, 1236 n.15 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING PRIVILEGE CHOICE OF LAW

In a diversity case, state law governs the availability of the various privileges.  See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc., 136 F.3d 695, 699 (10th Cir. 1998); Fed. R. Evid. 501.  Pursuant to the Federal Rules of Evidence, however, "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience" normally govern the existence and scope of a privilege.  Fed. R. Evid. 501.

> Rule 501 states:
>
> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.  However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed. R. Evid. 501.

Some cases involve both federal and state law claims.  Rule 501's text suggests that, where there are both federal and state claims, federal privilege law should apply to federal claims

and state privilege law should apply to state law claims.  See Motley v. Marathon Oil Co., 71 F.3d at 1551 ("Motley asserted both federal and state causes of action. As to state causes of action, a federal court should look to state law in deciding privilege questions.")(citing White v. American Airlines, Inc., 915 F.2d 1414, 1424 (10th Cir.1990)).  Applying that rule, however, is unhelpful in many instances where the privilege asserted goes to evidence that is relevant to both a federal and a state law claim.

Where a privilege is asserted for evidence relevant both to federal and pendent state law claims, most circuit courts have either held that federal privilege law governs or approved of such an approach without explicitly adopting it.  See In re Sealed Case (Medical Records), 381 F.3d 1205, 1212-13 (D.C. Cir. 2004)("'The usual solution by the courts' in such cases 'has been a preference for federal privilege law when it conflicts with state privilege law.'")(quoting 3 J. McLaughlin, Weinstein's Federal Evidence § 501.02[2][c], at 501-14 (2d ed. 2004))(footnote omitted); Virmani v. Novant Health Incorp., 259 F.3d 284, 287 n.3 (4th Cir. 2001)("We agree with our sister circuits that in a case involving both federal and state law claims, the federal law of privilege applies."); Pearson v. Miller, 211 F.3d 57, 61 (3d Cir. 2000)(concluding that, where there is a conflict between federal and state privilege law because of the existence of federal and pendent state law claims, the United States Court of Appeals for the Third Circuit "has resolved this potential conflict in favor of federal privilege law," because "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable")(internal quotation marks and citations omitted); Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992)("The existence of pendent state law claims does not relieve [courts] of [their] obligation to apply the federal law of privilege."); Hancock v. Hobbs, 967 F.2d 462, 466 (11th Cir. 1992)("Courts that have confronted this issue in the context of the

discoverability of evidence have uniformly held that the federal law of privilege governs even where the evidence sought might be relevant to a pendent state claim."); Religious Tech. Ctr. v. Wollersheim, 971 F.2d 364, 367 n.10 (9th Cir. 1992)(applying federal privilege law in a case involving both federal and pendent state law claims); von Bulow v. von Bulow, 811 F.2d 136, 141 (2d Cir. 1987)(declaring that, where the evidence sought "is relevant to both the federal and state claims," courts "consistently have held that the asserted privileges are governed by the principles of federal law"); Memorial Hosp. v. Shadur, 664 F.2d 1058, 1061 n.3 (7th Cir. 1981).

The Tenth Circuit has differed from the other Courts of Appeals to the extent that it has held that, where there are federal and state law claims, "[a]s to state causes of action, a federal court should look to state law in deciding privilege questions."  Motley v. Marathon Oil Co., 71 F.3d at 1551.  This rule would require a court considering evidence relevant only to state claims to apply state privilege law, even if there were other federal claims in the case.  The Tenth Circuit has not confronted a situation in which evidence allegedly subject to a privilege is relevant to both the federal and state law claims in the case.  The Court concluded in Vondrak v. City of Las Cruces that "where there is a federal cause of action and pendent state-law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state-law claims . . . federal privilege law should apply[.]"  760 F. Supp. 2d 1175. (emphasis added).  At least one treatise has approved of this approach as the "majority view."  EDWARD J. IMWINKELRIED, THE NEW WIGMORE: EVIDENTIARY PRIVILEGES § 4.2.3 (citing Vondrak v. City of Las Cruces)("The majority view is that the federal law prevails and applies to the testimony relevant to both the federal and state claim.").   The Court reaffirms that the weight of Court of Appeals' authority, combined with the practical considerations involved with running discovery and trials, indicate that the better rule is the Vondrak v. City of Las Cruces rule and concludes

that federal privilege law applies under such circumstances.

First, at the discovery phase, any attempt to bifurcate privileges along the border between federal and state law claims is hollow if the allegedly privileged evidence impacts both sets of claims.  If, for example, state law protects the evidence as privileged, but federal law does not protect the same evidence, a court would be in the conundrum of preventing the discovery of evidence as to the state law claims because of the state law privilege, while simultaneously ordering the disclosure of the same evidence as non-privileged as to the federal law claims.  Thus, as a practical matter, the federal privilege law is going to determine discovery in federal court to avoid this problem.

Second, it would be difficult and impracticable -- although not impossible -- to apply two different bodies of privilege law in front of one jury.  See Hancock v. Hobbs, 967 F.2d at 467.  In this case, for example, if one privilege law dictated that some records were privileged, while the other body of privilege law dictated a contrary result, a court applying state law to the state claims and federal law to the federal claims would have to admit the same evidence for one set of claims and exclude the same evidence for the other claims.  The Court would then give a limiting instruction to the jury, but such a limiting instruction would be of little value, given that evidence which should have been privileged would have been heard, and the privilege effectively lost.

In many respects, privileges protect the disclosure of information, not the use of information already disclosed, for whatever reason -- voluntary waiver, inadvertent disclosure, waiver by a third party, compelled disclosure, Freedom of Information Act claims, or other methods.  It does not make much sense to talk about "privileged" evidence once it is disclosed, for whatever reason.  Once the evidence is floating around out there, there is nothing of the privilege to protect; the confidentiality is lost.  Once that loss occurs, the usual need to get to the

truth and the normal federal evidentiary rules of relevancy and materiality, take over.  Thus, once there is a federal claim, the federal court has an overriding need to allow the discovery of all evidence that is relevant and not privileged under federal law.

And once the federal court orders the production of that evidence for the federal claim, the evidence is really no longer "privileged," even under state law.  The confidentiality has been lost or waived; it is no longer special evidence at all.  The parties can use it if it is relevant and material, without regard to the fact that it was once privileged under state law.[11]  The New Mexico physician-patient privilege, for example, provides that "A patient has a privilege to refuse to disclose, or to prevent any other person from disclosing," certain communications. N.M. R. Evid. 11-504.  This privilege does not address whether a party who already possesses such information may use it at trial.

In light of such considerations, the Court concludes that the best course of action is to have federal privilege law control when there are federal claims and the evidence allegedly subject to a privilege is relevant to both the federal and state claims.  In federal question cases, the Court has supplemental jurisdiction over the state law claims.  "[W]here the primary source of the court's jurisdiction is the federal claim, to which the state claim is merely pendent (supplemental), it seems appropriate that the federal evidentiary interest -- whether in privilege or production -- should be primary as well."   In re Sealed Case (Medical Records), 381 F.3d at 1213.

---

[11]The one exception might be that if the state law privilege was worded to require that evidence "cannot be used" rather than as evidence "shall not be compelled or disclosed."  The Illinois marital privilege, for example, does not exactly ban the introduction of evidence, but it does state that "Neither [husband nor wife], however, may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage . . . ."  725 Ill. Comp. Stat. Ann. 5/115-16.

The Court's opinion in <u>Vondrak v. City of Las Cruces</u>, 760 F. Supp. 2d 1170, provides an example of this approach.  In that case, the defendant police officers and city sought a deposition and records on the plaintiff's injuries from his treating neurologist.  <u>See</u> 760 F. Supp. 2d at 1172. The plaintiff opposed the defendants' attempt by asserting the attorney-client and physician-patient privileges.  <u>See</u> 760 F. Supp. 2d at 1175.  Because the Court determined that New Mexico and federal law on the relevant privileges would lead to different results, it had to determine "whether federal or state law governs the asserted privilege."  760 F. Supp. 2d at 1175.  The Court concluded that federal privilege law would apply because the information on the plaintiff's injuries was relevant to his state and federal civil rights claims.  <u>See</u> 760 F. Supp. 2d at 1177.

Although the Tenth Circuit has not addressed this issue since the Court decided <u>Vondrak v. City of Las Cruces</u>, the Court does not believe that it would hold to the contrary.  The Tenth Circuit has stated the general rule that, where a case involves federal and state law claims, state privilege applies to the state law claims.  It has not, however, held that state privilege law should preclude the use of evidence when federal law requires the production of the evidence and allows for its use.  The Tenth Circuit in <u>Motley v. Marathon Oil Co.</u> did not discuss whether the evidence at issue would have been relevant to the federal claim.  Nor did the Tenth Circuit suggest that any party contended that the evidence was relevant to the federal claim.  While the Court must make its best effort to follow Tenth Circuit precedent, there is no Tenth Circuit law governing this question.  The weight of the authority and practical considerations lead the Court to believe it has adopted the proper approach, both in <u>Vondrak v. City of Las Cruces</u> and again in this matter.

## RELEVANT LAW REGARDING EXCESSIVE FORCE

The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205. A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . That perspective includes an examination of the information possessed by the [officers]." Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)(citations omitted)(internal quotation marks omitted).

The Fourth Amendment's reasonableness standard is an objective standard. Courts must determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." Graham v. Connor, 490 U.S. at 397.

## RELEVANT LAW REGARDING THE PHYSICIAN-PATIENT PRIVILEGE

There was no physician-patient privilege at common law.  The Supreme Court of New Mexico has created a physician-patient privilege by rule.  See N.M. R. Evid. 11-504(B).  Federal courts have not recognized this privilege.

### 1.   The New Mexico Physician-Patient Privilege.

New Mexico has created a statutory physician-patient privilege.  Rule 11-504 of the New Mexico Rules of Evidence states:

> A patient has a privilege to refuse to disclose, or to prevent any other person from disclosing, a confidential communication made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition, including drug addiction, between the patient and the patient's physician, psychotherapist, or state or nationally licensed mental-health therapist.

N.M. R. Evid. 11-504(B).  The privilege includes two exceptions.  First, "[u]nless the court orders otherwise, any communications made by an individual during an examination of that individual's physical, mental, or emotional condition that has been ordered by the court are not privileged."  N.M. R. Evid. 11-504(D)(2).  Second, "[i]f a patient relies on a physical, mental, or emotional condition as part of a claim or defense, no privilege shall apply concerning confidential communications made relevant to that condition."  N.M. R. Evid. 11-504(D)(3). The patient must consult with the physician for treatment or diagnosis "with the intent to be treated."  Reaves v. Bergsrud, 1999-NMCA-075, ¶ 20, 982 P.2d 497, 501.  "The privilege generally seeks to ensure that a patient can communicate fully with a mental health professional without the risk that the information will be used against the patient in a court proceeding."  State v. Strauch, 2015-NMSC-009, ¶ 11, 345 P.3d 317, 328.

2.    <u>**There is No Federal Physician-Patient Privilege**</u>.

Rule 501 states that "principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience" govern the existence of such a privilege.  Fed. R. Evid. 501.  "The physician-patient evidentiary privilege is unknown to the common law.  In States where it exists by legislative enactment, it is subject to many exceptions and to waiver for many reasons."  <u>Whalen v. Roe</u>, 429 U.S. 589, 602 n.28 (1977).  Although the Court is not aware of any Tenth Circuit cases discussing the existence of a physician-patient privilege in federal question cases, other Courts of Appeals have recognized that there is no such privilege.  <u>See</u> <u>Northwestern Memorial Hosp. v. Ashcroft</u>, 362 F.3d 923, 926 (7th Cir. 2004)("[T]he evidentiary privileges that are applicable to federal-question suits are given not by state law but by federal law . . . which does not recognize a physician-patient (or hospital-patient) privilege."); <u>Gilbreath v. Guadalupe Hosp. Found., Inc.</u>, 5 F.3d 785, 791 (5th Cir. 1993)("[T]here is no physician-patient privilege under federal law."); <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1373 (6th Cir. 1992)("[F]ederal courts do not recognize a federal physician-patient privilege."); <u>Vondrak v. City of Las Cruces</u>, 760 F. Supp. 2d at 1178 ("[I]f Vondrak is trying to claim an physician-patient privilege, there is no such privilege under federal privilege law."); <u>Becker v. Securitas Sec. Servs. USA, Inc.</u>, No. 06-2226-KHV-DJW, 2007 WL 677711, at *2 (D. Kan. Mar. 2, 2007)(Waxse, J.)("It is well settled that there is no federal common law physician-patient privilege.  There is also no basis for the privilege under any federal statutory law.")(footnote omitted).

<u>**LAW REGARDING THE PSYCHOTHERAPIST-PATIENT PRIVILEGE**</u>

The Supreme Court established the federal psychotherapist-patient privilege in <u>Jaffee v. Redmond</u>, 518 U.S. 1, 15 (1996).  In that case, a police officer had roughly fifty counseling

sessions with a licensed clinical social worker to cope with psychological problems resulting from a police shooting.  See 518 U.S. at 5.  The shooting victim's relatives brought a civil suit against the officer and her employer, and sought access to the social worker's notes to cross-examine the police officer.  See 518 U.S. at 5.  Both the police officer and the social worker refused to discuss their conversations' contents, and the district court allowed the jury to draw a negative inference from their refusals.  See 518 U.S. at 5-6.  The United States Court of Appeals for the Seventh Circuit reversed, recognizing a psychotherapist-patient privilege, but allowing for exceptions when, "in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests."  518 U.S. at 7.  The Supreme Court granted certiorari to resolve a split among the Courts of Appeals.  See 518 U.S. at 8.

The Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence."  518 U.S. at 15.  It determined that "a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence.'"  518 U.S. at 9-10 (quoting Trammel v. United States, 445 U.S. 40, 51 (1980)).  The Supreme Court then explained the purpose of the privilege:

> Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests. Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.

518 U.S. at 10.[12]   It reasoned that the privilege served the public interest "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem," promoting "a public good of transcendent importance."[13]   518 U.S. at 11.   It also noted that the privilege would not greatly interfere with the pursuit of truth, as "[w]ithout a privilege, much of the desirable evidence to which litigants such as petitioner seek access -- for example, admissions against interest by a party -- is unlikely to come into being."  518 U.S. at 12.  Subsequent cases have described the case as a "notable exception" to the Supreme Court's

---

[12]Some courts and commentators have questioned the basis for the distinction between medical and psychological records.   Some contend that because Freudian techniques are increasingly rare, patients make embarrassing disclosures about their childhoods or deeply personal matters.  See § 5522 Policy of the Privilege, 25 FED. PRAC. & PROC. EVID. § 5522 (1st ed.).   Others doubt whether psychological patients are more likely to be dissuaded from seeking treatment by the threat of disclosure.   See § 5522 Policy of the Privilege, 25 FED. PRAC. & PROC. EVID. § 5522 (1st ed.)("It seems to be assumed that the paranoid mind will be satisfied by a few words added to the statute books."); Lora v. Bd. of Ed. of City of New York, 74 F.R.D. 565, 575 (E.D.N.Y. 1977)(Weinstein, J.)(" In the case before us, those persons in charge of gathering the data agreed that students and their families may be reluctant to give personal information to guidance counselors, psychologists, social workers, psychiatrists or their associates for many reasons, but that fear of use in any possible court proceeding is not a factor of any substantial importance.")(ultimately approving the privilege).  But see Stephen A. Saltzburg, Privileges and Professionals: Lawyers and Psychiatrists, 66 Va. L. Rev. 597, 620 (1980)("Psychiatric communications are uniquely sensitive, and successful treatment requires a degree of self-revelation by the patient which can only be accomplished in an atmosphere of inviolate privacy.").

[13]The privilege was originally grounded in the fear of stigma surrounding mental health treatment.  See John G. Fleming & Bruce Maimov, The Patient or His Victim: The Therapist's Dilemma, 62 CALIF. L. REV. 1025, 1050, 1974 (describing the experience of Thomas Eagleton, a Democratic candidate for Vice-President of the United States who was forced off the ticket after the public learned that he had once seen a psychiatrist).  Some commentators have suggested that the stigma resulting from mental health treatment is not A great as courts originally assumed. See § 5522 Policy of the Privilege, 25 FED. PRAC. & PROC. EVID. § 5522 (1st ed.).

general trend of refusing to create new privileges.[14]   In re Qwest Commc'ns Int'l Inc., 450 F.3d 1179, 1197 (10th Cir. 2006).

The Supreme Court did not delineate the privilege's other boundaries, explaining that, "[b]ecause this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours in a way that would govern all conceivable future questions in this area." 518 U.S. at 18 (internal quotations omitted). "The lower federal courts have just begun to flesh out the dimensions of the privilege." 1 MCCORMICK ON EVID. § 98 (7th ed. 2013).

### 1.    When the Privilege Applies.

The Supreme Court provided basic guidelines on the privilege's application. The communications must be made in the course of diagnosis and treatment. See Jaffee v. Redmond, 518 U.S. at 15. The Supreme Court rejected the Seventh Circuit's balancing component, stating that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." 518 U.S. at 17. It allowed for an exception when "a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." 518 U.S. at 18 n.19.

The lower courts have further defined when this dangerous patient exception applies. See United States v. Auster, 517 F.3d 312, 315-16 (5th Cir. 2008)(declining to apply privilege when patient knew that therapist would convey his threats to his targets); United States v. Glass, 133

---

[14]The psychotherapist-patient privilege is an exception to general rules disfavoring evidentiary privileges. See United States v. Nixon, 418 U.S. 683, 710 (1974)("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."); Mason v. Stock, 869 F. Supp. at 833 ("It is a venerable legal axiom that privileges are to be narrowly, not expansively, construed.")(internal quotations omitted).

F.3d 1356, 1360 (10th Cir. 1998)(requiring evidentiary hearing to determine whether threat could be averted only by disclosure).  But see United States v. Chase, 340 F.3d 978, 985 (9th Cir. 2003)(holding that privilege prevented discovery after threat had passed).  Courts have also allowed for a crime-fraud exception.  See In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 78 (1st Cir. 1999).

### 2.     What the Privilege Covers.

The privilege extends to confidential communications made to licensed psychiatrists, psychologists, and social workers in the course of psychotherapy.  See Jaffee v. Redmond, 518 U.S. at 15.  The privilege also protects notes made during the course of treatment.  See Jacobs v. Connecticut Cmty. Tech. Colleges, 258 F.R.D. 192, 195 (D. Conn. 2009)(Smith, J.).  Its scope is not unlimited, however:

> Facts regarding the very occurrence of psychotherapy, such as the dates of treatment, are not privileged. And so, for example, if Plaintiff was seeing a psychotherapist before any actionable emotional injury allegedly occurred, the dates of such pre-existing treatment would be available to Defendants. The substance of the psychotherapist-patient communication is privileged. The fact that such communication took place is not.

Vanderbilt v. Town of Chilmark, 174 F.R.D. 225, 230 (D. Mass. 1997)(Tauro, J.).  See Langenfeld v. Armstrong World Indus., Inc., 299 F.R.D. 547, 551 (S.D. Ohio 2014)(Frost, J.)("The privilege does not, however, cover the patient/psychotherapist's identity, the time of treatment, and/or the fact that any such treatment took place.").

### 3.     When a Party Waives the Privilege.

The Supreme Court explained that, "[l]ike other testimonial privileges, the patient may of course waive the protection," but did not specify precisely when that waiver would occur.  Jaffee v. Redmond, 518 U.S. at 15 n.14.  See 1 MCCORMICK ON EVID. § 103 (7th ed. 2013)("The

physician-patient privilege, like most other privileges, may also be waived in advance of trial by a disclosure of the privileged information either made or acquiesced in by the privilege holder.").

In Speaker ex rel. Speaker v. County of San Bernardino, 82 F. Supp. 2d 1105 (C.D. Cal. 2000)(Timlin, J.), San Bernardino County required a police officer to speak with a mental health counselor after he shot a man.  See 82 F. Supp. 2d at 1107.  San Bernardino County informed the officer that the sessions would be confidential.  See 82 F. Supp. 2d at 1107.  The victim's family later sued the officer and San Bernardino County, and sought to question the counselor on the content of her conversations with the officer at trial.  See 82 F. Supp. 2d at 1107.

The district court rejected two of the plaintiff's arguments that the psychotherapist-patient privilege did not apply.  First, the court determined that a "'quasi-therapist'/patient privilege" protected the communications, despite the counselor's lack of a license, because the officer "reasonably, but mistakenly" believed that she was a psychotherapist.  82 F. Supp. 2d at 1115.  Second, the court rejected the plaintiff's argument that the privilege could not attach to counseling sessions that an employer required.  See 82 F. Supp. 2d at 1115.  It explained that the waiver inquiry "turn[s] on the fact that the officer knew that the counselor's report would go to his employer."  82 F. Supp. 2d at 1115.  See Kamper v. Gray, 182 F.R.D. 597, 599 (E.D. Mo. 1998)(Sippel, J.)(holding that a police officer waived the privilege, "[s]ince he was aware that his evaluations would be reported to his employer").  See also STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL 501.02 (8th ed. 2002).

The United States District Court for the Western District of Pennsylvania confronted a similar issue in Barrett v. Vojtas, 182 F.R.D. 177 (W.D. Pa. 1998)(Cindrich, J.).  In that case, a police officer defendant sought a protective order covering conversations and notes from

employer-mandated counseling sessions with a psychiatrist and a psychologist.  See 182 F.R.D. at 178.  The district court denied the defendant's motion, explaining that "[a] police officer who is ordered to therapy, knowing that the therapist will report back to his or her superior, would have no expectation that his or her conversation was confidential."  182 F.R.D. at 181.  Although the court allowed that "there could be situations giving rise to the privilege when an officer has been ordered to undergo therapy," it refused to apply the privilege "when it is expected that the therapist will produce a report or an evaluation from the ordered sessions for review by third parties."  182 F.R.D. at 181.  See Boudreau ex rel. Boudreau v. Ryan, No. 00 C 5392, 2001 WL 1001156, at *4 (N.D. Ill. Aug. 24, 2001)(Grady, J.)(unpublished)("There is also no showing that the communications at issue were made with the expectation of confidentiality.  If they were not, then the privilege does not attach.").

The United States District Court for the District of New Jersey confronted similar facts two years later in Caver v. City of Trenton, 192 F.R.D. 154.  The plaintiff in that case argued that the privilege should not apply, because the defendant police officer was required to undergo a psychological fitness examination.  See 192 F.R.D. at 162.  The district court rejected this argument:

> The Court finds that whether Defendant Valdora went to a psychologist voluntarily, or was ordered to go, is not dispositive of the issue. What is critical is that Defendant Valdora was examined by a psychologist for the purpose of diagnosing whether he was suffering from some mental illness or emotional disorder that would render him unfit to be a police officer.  More importantly, unlike . . . the cases relied on by Plaintiffs, Defendant Valdora clearly had an expectation of confidentiality. He was told and reassured that the psychological records and reports would be kept strictly confidential, and would not be disclosed to the City of Trenton personnel.

192 F.R.D. at 162.  Because the psychologist conducting the examination gave only a pass or fail recommendation to the police department without disclosing any of the officers' information, the

district court concluded that all of the reports and records were privileged, and should not be disclosed.  See 92 F.R.D. at 162.  Accord Phelps v. Coy, 194 F.R.D. 606, 608 (S.D. Ohio 2000)(Rice, J.)(holding that all communications disclosed to police officer's employer were non-confidential and subject to disclosure).

The amount of information disclosed to police departments can be decisive.  In James v. Harris County, 237 F.R.D. 606 (S.D. Tex. 2006)(Atlas, J.), the district court found that a police officer had a reasonable expectation of privacy in his mandatory post-shooting evaluation.  See 237 F.R.D. at 612.  The district court noted that the officer's employer received only "the fact of the referral and the fact of Wilkinson's attendance," and distinguished the case from cases in which "the officers knew that reports and assessments from post-incident evaluation sessions would be submitted to their employers."  237 F.R.D. at 613.

## LAW REGARDING CERTIFICATION TO THE TENTH CIRCUIT

Congress has given the Courts of Appeals "jurisdiction of appeals from all final decisions of the district courts of the United States."  28 U.S.C. § 1291.  The restriction of appellate review to final decisions "prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy."  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 170 (1974).  Various prescriptions for appeal from interlocutory rulings supplement the general rule requiring final decisions.  In 1958, Congress enacted 28 U.S.C. § 1292(b), which empowers the district courts to certify certain pivotal and debatable decisions for immediate review:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action

may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).  The Supreme Court of the United States has understood the procedure that 28 U.S.C. § 1292(b) established to "confer on district courts first line discretion to allow interlocutory appeals."  Swint v. Chambers Cnty. Comm'n, 514 U.S. 35, 47 (1995).

### 1.    Controlling Questions of Law.

Although the lower courts have provided various definitions of "controlling question of law," there are a few informal rules.  28 U.S.C. § 1292(b).  "Question of law" refers to a "question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than to whether the party opposing summary judgment had raised a genuine issue of material fact."  Ahrenholz v. Bd. of Trustees of Univ. of Ill., 219 F.3d 674, 676 (7th Cir. 2000)(Posner, J.).  It does not include questions requiring a Court of Appeals to "delve beyond the surface of the record in order to determine the facts."  McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1259 (11th Cir. 2004).  "The legal question must be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law."  McFarlin v. Conseco Servs., LLC, 381 F.3d at 1259.

A legal issue need not be dispositive to be controlling, but it must at least "materially affect the outcome of the case."  In re City of Memphis, 293 F.3d 345, 351 (6th Cir. 2002).  "A 'controlling question' has a broader definition than it is typically accorded in other situations, and it can include not only those issues that will resolve the action in its entirety but also those that are dispositive in other respects, such as whether a particular claim exists."  2 FED. PROC., L.

ED. § 3:215.   An issue that could determine the amount of recovery, for example, may be certified.   See Junco v. E. Air Lines, Inc., 399 F. Supp. 666, 667 (S.D.N.Y. 1975)(Knapp, J.)(certifying issue that could have "decisive effect" on the amount of recovery, which was the only remaining issue).   A controlling question of law would generally constitute reversible error on final appeal.   See P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp., 161 F. Supp. 2d 355, 358 (D.N.J. 2001)(Walls, J.).

Discovery issues do not often involve controlling questions of law.   See 10B FED. PROC., L. ED. § 26:958.   "Questions of this sort, involving the discretion of the judge in conducting pretrial discovery proceedings, should not be reviewed by an appellate court at this stage of a litigation except where there has been a manifest abuse of discretion."   Atl. City Elec. Co. v. A. B. Chance Co., 313 F.2d 431, 434 (2d Cir. 1963).   See White v. Nix, 43 F.3d 374 (8th Cir. 1994)("[T]he discretionary resolution of discovery issues precludes the requisite controlling question of law.").

## 2.     Substantial Ground for Difference of Opinion.

Substantial ground for difference of opinion does not exist merely because courts have disagreed on an issue.

> There is a substantial ground for difference of opinion which supports a certificate for an interlocutory appeal if a trial court rules in a manner which appears contrary to the rulings of all courts of appeals which have reached the issue, if the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

2 FED. PROC., L. ED. § 3:218 (footnotes omitted)(collecting cases).   The fact that a court confronts an issue of first impression does not present substantial ground for difference of opinion.   See Krangel v. Gen. Dynamics Corp., 968 F.2d 914, 916 (9th Cir. 1992).   "The mere fact that a substantially greater number of judges have resolved the issue one way rather than

another does not, of itself, tend to show that there is no substantial ground for difference of opinion." Max Daetwyler Corp. v. Meyer, 575 F. Supp. 280, 283 (E.D. Pa. 1983)(Pollak, J.). An attorney's contention that one precedent rather than another should apply does not merit interlocutory appeal.    See Singh v. Daimler-Benz, AG, 800 F. Supp. 260, 263 (E.D. Pa. 1992)(Newcomer, J.), aff'd, 9 F.3d 303 (3d Cir. 1993).

       3.       **Materially Advance Litigation's the Ultimate Termination.**

Interlocutory review is appropriate "only in extraordinary cases where decision might avoid protracted and expensive litigation." Robbins Co. v. Lawrence Mfg. Co., 482 F.2d 426, 429-30 (9th Cir. 1973).   An immediate appeal advances this termination if it "would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." Coates v. Brazoria Cty. Tex., 919 F. Supp. 2d 863, 867 (S.D. Tex. 2013)(Costa, J.)(quoting Orson, Inc. v. Miramax Film Corp., 867 F. Supp. 319, 322 (E.D. Pa. 1994)(Joyner, J.)).   "When litigation will be conducted in substantially the same manner regardless of [the court's] decision, the appeal cannot be said to materially advance the ultimate termination of the litigation." In re City of Memphis, 293 F.3d at 351 (quoting White v. Nix, 43 F.3d at 378).

The determination whether an appeal will materially advance the litigation's termination "properly turns on pragmatic considerations, assessed by reviewing the 'procedural and substantive status of the case with respect to the progress or completion of discovery, the disposition of pretrial motions, the extent of the parties' preparation for trial, and the nature and scope of the requested relief.'"   2 FED. PROC., L. ED. § 3:219 (quoting Fed. Deposit Ins. Corp. v. First Nat. Bank of Waukesha, Wis., 604 F. Supp. 616, 620 (E.D. Wis. 1985)(Warren, J.).   Cases appropriate for certification involve "a defense disputing the right to maintain the action," on

which a decision could swiftly end the lawsuit.  Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 337 (S.D.N.Y. 2012)(Cote, J.).

## ANALYSIS

The Court will deny Dorato's MTS in part and grant it in part.  The Court will deny the MTS' request to strike the Defendants' affirmative defenses.  Because federal privilege law controls the production of evidence, and because there is no federal physician-patient privilege, however, the Court will require the Defendants to amend certain portions of their Answer.  The Court will grant the MPO in part and deny it in part, because Smith waived his psychotherapist-patient privilege as to records created for his employer's benefit that he knew would be disclosed to third parties such as the City of Albuquerque and the APD.  The Court will grant the MCD, because neither Smith's privacy rights nor the self-critical analysis privilege protect the APD's documents.  Finally, the Court will deny the MTC, because there is no controlling issue of law, there are no substantial grounds for difference of opinion, and an immediate appeal could prolong this litigation rather than materially advance it.

## I.   THE COURT WILL DENY THE MTS AS TO THE DEFENDANTS' AFFIRMATIVE DEFENSES, BUT WILL REQUIRE THE DEFENDANTS TO AMEND THEIR ANSWERS THAT RELY ON THE NON-EXISTENT FEDERAL PHYSICIAN-PATIENT PRIVILEGE.

The MTS raises two primary arguments: (i) that the Defendants raise numerous affirmative defenses, but fail to provide any supporting facts; and (ii) that the Defendants cannot use the physician-patient privilege to avoid responding to paragraphs 12 and 13 of the Complaint, which are background allegations incorporated by reference into the federal claim.  See MTS at 6-9.  The Court declines to accept the first argument and require more detailed information in the answer, because it will not apply Bell Atlantic v. Twombly and Ashcroft v. Iqbal to affirmative defenses pled in answers.  It agrees with the second argument on the grounds

that: (i) the requested information is relevant to both state and federal claims; (ii) federal law does not recognize a physician-patient privilege; and (iii) federal privilege law requires the information's disclosure.

### A. THE COURT WILL NOT STRIKE THE DEFENDANTS' GENERAL AFFIRMATIVE DEFENSES.

Rule 12(f) of the Federal Rules of Civil Procedure allows the Court to strike "from a pleading an insufficient defense." Fed. R. Civ. P. 12(f). The decision whether to strike affirmative defenses from a pleading is within the Court's discretion. See Geer v. Cox, 242 F. Supp. 2d 1009, 1025 (D. Kan. 2003)(Robinson, J.).

Dorato argues that the Court should apply the heightened pleading standards from Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal to the Defendants' Answer. See MTS at 5. See also Hayne v. Green Ford Sales, Inc., 263 F.R.D. 647, 651 (D. Kan. 2009)(Rushfelt, J.)(noting that additional allegations "show[] that the pleader at least has some valid premise for asserting the defense and is not merely tossing it into the case like a fish hook without bait"). In Lane v. Page, 272 F.R.D. 581, the Court declined to "extend the heightened pleading standard the Supreme Court established in Bell Atlantic v. Twombly and Ashcroft v. Iqbal to affirmative defenses pled in answers, because the text of the rules, and the functional demands of claims and defenses, militate against requiring factual specificity in affirmative defenses." 272 F.R.D. at 588. See Wells v. Hi Country Auto Grp., 982 F. Supp. 2d 1261, 1264 (D.N.M. 2013)(Browning, J.)(reaffirming position stated in Lane v. Page). "Whereas Rule 8(a)(2) requires a 'showing that the pleader is entitled to relief,' Rule 8(c)(1) merely requires a defendant to 'affirmatively state any avoidance or affirmative defense.'" 10A C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1274 (3d ed.).

The Court notes that neither the Supreme Court nor the Tenth Circuit has ruled on this issue.  See 10A WRIGHT & MILLER, supra, § 1274 (collecting cases); Constr. Indus. Laborers Pension Fund v. Explosive Contractors, Inc., No. 12-2624-EFM, 2013 WL 3984371, at *1 (D. Kan. Aug. 1, 2013)(Melgren, J.)("Neither the Supreme Court nor the Tenth Circuit have yet addressed the issue."); Smith v. Mustang, Indep. Sch. Dist. No. I-69, No. CIV-11-1146-M, 2012 WL 10848, at *2 (W.D. Okla. Jan. 3, 2012)(Miles-LaGrange, J.)("[T]he Tenth Circuit has not ruled on whether *Twombly* and *Iqbal* apply to pleading affirmative defenses, . . ."). There is even a split within the District of Kansas on this issue.  Compare Falley v. Friends Univ., 787 F. Supp. 2d 1255, 1259 (D. Kan. 2011)(Murguia, J.)("[T]he court determines that the pleading standards of *Twombly* and *Iqbal* should be limited to complaints -- not extended to affirmative defenses.") with Constr. Indus. Laborers Pension Fund v. Explosive Contractors, Inc., 2013 WL 3984371, at *2 (disagreeing with Falley v. Friends Univ. and recognizing split).  Given the lack of subsequent Tenth Circuit or Supreme Court decisions on point and the Court's decision in Lane v. Page, the Court declines Dorato's invitation to reconsider its reasoning.  It will thus leave the Defendants' affirmative defenses intact.

**B.    FEDERAL PRIVILEGE LAW CONTROLS DISCOVERY ON BOTH THE FEDERAL CLAIM AND THE STATE CLAIM IF THE EVIDENCE IN DISPUTE IS RELEVANT TO BOTH CLAIMS.**

The parties both cite Vondrak v. City of Las Cruces, but extract opposite rules.  Dorato argues that the case held that federal privilege law should apply if evidence is relevant to both a federal cause of action and pendent state law claims joined in the same proceeding.  See Reply to MTS at 5.  The Defendants seem to disagree at times, arguing that Vondrak v. City of Las Cruces held that Court should look to state law in deciding privilege questions on state causes of action even when they are joined with federal claims.  See MPO at 5-6.

Dorato's view of Vondrak v. City of Las Cruces is correct.  The Court's opinion held that, "where there is a federal cause of action and pendent state law claims, and where the asserted privilege relates to evidence that is relevant both to the federal and state law claims . . . federal privilege law should apply."  760 F.Supp.2d at 1175.  The Court reaffirms its reasoning in that case.  See EDWARD J. IMWINKELRIED, supra, § 4.2.3 (citing Vondrak v. City of Las Cruces)("The majority view is that the federal law prevails and applies to the testimony relevant to both the federal and state claim."); 2 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE § 5.9, at 494 n.5 (3d ed. 2007)(stating the majority rule, that federal privilege law applies when evidence is relevant to both the federal and state claims).

The Defendants concede that the evidence on Smith's medical and psychological ailments is relevant to Dorato's negligent-hiring-and-retention state claims.  See Reply to MPO at 10.  They argue, however, that this evidence is irrelevant to Dorato's federal claims.  See MPO at 3.  The federal claims, they assert, require the Court to examine the reasonableness of Smith's use of force "from the perspective of a reasonable officer on the scene."  MPO at 3.  This objective standard, they contend, leaves no room for evidence of an officer's physical or mental health problems.

"Relevance is construed broadly at the discovery stage. The wide scope of discovery under Federal Rule of Civil Procedure 26 allows parties to obtain "'discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.'"  Heilman v. Waldron, 287 F.R.D. 467, 473 (D. Minn. 2012)(Tunheim, J.)(quoting Fed. R. Civ. P. 26(b)(1)).  The Court may require the production of information not admissible at trial, so long as it appears reasonably calculated to lead to the discovery of admissible evidence.  See Heilman v. Waldron, 287 F.R.D. at 473.  Evidence of Smith's medical and psychological ailments could be relevant to Dorato's

federal claims in two primary ways: (i) as a possible physical and/or mental condition that caused Smith to use excessive force; and (ii) as evidence undermining his credibility as a witness to the events in question.

The evidence related to Smith's hearing and other physical ailments is relevant on both of these grounds.  In Hutton v. City of Martinez, a police shooting victim's attorney noticed that a defendant police officer mentioned severe back and neck pain during his post-incident interview.  See 219 F.R.D. at 165.  The attorney then attempted to obtain testimony and records on the defendant's medical conditions, on the grounds that the ailments may have caused him to shoot the plaintiff rather than pursuing him on foot.  See 219 F.R.D. at 166.  The district court granted the requested discovery on two grounds.  First, it explained that the requested information was "directly relevant to his physical condition on the day of the shooting."  219 F.R.D. at 166.  Second, it noted that the information "could also support or contradict Ray's testimony that on the day of the shooting he was not suffering from any pain which would have affected his ability to pursue Plaintiff or which would have motivated him to shoot Plaintiff rather than to chase him."  219 F.R.D. at 166.

Evidence of Smith's physical health is analogous to the information that the plaintiff sought in Hutton v. City of Martinez.  A serious hearing disability could have impacted Smith's ability to understand Tillison and caused him to escalate the situation.  For example, it could have interfered when, as Dorato alleges, Tillison told Smith that he did not do anything wrong.  See Amended Complaint ¶ 22, at 4.  It could have prevented Smith from understanding Tillison's replies to his orders.  See Reply to MPO at 4 (noting that "Officer Smith acknowledged that Mr. Tillison did say something to him in response").

An impairment to Smith's leg or shoulder could have reduced his mobility.  Given that Smith has stated that he shot Tillison because he was afraid that Tillison would hit him with his SUV, and that he had limited room to maneuver and limited time to get out of the way, Smith's mobility could be relevant to his capabilities and reasons for using deadly force.  See Amended Complaint ¶¶ 58-59, at 7.  In Heilman v. Waldron, the court held that "Plaintiff is entitled to obtain information about Waldron's use of such drugs or supplements because this information could be relevant to determining Waldron's physical strength on July 20 and the objective reasonableness of his actions."  287 F.R.D. at 474.  Information on Smith's physical abilities would be similarly relevant to determining the objective reasonableness of his actions.

The Defendants' arguments that the objective standard for excessive force makes this information irrelevant are unconvincing.  The Court acknowledges, as it must, that the issue centers on whether Smith's actions were "objectively reasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. at 397.  It does not matter if Smith had physical limitations or mental issues if he used objectively reasonable force.  On the other hand, understanding all of the "facts and circumstances confronting the officer" is important.  Graham v. Connor, 490 U.S. at 397.  An objectively reasonable officer might have de-escalated the situation after hearing Tillison's response to his orders.   See Reply to MPO at 4.  An objectively reasonable officer might have merely stepped aside if he could avoid being hit by the SUV.  The medical evidence is thus relevant to whether Smith's actions were objectively reasonable.

Smith's possible hearing issues are also directly relevant to his credibility, as he is the only witness to the events in dispute.  Hutton v. City of Martinez required the production of evidence of the officer's mobility impairments, because it could "support or contradict" his

testimony.  See 219 F.R.D. at 166.  Smith's credibility will depend in part on whether the jury believes his account of his interactions with Tillison, which involved repeated commands and an unknown response from Tillison.  See Affidavit of Martin Smith ¶ 20, at 4, filed May 12, 2014 (Doc. 11-1)("The driver said something to me, but I do not recall what he said.").  At least one possible witness's affidavit provides details on Tillison's response to Smith.  See Affidavit of Gary Hill, Jr., taken June 3, 2015, filed August 18, 2015 (Doc. 105-2)("I heard Daniel say 'I didn't do nothing, I didn't do nothing.").  The jury might decide that it does not believe Smith, not because he it thinks that he is a liar, but because he could not hear clearly.

The Defendants correctly argue that evidence of Smith's psychological health cannot help us to understand whether his actions were "objectively reasonable," because his "underlying intent or motivation" is irrelevant.  Graham v. Connor, 490 U.S. at 397.  That same evidence, however, is relevant to Smith's credibility as a witness.  Dorato's citation to United States v. Robinson is not directly on point.  No one alleges that Smith smoked "up to a pound of marijuana per week," abused numerous prescription medications, or suffered from auditory and visual hallucinations severe enough to warrant admission to a psychiatric ward, like the witness in United States v. Robinson.  See 583 F.3d at 1272.  That case's underlying reasoning, however, remains controlling.  Smith has acknowledged that he suffered from PTSD at the time of the incident.  See Defendants Martin Smith, the City of Albuquerque, and the City of Albuquerque Police Department's Amended Answer to Plaintiffs' Complaint for Alleged Civil Rights Violations ¶ 8 at 2, filed March 17, 2015 (Doc. 66).  "Diagnostic criteria for PTSD include . . . symptoms from each of four symptom clusters: intrusion, avoidance, negative alterations in cognitions and mood, and alterations in arousal and reactivity."  DSM-5 Criteria for PTSD, National Center for PTSD, U.S. Department of Veterans Affairs (Nov. 25, 2015),

http://www.ptsd.va.gov/professional/PTSD-overview/dsm5_criteria_ptsd.asp.     These system clusters encompass several memory-related symptoms, including "flashbacks" and "memory problems."  Diseases and Conditions: Post-traumatic stress disorder (PTSD), MAYO CLINIC (Apr. 15,     2014),     http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/symptoms/con-20022540.  Smith's memory of the relevant events is important to the case, because he is the only surviving witness.  Any psychological problems that affect his memory are relevant to his credibility and will help the finder of fact to determine what happened.  There is, in short, "credible medical evidence" that a person diagnosed with PTSD could suffer from memory problems.  MPO at 5.

Chief Magistrate Judge Molzen's decision in Tenorio v. Pitzer is distinguishable on two grounds: (i) the plaintiff in that case failed to argue that PTSD was relevant to the officer's credibility as a witness; and (ii) there are far more substantial indications that Smith actually suffered from PTSD.  See Tenorio v. Pitzer, No. 12-CV-01295 LH/KBM, Order on Deposition Discovery Dispute, filed May 31, 2013 (Doc. 58)("Tenorio Order").  Chief Magistrate Judge Molzen rejected the plaintiffs' request to ask a police officer defendant whether he "*believes* that he has ever suffered from Post-Traumatic Stress Disorder" at his deposition.  Tenorio Order at 1.  The plaintiffs there argued that the police officer's PTSD might have heightened his sense of fear and contributed to his unreasonable use of lethal force.  See Tenorio v. Pitzer, No. 12-CV-01295 LH/KBM, Plaintiff's Motion to Compel Deposition Testimony at 2, filed May 10, 2013 (Doc. 46).  Like the Defendants in this case, the officer there cited Graham v. Connor, 490 U.S. at 396-97, for the proposition that his intent or motivation was irrelevant.  See Tenorio v. Pitzer, No. 12-CV-01295 LH/KBM, Defendant Brian Pitzer's Response to Plaintiff's Motion to Compel Deposition Testimony [Doc. 46] at 3, filed May 23, 2013 (Doc. 53)("Pitzer Response").  Unlike

Dorato, however, the plaintiff in that case did not argue that the PTSD could have affected the officer's credibility as a witness. That Smith is the only remaining witness makes his PTSD relevant even under Graham v. Connor's objective standard. Dorato has also presented substantial evidence that Smith suffers from PTSD -- Smith has even admitted the diagnosis. See Dorato v. Smith, 2015 WL 3540363, at *53. In Tenorio v. Pitzer, on the other hand, the officer directly denied that he had been diagnosed with PTSD during his deposition. See Pitzer Response at 2. Dorato's discovery requests do not threaten the sort of fishing expedition that Chief Magistrate Judge Molzen rejected in Tenorio v. Pitzer.

The Court's Memorandum Opinion and Order in Montoya v. City of Albuquerque, No. CIV 03-0261 JB/RHS (D.N.M. Feb. 20, 2004)(Browning, J.), is distinguishable on slightly different grounds. The plaintiffs in that case argued that mental health records could be relevant to the defendant police officers' credibility and admissible for impeachment. See Plaintiffs' Motion to Compel Discovery at 4, filed December 3, 2003 (Doc. 59). They did not, however, provide any evidence that the police officers suffered from mental health conditions. The Court denied the motion, because it was "not convinced that disclosure of the information will lead to admissible evidence," noting that "the mere fact that they are police officers does not require disclosure" of psychological records. Montoya v. City of Albuquerque, at 5-6. In this case, on the other hand, the Court has identified substantial indications that the disclosure of Smith's psychological records will lead to admissible evidence. This case involves more evidence than "the mere fact" that Smith is a police officer.

In short, this case involves a federal cause of action and pendent state law claims. The asserted privilege relates to medical and psychological evidence that is relevant to both the federal and state claims. See Vondrak v. City of Las Cruces, 760 F.Supp.2d at 1175. Federal

privilege law thus controls discovery, and the existence of a physician-patient privilege is a question of federal law.  There is no federal physician-patient privilege, and Smith's medical records may lead to admissible evidence.  The Court thus requires the Defendants to amend their Answers that rely on this non-existent privilege.

## II.   THE COURT WILL DENY MOST OF THE MPO, BECAUSE THE REQUESTED INFORMATION IS RELEVANT, NO PRIVILEGES PROTECT IT, AND THE COURT WILL NOT CONDUCT AN IN CAMERA REVIEW AT THE START OF DISCOVERY.

Information on Smith's psychological health is relevant to his credibility as a witness, and thus to his federal and state claims.  It is also highly relevant to Dorato's negligent-hiring-and-retention state claims.  The Court must now determine whether the Defendants have other valid reasons for refusing to produce this information.  Although the Court concludes that Smith has a psychotherapist-patient privilege, Smith may have waived that privilege by sharing some of his records with the APD and the City of Albuquerque.  The Court thus orders Smith to turn over some, but not all, of the information related to his psychological health, although the Court will put in place protocols to protect Smith's privacy as much as possible.

### A.   SMITH WAIVED THE PSYCHOTHERAPIST-PATIENT PRIVILEGE AS TO RECORDS THAT HE WAS AWARE WOULD BE SHARED WITH A THIRD PARTY, SUCH AS THOSE CREATED TO BENEFIT HIS EMPLOYER.

Parties may waive the psychotherapist-patient privilege in two ways.  First, a party "waives the psychotherapist-patient privilege by placing his or her medical condition at issue." Fisher v. Sw. Bell Tel. Co., 361 F. App'x 974, 978 (10th Cir. 2010).  See Simpson v. Univ. of Colorado, 220 F.R.D. 354, 364 (D. Colo. 2004)(Shaffer, J.)("By asserting a specific psychological condition and offering the expert testimony of her treating therapist, Simpson has waived the psychotherapist-patient privilege for purposes of this action.").  Dorato, rather than

the Defendants, has attempted to place Smith's medical conditions at issue.  The Defendants thus have not waived any privileges on this ground.

Second, a party waives the privilege if he or she "has no reasonable expectation that the communications will remain private."  Estate of Turnbow v. Ogden City, 254 F.R.D. 434, 437 (D. Utah 2008)(Warner, J.).  If a party is informed that evaluations, tests, therapy session notes, or any other information will be disclosed to his or her employer, that party cannot have a reasonable expectation of privacy.  See Scott v. Edinburg, 101 F. Supp. 2d 1017, 1020 (N.D. Ill. 2000)(Schenkier, J.)(allowing discovery of psychologist's records, because the police officer was informed that the records could be shared with the police department or subpoenaed during future litigation); Kamper v. Gray, 182 F.R.D. at 599 (holding that police officer had no reasonable expectation of privacy, because "he was aware that his evaluations would be reported to his employer"); James v. Harris Cty., 237 F.R.D. at 611-12 ("The determinative factor assessing the existence of a psychotherapist-patient privilege is whether an officer had a reasonable expectation of confidentiality relating to the post-incident counseling session or evaluation.").

Smith, like the officers in these cases, did not have a reasonable expectation of privacy for psychological information that he knew would be disclosed to the City of Albuquerque, the APD, or any other third party.  The results of a psychological examination used in hiring decisions, for example, are not privileged, and Smith must disclose them.  Psychological records or information generated for Smith's sole benefit, without any indication that they would be shared with a third party, remain privileged.  If, for example, the City of Albuquerque required officers involved in police shootings to visit psychotherapists as an employee benefit, but did not receive the results of the examinations, the results need not be disclosed.  Smith, in short, waived

his psychotherapist-patient privilege by disclosing the substance of therapy sessions to "unrelated third parties."   United States v. Hudson, No. CRIM.A. 13-20063-01, 2013 WL 4768084, *3 (D. Kan. Sept. 5, 2013)(unpublished).

The Defendants attempt to restrict the waiver's scope, arguing that Smith's "submission to a psychological exam as a condition of employment" does not constitute "a blanket waiver of his psychotherapist-patient privilege to anyone and everyone."  Reply to MPO at 11.  They argue that the privilege is not waived when it is "based upon a recommendation of fitness for duty" and when the reports "are kept completely confidential."  Reply to MPO at 11.  The Defendants rely upon Caver v. City of Trenton, which does not fully support their argument.  That case specifically noted that the defendant "clearly had an expectation of confidentiality. He was told and reassured that the psychological records and reports would be kept strictly confidential, and would not be disclosed to the City of Trenton personnel."  192 F.R.D. at 162.  The Court's instructions respect that distinction -- if Smith had a reasonable expectation of confidentiality, his records will remain privileged.  The Defendants do not cite any other cases permitting a partial or selective waiver.

The few cases on point tend to disapprove the use of selective waiver.  United States v. Hudson addresses the question whether a party can selectively waive the psychotherapist-patient privilege.  See 2013 WL 4768084, at *1.  The case involved a defendant applying for disability benefits who disclosed mental health records to both the Kansas Public Employees Retirement System and a confidential informant for the government.  See 2013 WL 4768084, at *1.  The defendant recognized that he had waived the privilege as to the state retirement system, but argued that he had not waived the privilege as to the federal government's use of the same information in his prosecution.  See  2013 WL 4768084, at *4.  The district court rejected his

attempt to selectively waive the privilege, explaining that "[t]he [patient] cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality as to others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit."  2013 WL 4768084, at *4 (citations and quotations omitted).  It also noted that, although the Tenth Circuit has not completely foreclosed the possibility of selective waiver, it has been critical of the concept in the attorney-client privilege context.  See In re Qwest Commc'ns Int'l Inc., 450 F.3d at 1192.

The Court concludes that Smith cannot "invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit."  United States v. Hudson, 2013 WL 4768084, at *4.  If the psychological treatment was provided for Smith's benefit, but the privilege was not otherwise waived, the Court should not order the documents produced.  If, however, Smith knew that others would see the records, or if the treatment or session was primarily for the benefit of the employer, there is no sound reason that the Police Department and the City of Albuquerque should see the documents, but a plaintiff suing Smith on a federal claim, or even the Court, should not see them.  The Defendants must disclose all records as to which Smith had no reasonable expectation of privacy, such as those which were not created solely to benefit Smith.

### B.    THE COURT WILL NOT CONDUCT AN IN CAMERA REVIEW AT THIS EARLY STAGE OF DISCOVERY.

The Court declines the Defendants' suggestion that it should conduct an in camera review of the disputed medical/psychological records at this early stage in the discovery process for three primary reasons.  First, an in camera review would be premature at this stage in the proceedings.  The parties have not yet reviewed the relevant records to determine whether they are subject to any privileges.  The Defendants in particular have wanted the written opinion to

guide their production.  The Court will wait until the parties have reviewed this opinion for guidance, created a privilege log, and developed disputes about the privileged status of specific documents within the larger pool of records; and allow the parties to raise the possibility of in camera review again, when there are few documents, if any, at issue.  This delay will help to narrow the issues for decision.

Second, there are "potentially hundreds, perhaps thousands, of documents which would require review."  United Inv'rs Life Ins. Co. v. Nationwide Life Ins. Co., 233 F.R.D. 483, 486 (N.D. Miss. 2006).  Reviewing the documents before the parties have even attempted to identify their disputes "would constitute a great and unnecessary expenditure of judicial resources." United Inv'rs Life Ins. Co. v. Nationwide Life Ins. Co., 233 F.R.D. at 486.  In Hampton v. City of San Diego, 147 F.R.D. 227 (S.D. Cal. 1993), the defendant police officers asked the court "to comb through seven personnel files and seven internal affairs histories which defense counsel has characterized as 'extensive and voluminous documents and materials.'"  147 F.R.D. at 229-30.  The Court stated that "[t]his is the type of review the attorneys should be conducting long before approaching the court. It is certainly not fair to the taxpayers of this country to have to pay the costs and expenditures of the federal courts for work that attorneys should be doing." 147 F.R.D. at 229-30.  Federal discovery is meant to be self-executing.  It is best when the Court gives guidance as to the law and the parties do the actual work of going through the documents and applying its guidelines.  The Court is reluctant to shift that work from the bar to the Court unless there is a compelling reason.  Although the Court may be willing to conduct an in camera review at a future stage in these proceedings, it agrees with other district courts that a review now would be a costly waste of scarce resources.

Third, although the Court regularly does in camera review, all parties should, as much as possible, avoid shifting the burden because

> courts are rarely, if ever, in the best position to evaluate . . . the importance of the information sought to the plaintiff's case. Judges can, of course, review the pleadings, but they do not have access to depositions, interrogatories, and other discovery responses; and, if they did, the task of reviewing the responses would usually be a daunting one.

Everitt v. Brezzel, 750 F. Supp. 1063, 1067 (D. Colo. 1990)(Nottingham, J.).  See Solis-Marrufo v. Bd. of Comm'rs for Cty. of Bernalillo, No. CIV 11-0107 JB/KBM, 2013 WL 1658304, at *20 (D.N.M. Apr. 4, 2013)(Browning, J.)("The Court stated that, with an in camera review, it does not always know for what to look.").  The parties' counsel are more familiar with the names, places, conditions, and other facts that determine whether a given document is useful and from where it came.  The lack of argument from the parties on why any given document is privileged also "leaves the courts to perform the balancing process in a vacuum."  Everitt v. Brezzel, 750 F. Supp. at 1067.  The plaintiffs cannot make arguments on particular documents, and the defendants are likely to argue that the privilege applies to everything.  See Everitt v. Brezzel, 750 F. Supp. at 1067.

The Defendants contend that other courts faced with similar questions have conducted in camera reviews.  Their citation to Soto v. City of Concord, 162 F.R.D. 603 (N.D. Cal. 1995), is not directly on point.  That case required the defendants to meet a "threshold burden" before it reviewed any documents.  See 162 F.R.D. at 613.  Other courts, like the district court in Estate of Turnbow v. Ogden City, 254 F.R.D. at 436, have simply reached different results on a discretionary decision.  The Defendants do not cite controlling authority indicating that courts "traditionally" conduct in camera review in this situation.  Nov. 16 Tr. at 31:19-25 (Griffin).

### C.    THE COURT WILL NOT PERMIT A FISHING EXPEDITION.

The Defendants contend that disclosing the target materials would "permit plaintiff to engage in a fishing expedition in the hope of supporting his claim."  Response to MCD at 2 (quoting McGee v. Hayes, 43 F. App'x. at 217).  The Court does not intend to make it easy for § 1983 plaintiffs to go fishing through police officers' medical and psychological records.  Unlike attorneys in many cases, however, Dorato provides substantial and credible evidence of medical and psychological ailments relevant to the present dispute.  See Dorato v. Smith, No. CIV 14-0365 JB/GBW, 2015 WL 3540363, at *61 (D.N.M. May 26, 2015)(Browning, J.)(discussing a video recreation of the scene); Electronic Mail Transmission from Karen Salazar, APD, to Marcie Duran, APD, dated April 25, 2011, filed August 18, 2015 (Doc. 105-3)(indicating that Smith was "released to light duty"); Physician Evaluation Form, City of Albuquerque Employee Health Center, dated May 9, 2011, filed August 18, 2015 (Doc. 105-3)(showing knee and shoulder problems); Interoffice Memorandum from R. Mason, Lieutenant, APD to M. Calloway, Deputy Chief of Field Services, APD, dated April 3, 2007, filed August 18, 2015 (Doc. 105-6)(mentioning that Smith has "a history that would warrant" placement with a training officer on his return from military service).  See also Amended Complaint ¶ 81, at 11 ("Upon information and belief, Officer Smith later told his co-workers that he 'blacked out' and had a 'PTSD moment' when he shot and killed Daniel Tillison"); Nov. 16 Tr. at 56:2-6 (Carpenter, Court)("The Court: When did you learn of the statement that [Smith] told another officer that when he shot Mr. Tillison that he blanked out?  Did you know that before the case started?  Ms. Carpenter: I did."); Sept. 14 Tr. at 7:16-18 (Carpenter)("Judge, officer Smith said that Tillison gave him a warrior stare and that made him afraid.").  Dorato obtained at least some of this evidence through pre-litigation informal discovery, including New Mexico's Inspection of Public

Records Act, N.M. Stat. Ann. §§ 14–2–1 to 14–2–12 ("IPRA").  See Nov. 16 Tr. at 54:6-9 (Carpenter)("[B]efore we filed this lawsuit, we did an IPRA request with the City of Albuquerque. . . . They got us a lot of documents."); Sept. 14 Tr. at 10:20-23 (Carpenter)("Judge, the documents that I submitted and attached as exhibits I largely got pursuant to an IPRA request.  I haven't got anything from defendants.").  As the Defendants note, "[d]iscovery . . . is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support."  Response to MCD at 2 (quoting Tottenham v. Trans World Gaming Corp., No. 00 Civ. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)).  The Court will allow Dorato to flesh out her allegations.

The Court emphasizes that materials disclosed will be subject to a strict protective order.  It also notes that it has not made rulings on whether any of this evidence will be admissible at trial.  Moreover, the Defendants may renew their motion for in camera review after they have developed specific disputes over privileges and the parties may contact the Court for assistance in resolving discovery disputes as they arise.

**III.   THE COURT WILL GRANT THE MCD FOR THE REASONS STATED ABOVE, BECAUSE SMITH HAS NO PRIVACY RIGHT PREVENTING DISCLOSURE, AND BECAUSE THE SELF-CRITICAL ANALYSIS PRIVILEGE DOES NOT APPLY.**

Smith's constitutional right to privacy cannot overcome the more compelling state interest in ascertaining the truth, and the Court's protective order will help to minimize the intrusive nature of disclosure.  The Court concludes that the self-critical analysis privilege cannot properly prevent disclosure.  It thus grants Dorato's MCD.

## A.    THE NEED TO ASCERTAIN THE TRUTH OVERRIDES SMITH'S PRIVACY RIGHT IN HIS POLICE FILES.

The Defendants contend that police officers have a constitutional privacy right to prevent the disclosure of matters in their personnel and investigative files.  See Response to MCD at 4. The parties agree that the Tenth Circuit's "Colorado Test" from Denver Policemen's Protective Association v. Lichtenstein, 660 F.2d 432, controls the question.  MCD at 5; Response to MCD at 4-5.  In Denver Policemen's Protective Association v. Lichtenstein, a police union challenged a state court's decision to require the production of police personnel and staff inspection bureau files on constitutional privacy grounds.  See 660 F.2d at 434.  The Tenth Circuit considered: "(1) if the party asserting the right has a legitimate expectation of privacy, (2) if disclosure serves a compelling state interest, and (3) if disclosure can be made in the least intrusive manner." Denver Policemen's Protective Ass'n v. Lichtenstein, 660 F.2d at 435 (citing Martinelli v. Dist. Court In & For City & Cty. of Denver, 199 Colo. 163, 173, 612 P.2d 1083, 1091 (1980)).  The Tenth Circuit concluded that the officers had a legitimate expectation of privacy, because "statements by officers taken in the course of investigation are made with the understanding that they are confidential and will not be used for other purposes."  Denver Policemen's Protective Ass'n v. Lichtenstein, 660 F.2d at 435.  It also recognized the compelling state interest -- "the ascertainment of the truth."  660 F.2d at 436.  Finally, it determined that the state court's decision to review the materials in camera was not "such a gross abuse of privacy as to amount to an abridgement of fundamental constitutional guarantees."  660 F.2d at 436.  It concluded that the compelling state interest outweighed the officers' privacy rights and affirmed the state court's order to disclose the information.  660 F.2d at 436.

The first factor here mirrors the first factor in Denver Policemen's Protective Association v. Lichtenstein.  The Court agrees with the Defendants that they have privacy interests in

personal matters contained within their police files.  See Mason v. Stock, 869 F. Supp. 828, 833 (D. Kan. 1994)(Belot, J.)("Since [Denver Policemen's Protective Ass'n v.] Lichtenstein, the court has continued to recognize a constitutional right to privacy and confidentiality in personal information within government records.").  It concludes, however, the compelling interest in ascertaining the truth overrides the officers' legitimate expectations of privacy.

> Section 1983 represents a balancing feature in our governmental structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special import that suits brought under this statute be resolved by a determination of the truth rather than by a determination that the truth shall remain hidden.

Wood v. Breier, 54 F.R.D. 7, 11 (E.D. Wis. 1972)(Reynolds, J.).  This concern is particularly relevant where the police officer is the only direct eyewitness involved -- any evidence that goes to Smith's credibility could lead to a different result.  Finally, the Court has ordered that all documents be disclosed subject to a strict protective order.  See Order Granting Unopposed Motion for Protective Order for the Contents of the City of Albuquerque's Internal Affairs and Personnel File of Martin Smith and for Martin Smith's Medical and Psychological Records, filed October 5, 2016 (Doc. 119)("Protective Order").  The Protective Order provides for disclosure in the least intrusive manner practicable under the circumstances.  See Denver Policemen's Protective Ass'n v. Lichtenstein, 660 F.2d at 435.

### B.     THE SELF-CRITICAL ANALYSIS PRIVILEGE DOES NOT APPLY.

The Defendants also cite the self-critical analysis privilege as a means to withhold documents.  See Response to MCD at 5.  This privilege protects internal and confidential performance evaluations, internal investigations records, and other documents containing an employer's self-critical analyses.  See Hoffman v. United Telecommunications, Inc., 117 F.R.D. 440, 442 (D. Kan. 1987)(Rushfelt, J.).  It is grounded in a concern that disclosing these

documents "will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards."  Aramburu v. Boeing Co., 885 F. Supp. 1434, 1438 (D. Kan. 1995)(Crow, J.).  The Defendants place their case within this rationale, arguing that the privilege assures "that subordinates within an agency will feel free to provide the decision maker with their uninhibited opinions and recommendations."  Response to MCD at 5 (quoting Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980)).

Most federal courts have declined to apply the self-critical analysis privilege, although many have been ambiguous as to whether or not they recognize it.  See EDWARD J. IMWINKELRIED, supra, § 7.8.1; 5C WRIGHT & MILLER, supra, § 5431 ("[T]here seems little justification for creating a new privilege if the matter sought to be protected falls outside the required reports privilege.").  The Courts of Appeals that have faced the question directly have refused to recognize the privilege.  See Freiermuth v. PPG Indus., Inc., 218 F.R.D. 694, 697 (N.D. Ala. 2003)(Smith, J.)(collecting cases); Johnson v. United Parcel Serv., Inc., 206 F.R.D. 686, 689-90 (M.D. Fla. 2002)(Jones, J.)("In fact, no circuit court of appeals has explicitly recognized the self-critical analysis privilege.").

The Court declines to recognize the privilege and, even if it exists, apply it here, for three primary reasons.  First, "[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."  United States v. Nixon, 418 U.S. 683, 710 (1974).  "It is a venerable legal axiom that privileges are to be narrowly, not expansively, construed."  Mason v. Stock, 869 F. Supp. at 833 (internal quotations omitted).  Courts construe privileges particularly narrowly in § 1983 claims, "where an assertion of privilege must 'overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action.'"  Mason v. Stock, 869 F. Supp. at 833 (internal quotations

omitted).   Second, the Tenth Circuit's only mention of the self-critical analysis privilege appears to disapprove of its use.   See In re Qwest Commc'ns Int'l Inc., 450 F.3d at 1199 (describing this privilege as "recognized for specified situations in a minority of states").   The Tenth Circuit has also expressed some doubt about the privilege's underlying rationale.   It addressed a similar assertion of the "executive or governmental" privilege in Denver Policemen's Protective Association v. Lichtenstein.   See 660 F.2d at 437.   The police in that case argued that, if they could not guarantee confidentiality, "citizens and police officers alike will be reluctant to make statements or likely fail to be completely candid in their statements."   660 F.2d at 437.   The Tenth Circuit responded that "it is doubtful that citizens and police officers will absolutely refuse to cooperate in investigations because of a few isolated instances of disclosure."   660 F.2d at 437.   The Court shares the Tenth Circuit's doubt about the fatal consequences of disregarding this privilege.

Third, other district courts have refused to apply the self-critical analysis privilege to police departments' internal investigations and personnel files.   See Soto v. City of Concord, 162 F.R.D. 603, 612 (N.D. Cal. 1995)(James, J.)("[T]he notion that police departments should be able to completely shield their internal affairs investigatory process from the public offends basic notions of openness and public confidence in our system of justice."); Duenez v. City of Manteca, No. 2:11-CV-1820 LKK AC, 2013 WL 684654, at *11 (E.D. Cal. Feb. 22, 2013)(Claire, J.)(explaining that the Ninth Circuit has refused to recognize the privilege); Taylor v. Los Angeles Police Dep't, No. EDCV99-0383-RT(RCX), 1999 WL 33101661, at *6 (C.D. Cal. Nov. 10, 1999)(Chapman, J.)("[T]his Court agrees with the reasoning of the court in Soto that 'the self-critical analysis privilege should not be applied to police personnel files and records of internal affairs investigations in civil rights suits against police officers.'").   Some courts have

premised their rejection of the privilege on the fact that police departments must continue to prepare internal reports regardless whether they are disclosed or not.  See Skibo v. City of New York, 109 F.R.D. 58, 64 (E.D.N.Y. 1985)(Scheindlin, J.)("The police department needs to continue to monitor itself to ensure that department procedures are effective and that officers are complying with these procedures. It is unlikely that production of the manual and evaluations would halt this self analysis process."); Scott v. City of Peoria, 280 F.R.D. 419, 426 (C.D. Ill. 2011)(Gorman, J.)("[P]ublic entities have an obligation to perform these reviews, and making those reviews subject to public scrutiny ensures that the investigations will be thorough.").

## IV.   THE COURT WILL DENY THE MOTION TO CERTIFY ITS MPO/MCD ORDER TO THE TENTH CIRCUIT.

The Court will deny the Defendants' MTC.  District judges may certify an order to the Courts of Appeals when they determine "[(i)] that such order involves a controlling question of law [(ii)] as to which there is substantial ground for difference of opinion[;] and [(iii)] that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The Court concludes that its MPO/MCD Order does not satisfy any of these conditions.

### A.   THE MPO/MCD ORDER DOES NOT INVOLVE A CONTROLLING ISSUE OF LAW.

The Court agrees with Dorato that the discovery issues discussed in this opinion do not involve controlling issues of law.  The Defendants argue that the Court's MPO/MCD Order decides a controlling issue of law, because it will determine whether Smith must disclose important information and because it is of special consequence to suits against other law enforcement officers.  See MTC at 1; Reply to MTC at 4.

The Court declines to adopt the Defendants' arguments.  As an initial matter, the Court notes that a question need not be dispositive in order to be controlling; a district court may certify it if it "could materially affect the outcome of litigation in the district court."   In re Cement Antitrust Litig. (MDL No. 296), 673 F.2d 1020, 1026 (9th Cir. 1981).  Discovery issues, however, are generally not appropriate for interlocutory review.  See McCann v. Commc'ns Design Corp., 775 F. Supp. 1506, 1534 (D. Conn. 1991)(Cabranes, J.)("[A]n order granting or denying discovery is ordinarily a non-appealable interlocutory order which is reviewable only upon final judgment or order.").   In White v. Nix, 43 F.3d 374, the United States Court of Appeals for the Eighth Circuit held that a district court abused its discretion by certifying its discovery order, which required prison officials to turn over confidential investigative files on a prison assault, for interlocutory appeal.  See 43 F.3d at 377.  The Eighth Circuit explained that "the discretionary resolution of discovery issues precludes the requisite controlling question of law" and refused to review the order as "a matter for the discretion of the trial court."  43 F.3d at 377-78 (internal quotations omitted).  See United States v. Woodbury, 263 F.2d 784, 788 (9th Cir. 1959)(holding that a privilege dispute was "collateral to the basic issues of this case, and cannot be regarded as presenting a 'controlling question of law' as those words are used in the statute")(quoting 28 U.S.C. § 1292(b)).

There are exceptions to this general rule, but they tend to involve evidence more important to the case's ultimate outcome.  See Mohawk Indus., Inc. v. Carpenter, 558 U.S. at 112 ("Section 1292(b) appeals . . . facilitate immediate review of some of the more consequential attorney-client privilege rulings.").   In Commonwealth Edison Co. v. Allis-Chalmers Manufacturing Company, 225 F. Supp. 332 (N.D. Ill. 1963)(Robson, J.) aff'd, 335 F.2d 203 (7th Cir. 1964), the United States District Court for the Northern District of Illinois certified the issue

"whether plaintiffs should be required to answer detailed interrogatories which have been designed to elicit facts on the extent to which plaintiffs have 'passed on' the alleged excess charges paid by them for electrical equipment," because it went "to the heart of these controversies." 225 F. Supp. at 338. The Defendants' obligation to turn over Smith's records does not have the same importance to this dispute. See Stout v. Illinois Farmers Ins. Co., 882 F. Supp. 776, 778 (S.D. Ind. 1994)("The issue of the documents to which plaintiff will have access in building his case is not a controlling question of law. Granted, it will impact the way that the case is tried, but not in a fundamental way."). As in Chevron U.S.A., Inc. v. United States, 83 Fed. Cl. 313, 317 (2008), the records here may be "highly relevant," but "they are not the only evidence that may establish liability." 83 Fed. Cl. at 313. Dorato has done a lot of work and have a lot of evidence; there will be a trial regardless whether the Court orders the production. The Court is thus "unable to represent that interlocutory review will 'materially affect' this litigation, certainly not at this juncture before discovery is complete." 83 Fed. Cl. at 313.

> **B. THE ISSUE THAT THE DEFENDANTS ASK THE COURT TO CERTIFY DOES NOT ALLOW SUBSTANTIAL GROUND FOR DIFFERENCE OF OPINION.**

While the Defendants do not like many of the Court's discovery decisions in this case, the Court is not convinced that what it is doing is as novel, extraordinary, or unusual as the Defendants suggest. The Defendants essentially argue that the Court is deviating from Tenth Circuit precedent by failing to follow Motley v. Marathon Oil Co.'s rule that "[a]s to state causes of action, a federal court should look to state law in deciding privilege questions." MTC at 1 (quoting Motley v. Marathon Oil Co., 71 F.3d at 1551). The Court has adequately distinguished the situation in Motley v. Marathon Oil Co. from the situation in the present case above. That the issue may be one of first impression does not automatically mean that there is substantial

ground for difference of opinion.  See Krangel v. Gen. Dynamics Corp., 968 F.2d at 916.

Moreover, the privilege law that the Court has applied in this case is the privilege law that many

other courts have applied -- it is, in fact, the majority rule.  See STEPHEN A. SALTZBURG,

MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL 501-9 (8th ed.

2002)("We note that most Courts, when confronted with this question, have held that the federal

law of privilege applies to both the federal claim and to the pendent state claim.").  In the end,

the Court believes that it is making very little, if any, new law in this case, but is merely applying

established law to the particular facts of the case.  The Court doubts that other judges would do

much differently than what it has done.  The Court does not agree that there is a substantial doubt

about its discovery decisions.

### C.     AN IMMEDIATE APPEAL WOULD NOT MATERIALLY ADVANCE THE ULTIMATE TERMINATION OF THIS LITIGATION.

Even if the Court concluded that the MPO/MCD Order presents a controlling issue of

law, it would still deny the MTC, because an immediate appeal would not materially advance the

ultimate termination of this litigation.  An immediate appeal advances this termination if it

"would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or

(3) eliminate issues to make discovery easier and less costly."  Coates v. Brazoria Cty. Tex., 919

F. Supp. 2d at 867 (quoting Orson, Inc. v. Miramax Film Corp., 867 F. Supp. at 322).  See

Consub Delaware LLC v. Schahin Engenharia Limitada, 476 F. Supp. 2d 305, 310 (S.D.N.Y.

2007)(Scheindlin, J.) abrogated on other grounds by Shipping Corp. of India v. Jaldhi Overseas

Pte Ltd., 585 F.3d 58, 61 (2d Cir. 2009).  Courts have repeatedly emphasized how rare these

appeals should be, and that they "'should be limited to extraordinary cases in which extended

and expensive proceedings probably can be avoided by immediate final decision of controlling

questions encountered early in the action.'"  State of Utah By & Through Utah State Dep't of

Health v. Kennecott Corp., 14 F.3d at 1495 (quoting S. Rep. No. 2434, 85th Cong., 2d Sess. 1 (1958)(hereinafter S. Rep. 2434), reprinted in 1958 U.S.C.C.A.N. 5255, 5262).  See Carbajal v. Keefer, 51 F. Supp. 3d 1065, 1068 (D. Colo. 2014)("[A]ppeals under this section are exceedingly rare.").

Resolution of the issue raised in the Court's MPO/MCD Order will not expedite the resolution of this matter.  Discovery will continue; a trial is likely.  The appeal will be a parallel proceeding.  The case may be over before the Tenth Circuit rules.  The relevant issue does not involve "a defense disputing the right to maintain the action," on which a decision could swiftly end the lawsuit.  Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 337 (S.D.N.Y. 2012).   Dorato already possesses enough evidence on Smith's physical and psychological health that they likely will proceed to trial regardless of the Court's or the Tenth Circuit's decisions.  The "basic policy of postponing appellate review until after the entry of a final judgment" weighs particularly heavily here, where the Defendants have adequate recourse through a post-judgment appeal.  Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d at 337.  Indeed, if the Court abused its discretion or violated the law, the admission of evidence that never should have been disclosed may be a ground for error or reversal.

**V.     THE COURT HAS ALSO PUT IN PLACE CERTAIN PROTECTIONS TO MINIMIZE AND/OR MITIGATE THE INTRUSION ON SMITH'S PRIVACY.**

The Court has employed certain protections to minimize and/or mitigate the intrusion on Smith's privacy interests.  First, the Court has put in place a rigorous Protective Order.  The documents can be used only in this case and must be handled with care.  Second, the Court has not, as in a normal tort case, ordered Smith to execute medical releases and to turn the releases over to Dorato.  Instead, the Court has ordered the Defendants to gather all of the documents and produce them.  This procedure allows the Defendants to look at them first.

Third, Smith can determine whether to assert the psychotherapist-patient privilege for any documents.  For withheld documents, the Defendants must prepare a privilege log so that Dorato can review and dispute privilege assertions if necessary.  While the Defendants have complained about having to prepare a privilege log, such logs are standard and customary when a privilege is asserted as a reason not to produce documents that are responsive to discovery requests.  See S2 Automation LLC v. Micron Tech., Inc., No. CIV 11-0884 JB/WDS, 2012 WL 3656454, at *17 (D.N.M. Aug. 9, 2012)(Browning, J.)("'It is well settled that failure to produce a privilege log . . . may be deemed waiver of the privilege.'")(quoting Anaya v. CBS Broad., Inc., 251 F.R.D. at 651)).

Fourth, this procedure gives the Defendants an opportunity to see if there are documents that are arguably not relevant to the case.  Dorato has agreed that, if there are documents about STDs or toe fungus, she is not interested in them.  See Nov. 16 Tr. at 60:15-22 (Carpenter); id. at 61:15-62:1 (Carpenter, Court).  If the Defendants do not think that categories of documents are relevant, they can call Dorato first and see if they need to produce them; Dorato may not even want them after she hears a description.  This procedure may considerably reduce the realm of documents that are produced.  The Court notes, to aid further disputes, that it has already ruled that Dorato is entitled to Smith's medical records.  If the Dorato wants a particular category of medical records, she is entitled to it.  The exception is, however, that the Defendants do not have to produce documents that they place on the privilege log, i.e., documents that the psychotherapist-patient privilege covers.

Finally, while the Court is not agreeing to conduct in camera review at this stage, it is not ruling it out down the road.  There may come a time when the Court has to look at documents that the Defendants are withholding under the psychotherapist-patient privilege.  The Court

hopes that in camera review is not necessary, trusting it has given the parties a lot of guidance so far in this case and this opinion.  Also, the Court encourages the Defendants to assert the psychotherapist-patient privilege in good faith and consistent with the law stated here.  For example, the Defendants may not assert the privilege as to records created to vet Smith's psychological health during the hiring process.  See Nov. 16 Tr. at 45:7-17 (Court).  If Smith asserts the privilege for certain records, the Court will likely bar him from using those records to defend himself at trial.  See Sept. 24 Tr. at 25:16-26:15 (Court).

Not every document that mentions the mind, PTSD, or mental health symptoms may be privileged.   The privilege, as stated in Jaffee v. Redmond, applies to "confidential communications between a licensed psychotherapist[15] and her patients in the course of diagnosis or treatment."  518 U.S. at 15.

At the November 16, 2015, hearing, the police union's attorney appeared to express three primary concerns: (i) the privilege's narrow scope; (ii) the breadth of the Court's discovery orders; and (iii) the duration of the Court's discovery orders.  See Nov. 16 Tr. at 41:20-72:15 (Mowrer).  After the Court explained how it would handle the discovery to minimize the intrusion on the police officers' privacy, the police union's attorney stated that he was satisfied with the scope of the privilege:

> THE COURT:  It would seem to me that when they go over to see the psychiatrist or psychologist and that psychiatrist or psychologist is going to report to the City the results, it seems to me that that's a waiver.  It's a bit like when I'm -- it's a poor analogy, but it is an analogy.  When I order a competency exam, they know full well the defendant, that it's going to be [turned over] to me.
>
> MR. MOWRER:  Right.
>
> . . . .

---

[15]The definition of "psychotherapist" also includes licensed psychiatrists and licensed social workers.  Jaffee v. Redmond, 518 U.S. at 15.

THE COURT:  Now, if on the other hand the city did this, I'll hear from Ms. Carpenter, but I think if the city did this, they said look, Mr. Smith, you shot somebody.  We're worried about you.  We're worried about your health.  Or the union said we're worried about your health, go see this psychiatrist ten times.  We don't want to know the results.  This is just for your benefit.  This is just a benefit of the City.  This just like us providing health care.  Where [] we're making you go do it, I think I'd probably leave that as privileged.  So that's the line.  Are you comfortable with that line?

. . . .

MR. MOWRER:  Yes because the issue is judge we don't have any clear distinction like that.  We've never had a clear distinction like that.  And if that's the line and the court is going to protect the line, that takes part of that problem away for sure, because that defeats -- if we cross that line, and that stuff starts coming out, that defeats the intent of making people better when they have been involved right wrong or indifferent in critical incidents.

Nov. 16 Tr. at 46:5-47:20 (Court, Mowrer).

The Court addresses the attorney's second concern with safeguards to ensure that future plaintiffs do not engage in a "shopping spree" of medical record discovery.  Nov. 16 Tr. at 50:22-23 (Mowrer).  Plaintiffs are entitled to medical records only when they can raise a specific and good-faith basis for their requests.  In this matter, Dorato presented evidence of Smith's medical conditions.  The Court will not forbid her to "flesh out allegations for which [she] initially [has] at least a modicum of objective support."  Rivera v. DJO, LLC, 2012 WL 3860744, at *1.

Finally, the Court declines to truncate the relevant time period from ten years to three or five years, because it believes that additional records may be necessary to accurately understand the evolution of certain medical conditions.  Hearing and leg injuries, for example, may take more than ten years to fully develop, and a history of past injuries to the same body part may increase the effect of even minor subsequent trauma.

The Court thus believes that it has minimized the intrusion on the officers' privacy interests as much as possible given the Court's and Dorato's needs for discovery on medical issues.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion to Strike Defendants' Affirmative Defenses and Officer Smith's Defense of Doctor Patient Privilege [Doc. 10], filed May 14, 2014 (Doc. 13), is granted in part and denied in part; (ii) the requests in Defendant Martin Smith's Motion for Protective Order, and Memorandum in Support, filed August 4, 2015 (Doc. 101) are granted in part and denied in part; (iii) the Plaintiffs' Opposed Second Motion to Compel Discovery, filed August 25, 2015 (Doc. 106) is granted; and (iv) the requests in the Defendants' Motion, and Memorandum in Support, for the Court to Certify the Court's Order [Doc. 117] and Pending Memorandum Opinion for Interlocutory Appeal, filed October 12, 2015 (Doc. 121) are denied.  The Defendants must take the following actions:

1.     All medical records and examinations that Defendant City of Albuquerque and/or the City of Albuquerque's contractors have within their possession, custody, or control pertaining to the physical health of Defendant Martin Smith must be turned over to Deputy City Attorney Stephanie Griffin, Smith's attorney, so that they can then be disclosed to Frances Carpenter, Plaintiff Veronica Dorato's attorney.  This obligation applies to records and examinations from any date.

2.     All medical records and examinations that any third party medical provider has within its possession, custody, or control that pertain to Smith's physical health must be turned over to Ms. Griffin, so that they can then be disclosed to Ms. Carpenter.  This obligation applies to records and examinations dating from March 19, 2002 (the date ten years before the incident), to October 2, 2015 (the date of the Court's original Order).

3.      All psychological records and examinations that the City of Albuquerque and/or the City of Albuquerque's contractors have within their possession, custody, or control pertaining to Smith's psychological health must be disclosed to Ms. Griffin so that they can then be disclosed to Ms. Carpenter.  This obligation applies to records and examinations from any date.  This section is subject to the following exceptions:

       a.      All psychological records and examinations that were generated for Smith's sole benefit, and which he has kept confidential, are privileged and shall not be disclosed.

       b.      All psychological records and examinations as to which Smith had a reasonable expectation of privacy, i.e., which were not turned over to the City of Albuquerque, the APD, or some other third party, at the time of the creation of the records and examinations, and which he has kept confidential, are privileged, and shall not be disclosed.

4.      All psychological records and examinations that any third party mental health provider has within its possession, custody, or control pertaining to Smith's psychological health must be disclosed to Ms. Griffin.  Upon receipt of any such records, Ms. Griffin must prepare a privilege log that asserts and sufficiently describes records which are subject to the psychotherapist-patient privilege.  Ms. Griffin must provide a copy of this privilege log and any non-privileged records to Ms. Carpenter.  This obligation applies to records and examinations dating from March 19, 2002 (the date ten years before the incident), to October 2, 2015 (the date of the Court's original Order).

5.      All records requested in the Plaintiffs' Opposed Second Motion to Compel Discovery, filed August 25, 2015 (Doc. 106), must be disclosed to Ms. Griffin, so that they can

then be disclosed to Ms. Carpenter.  This obligation applies to records and examinations from any date.

      6.    Based upon the parties' agreement, the non-public information identified as COA1-COA2; COA12-COA17; COA20-COA32; COA41-COA46; COA52; COA64-COA76; COA78; COA79-COA105; COA185; COA199-COA208; COA215;COA218; COA219-COA223; COA224-COA236; COA240-COA242; COA362-COA366 in the privilege log already provided to Dorato's counsel shall be disclosed to Ms. Carpenter.

      Any medical records, psychological records, and Internal Documents disclosed pursuant to this order to Ms. Carpenter shall be disclosed in accordance with the terms of the Court's Order Granting Unopposed Motion for Protective Order for the Contents of the City of Albuquerque's Internal Affairs and Personnel File of Martin Smith and for Martin Smith's Medical and Psychological Records, filed October 5, 2016 (Doc. 119).

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Frances Crockett Carpenter
Hans Peter Erickson
Frances Crockett, LLC
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Jessica Hernandez
  City Attorney
Stephanie M. Griffin
  Assistant City Attorney
Albuquerque, New Mexico

     *Attorneys for the Defendants*

Frederick Mowrer
Sanchez, Mowrer & Desiderio, P.C.
Albuquerque, New Mexico

*Attorney for the Albuquerque Police Officer's Association*